**LANDMAN CORSI BALLAINE & FORD P.C.**
**One Gateway Center, 4th Floor**
**Newark, New Jersey 07102-5388**
**(973) 623-2700**
**By:   Jerry A. Cuomo (JC-4253)**
**Attorneys for Plaintiff Freedom Mortgage Corporation**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **FREEDOM MORTGAGE CORPORATION,** | Civil Action No. _____ |
| **Plaintiff,** | |
| **v.** | **COMPLAINT and JURY DEMAND** |
| **LOANCARE, LLC (as successor to FNF Servicing, Inc. and LoanCare, a Division of FNF Servicing, Inc.),** | |
| **Defendant.** | |

Plaintiff Freedom Mortgage Corporation ("Freedom") for its Complaint against Defendant LoanCare, LLC alleges as follows:

## NATURE OF THE ACTION

1.      The causes of action asserted in this Complaint arise from numerous contractual breaches, acts, omissions, delays, fraud and misrepresentations by defendant LoanCare, LLC (and/or its predecessors) during its subservicing of hundreds of thousands of mortgage loans for Freedom, including mortgage loans pertaining to property located within New Jersey.

2.      The conduct of defendant LoanCare, LLC (and/or its predecessors) has resulted in losses and damages to Freedom in the tens of millions of dollars.

1

## THE PARTIES

3.      Plaintiff Freedom is a corporation organized under the laws of the state of New Jersey with its principal place of business at 907 Pleasant Valley Avenue, Mount Laurel, New Jersey.

4.      Defendant LoanCare, LLC is a Virginia limited liability company and has an office and place of business at 3637 Sentara Way, Virginia Beach, Virginia.  Upon information and belief after diligent investigation, the members of defendant LoanCare, LLC are citizens of states other than New Jersey.

5.      Defendant LoanCare, LLC was formed and created on or about December 2, 2013.

6.      On or about December 2, 2013, pursuant to filings with the Virginia Secretary of State, FNF Servicing, Inc. (a former Virginia corporation) ("FNF") was converted into defendant LoanCare, LLC.

7.      As a result of this conversion, defendant LoanCare, LLC is the successor to FNF.

8.      Defendant LoanCare, LLC is also the successor to an unincorporated division of FNF which operated under the name "LoanCare."

## JURISDICTION AND VENUE

9.      This Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Freedom and LoanCare, LLC and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over LoanCare, LLC because it has (and/or its predecessors FNF and/or LoanCare, a division of FNF, have) engaged in and continues to engage in

2

continuous and systematic activities within New Jersey.

11.     This Court also has personal jurisdiction over LoanCare, LLC on the basis that it has (and/or its predecessors FNF and/or LoanCare, a division of FNF, have) minimum contacts with New Jersey because it has purposefully engaged in activities within New Jersey and Freedom's causes of action arise, at least in part, from those activities.

12.     Venue is proper in the District of New Jersey because LoanCare, LLC is subject to personal jurisdiction in New Jersey and, therefore, it is deemed to be a resident of New Jersey for purposes of venue. 28 U.S.C. § 1391(b)(1); 28 U.S.C. § 1391(c)(2).

13.     Venue is also proper in the District of New Jersey because a substantial part of the events or omissions giving rise to Freedom's claims against LoanCare, LLC occurred in New Jersey and a substantial part of the property that is the subject of Freedom's action is situated in New Jersey.  28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

**A.     Business of the Parties**

14.     Freedom is a full-service residential mortgage lender licensed in all 50 states, as well as Puerto Rico, the District of Columbia and the Virgin Islands.

15.     Freedom is an approved servicer of loans in good standing with, among others, the Federal Housing Administration ("FHA") of the Department of Housing and Urban Development ("HUD"), the Veterans Administration of the United States of America (now known as the Department of Veterans Affairs) ("VA"), the Federal National Mortgage Association ("Fannie Mae"), and Federal Home Loan Mortgage Corporation ("Freddie Mac").

4852-2765-6497v.1

16.     Freedom is also an approved issuer in good standing with the Government National Mortgage Association ("Ginnie Mae").

17.     According to its website, defendant LoanCare, LLC is in the business of "full service subservicing to the mortgage industry." (http://www.loancareservicing.com/company/) [last visited May 5, 2016]).

18.     Defendant LoanCare, LLC also advertises on its website that it is "approved to service Fannie Mae, Freddie Mac, Ginnie Mae and Federal Home Loan Bank loans. We are also an approved Veterans Administration, Federal Housing Authority, Rural Housing and HAMP servicer" and that it "specialize[s] in subservicing first and second liens, as well as non-performing loans and consumer loans including HELOCs and unsecured loans." (http://www.loancareservicing.com/company/who-we-are/credentials/) [last visited May 5, 2016]).

**B.      The Freedom-LoanCare Subservicing Agreement**

19.     As of April 1, 2005, Freedom was a party to a certain Subservicing Agreement with "LoanCare, a Division of FNF Servicing, Inc." ("the Original Agreement").

20.     On February 1, 2010, Freedom and "LoanCare, a Division of FNF Servicing, Inc." entered into an Amended and Restated Subservicing Agreement ("the Subservicing Agreement"). A copy of the Subservicing Agreement is attached hereto as **Exhibit 1**.

21.     A purpose of the Subservicing Agreement was to amend and restate the Original Agreement.

22.     Defendant LoanCare, LLC is the successor to the rights, duties, obligations and liabilities of "LoanCare, a Division of FNF Servicing, Inc." and FNF, including any and all rights,

4852-2765-6497v.1

duties, obligations and liabilities under the Subservicing Agreement.  Hereinafter, all references to "LoanCare" shall include defendant LoanCare, LLC in its own capacity and as successor to FNF and "LoanCare, a Division of FNF Servicing, Inc."

23.     The term of the Subservicing Agreement was through January 31, 2012, with successive renewal terms of two (2) years, if not earlier terminated by either party. (§ 5.1).[1]

24.     By Second Amendment to the Subservicing Agreement (dated January 4, 2016) entered into by Freedom and LoanCare, the term of the Subservicing Agreement shall expire on June 30, 2016.

25.     The Subservicing Agreement provides that it is governed by and will be construed in accordance with Virginia law. (§ 10.6).

26.     Pursuant to the terms and conditions of the Subservicing Agreement, LoanCare agreed to subservice certain loans as to which the respective owners of the loans had granted Freedom full servicing rights.

27.     In performing under the Subservicing Agreement, LoanCare is obligated to "discharge its duties, covenants and obligations as subservicer in accordance with [the Subservicing Agreement] with a degree of care that is no less than that provided by industry subservicers generally." (§ 2.9(a)).

28.     In performing the Subservicing Agreement, LoanCare is obligated to comply with certain "Applicable Requirements," as defined in the Subservicing Agreement. (§ 2.2).

29.     The Applicable Requirements which LoanCare is obligated to follow include, but are not limited to:

---

[1]     Unless otherwise indicated, citations herein are to the Subservicing Agreement (**Exh. 1**).

4852-2765-6497v.1

a.      the Subservicing Agreement itself (§ 1.8((i));

b.      the pertinent "Loan Documents," which are defined in the Subservicing Agreement to include, but are not limited to, any promissory notes, mortgage documents, and hazard or flood insurance policies (§§ 1.8(ii), 1.31);

c.      the selling or servicing guides, handbooks and/or manuals, bulletins and announcements issued by Fannie Mae, Freddie Mac, Ginnie Mae, HUD and the VA (§§ 1.8(iii), 1.25);

d.      any additional written instructions received by LoanCare from Fannie Mae, Ginnie Mae, HUD, the VA, the Federal Home Loan Bank or any other person having an interest in a loan (§§ 1.8(iv), 1.28, 1.29);

e.      any applicable federal, state and local laws and related regulations (§ 1.8(v)); and

f.      the applicable guidelines, regulations and requirements of any government agency, board, commission, instrumentality, body or officer having jurisdiction with respect to the loans (§ 1.8(vi)).

30.     Among other things, LoanCare is obligated under the Subservicing Agreement to: collect payments of principal, interest and escrowed sums to be held for payment of taxes and insurance (§§ 2.3(a-h)); maintain and monitor all required mortgage and hazard insurances (§§ 2.3(i), 2.3 (j)); inspect mortgaged properties (§ 2.3(k)); and secure all vacant and abandoned properties (§ 2.3(l)).

31.     Under the Subservicing Agreement, LoanCare is obligated to take "commercially

reasonable steps to maintain the maximum possible number of Loans in a current status by dealing quickly and prudently with Borrowers that are delinquent or in default." (§ 2.5(a)).

32.     In the event that a delinquent mortgage loan enters the foreclosure process, LoanCare is obligated under the Subservicing Agreement to, and in accordance with the applicable investor and insurer guidelines, perform a number of functions to manage that foreclosure, including, but not limited to:

    a.      recording the notice of default and accelerating the maturity of the loans;

    b.      instituting proceedings to foreclose the loan in accordance with the applicable loan documents through judicial sale or other acquisition;

    c.      selecting counsel to manage the foreclosure proceedings;

    d.      transferring title to the mortgaged property to the appropriate agency; and

    e.      securing and maintaining the mortgaged property. (§ 2.5(d)).

33.     LoanCare was also obligated to manage "the filing of all reimbursement claim forms and the collection of any applicable Mortgage insurance." (§ 2.5(d)(iii)).

34.     Exhibit G to the Subservicing Agreement (entitled "Roles and Responsibilities Matrix") sets forth a number of additional obligations of LoanCare, including its obligations as to the foreclosure process. (Exh. G, pp. 69-70).

35.     For example, LoanCare is obligated to:

    a.      "perform all foreclosure work according to investor and insurer guidelines";

    b.      "provide all payoff/reinstatement quotes";

    c.      "monitor all foreclosure timeframes" and "monitoring of all loans in

7

foreclosure"; and

      d.    "Follow the investor/insurer allowable fee schedule" and "the Fannie Mae allowable fee schedule." (Exh. G, § VII(D)(1, 13, 14, 15, 21, 22), p. 69).

36.    The Subservicing Agreement also provides that LoanCare's "preferred attorney network will be utilized for all foreclosure work." (Exh. G, § VII(D)(5), p. 69).

37.    Under the Subservicing Agreement, LoanCare was obligated to file certain claims for Freedom's benefit for reimbursement of unpaid principal balances, interest, fees and costs as to the foreclosed properties in accordance with the guidelines applicable to such claims. (Exh. G, § VII(E), p. 70).

38.    For example, LoanCare was obligated to file and pursue through completion:

      a.    HUD "Part A" claims associated with HUD mortgage insurance claims;

      b.    HUD "Part B" claims associated with HUD mortgage insurance claims;

      c.    claims to the VA with respect to their respective guarantees of certain mortgage loans;

      d.    claims under private mortgage insurance ("PMI"); and

      e.    claims associated with reimbursement of advances for Fannie Mae and Freddie Mac loans. (Exh. G, § VII(E)(2-8), p. 70).

39.    Under the Subservicing Agreement, LoanCare was also obligated to provide loss mitigation recommendations to Freedom and to file all claims with the appropriate agency for collection of any available incentive fees related thereto. (Exh. G, § VII(B), p. 68).

40.    If LoanCare entered into a loss mitigation option with a borrower, incentive fees

payable from the mortgage loan insurer, investor or guarantor were paid directly to Freedom.

41.     In exchange for performing the services required by the Subservicing Agreement, LoanCare was paid certain fees on a monthly basis, which were credited each month against amounts owed by LoanCare to Freedom. (§ 4.1(a-d)).

42.     Pursuant to the Subservicing Agreement, LoanCare was entitled to certain standard base fees for servicing loans, which fees were tiered based upon the type of loan and the number of loans being serviced. (Schedule II, A –"Standard Fees", p. 42).

43.     In addition to these standard base fees, LoanCare was entitled to additional fees in the event LoanCare rendered loss mitigation services as to a particular loan, such as arranging an informal payment plan or formal forbearance plan with a borrower. (Schedule II, B – "Loss Mitigation Services", p. 44).

44.     LoanCare was also entitled to reimbursement of any "Advances" (as defined in the Subservicing Agreement) that it made while servicing the loans. (§§ 4.1(b), 4.1(d)).

45.     "Advances" were also reimbursed to LoanCare in the form of a credit each month against amounts owed by LoanCare to Freedom.

46.     Subject to certain enumerated exceptions, the Subservicing Agreement provides that LoanCare "shall indemnify, defend and hold harmless [Freedom] from any Losses resulting from or arising out of: (i) the material failure of [LoanCare] to perform all of its material obligations in compliance with the terms of the [Subservicing Agreement]; (ii) a material breach of [LoanCare]'s representations and warranties; or (iii) gross negligence arising solely from its own acts or omissions or the willful misconduct of [LoanCare] in performing its obligations hereunder." (§ 8.2).

4852-2765-6497v.1

47.     Freedom and LoanCare entered into "Statements of Work" dated February 22, 2012 and January 18, 2013, as to the parties' respective obligations with respect to Freedom's participation in HUD's Single Family Loan Sales Program ("SFLS Program").

48.     These "Statements of Work" ("the SFLS SOWs") supplemented the Subservicing Agreement.

49.     Under the SFLS SOWs, LoanCare agreed, among other things, to file and pursue through completion, the HUD Part A and Part B claims associated with loans eligible for participation in the SFLS Program.

**C.     LoanCare's Acts and Omissions**

50.     During its performance under the Subservicing Agreement, numerous acts and omissions by LoanCare constituted material breaches of the Subservicing Agreement and caused losses and damages to Freedom.

### *1.     HUD Part A and Part B Claims*

51.     The FHA, part of HUD, provides mortgage insurance with respect to single-family home loans originated by FHA-approved lenders, such as Freedom, under prescribed terms.

52.     If a borrower defaults on its payment obligations under the FHA-insured mortgage loan, the FHA-approved lender and mortgage holder may submit a claim to HUD for insurance benefits.

53.     HUD will then pay the lender the balance of the loan (together with interest due and other costs) and assume ownership and possession of the property.

54.     The process for claiming insurance benefits requires the timely submission to HUD of

4852-2765-6497v.1

a "Part A" claim and "Part B" claim.

55.     In its HUD Part A Claim, the FHA-approved lender seeks reimbursement from HUD for the full unpaid principal balance of the FHA-insured mortgage loan, plus interest at a governmentally-mandated debenture rate.

56.     If the process of the acceleration of the note, completion of the foreclosure or liquidation process and the filing of the Part A Claim is not prosecuted in a timely or thorough manner in accordance with all applicable HUD rules and regulations, HUD will "curtail" the claim.

57.     When a claim is "curtailed", HUD reimburses the FHA-insured lender less than the full amount that it would otherwise have been reimbursed had the process of the acceleration of the note, completion of the foreclosure or liquidation process and Part A Claim been pursued in accordance with the applicable rules and regulations.

58.     After title to the foreclosed or liquidated property has been conveyed to HUD, the FHA-approved lender must submit its HUD Part B Claim for reimbursement of expenses.

59.     In its HUD Part B Claim, the FHA-approved lender seeks reimbursement from HUD of certain fees and costs associated with the foreclosure or liquidation process, including, for example, attorneys' fees, court costs, taxes, utilities, and property preservation and protection costs.

60.     As part of the HUD Part B Claim, the FHA-approved lender may also recover debenture interest on its fees and costs, provided, however, that if the lender's Part A Claim was curtailed by HUD, its Part B Claim will similarly be curtailed.

61.     Under the Subservicing Agreement, LoanCare was responsible for timely filing and pursuing to completion all HUD Part A and HUD Part B Claims as to FHA-insured loans that it was

servicing for Freedom.

62.     In filing and pursuing HUD Part A Claims, LoanCare failed to comply with the applicable rules and regulations resulting in various curtailments on Part A claims.

63.     For example, LoanCare failed to pursue HUD Part A Claims in a timely manner and missed various deadlines, resulting in curtailments.

64.     By way of further example, required forms prepared by LoanCare in connection with the HUD Part A Claim were incomplete or contained incorrect information, again resulting in curtailments.

65.     LoanCare also failed to seek extensions, which would have reduced the curtailment applied by HUD to numerous claims.

66.     For each HUD Part A Claim that was curtailed as a result of LoanCare's conduct, the HUD Part B Claim as to the same loan was also curtailed.

67.     The Collingwood Group ("Collingwood") was engaged by LoanCare and Freedom to complete an independent review of certain of Freedom's Part A Claims submitted by LoanCare to HUD and which were curtailed by HUD.

68.     Collingwood issued a written report of its findings dated March 20, 2014.

69.     With respect to 113 HUD Part A Claims, Collingwood made determinations as to whether Freedom or LoanCare was responsible for HUD's curtailment of the claim.

70.     Collingwood determined that LoanCare was responsible for the curtailments on 100 of the 113 HUD Part A Claims and the resulting losses to Freedom as to those claims.

71.     Collingwood also determined that, because the HUD Part A Claims for certain loans

12

were curtailed by HUD, the HUD Part B Claim for those loans would also be curtailed and would result in additional losses to Freedom.

72.     Freedom has identified that LoanCare's contractual breaches, acts, omissions and delays resulted in curtailments calculated by Freedom through March 31, 2016 with respect to 1,225 HUD Part A Claims resulting in approximately $15,419,560.74 in losses to Freedom (including certain losses associated with the EverBank Loans (as defined in ¶ 156, *infra*)).

73.     Freedom has identified that LoanCare's contractual breaches, acts, omissions and delays resulted in curtailments calculated by Freedom through March 31, 2016 with respect to 863 HUD Part B Claims resulting in approximately $1,781,453.98 in losses to Freedom (including certain losses associated with the EverBank Loans (as defined in ¶ 156, *infra*)).

74.     On or about September 30, 2015, HUD's Office of the Inspector General ("OIG") issued a report setting forth the results of an independent audit of LoanCare's handling of insurance claims submitted to HUD as to ten (10) FHA-insured mortgages which backed securities issued by Ginnie Mae.

75.     In reviewing those loans, OIG concluded that LoanCare had committed several of the same violations of the applicable rules and regulations as it did when subservicing the Freedom loans.

76.     OIG concluded that:

a.      As to six (6) of the loans it reviewed, LoanCare did not convey the foreclosed-upon property to FHA in a timely manner in accordance with the applicable HUD regulations.

b.      As to five (5) of the loans it reviewed, LoanCare failed to timely file HUD

13

Part B claims.

        c.    As to four (4) of the loans it reviewed, LoanCare failed to timely remit funds received at the conclusion of the claim to Ginnie Mae.

77.    OIG concluded that LoanCare "did not take prompt actions on foreclosed upon properties it services for Ginnie Mae. These delays negatively impacted FHA's insurance fund because of extra outflows. They also affected Ginnie Mae due to delays in receiving claim funds and lost interest."

78.    As a result of its investigation, OIG recommended that Ginnie Mae "require LoanCare to repay any additional costs associated with the violations" outlined in the OIG's September 30, 2015 report.

### 2.    *SFLS Program - HUD Part A and Part B Claims*

79.    The SFLS Program is intended to accelerate the processing and payment by HUD of insurance claims on defaulted single-family mortgage loans, to preserve or increase the value of the defaulted loan and to increase recovery by HUD.

80.    Through the SFLS Program, as an alternative to foreclosure, HUD agrees to accept an assignment of certain defaulted single-family FHA-insured mortgage loans and to pay the participating servicer's insurance claim.

81.    HUD then pools and sells the assigned mortgage loans through a competitive auction.

82.    Beginning in 2012, Freedom acted as a participating servicer in the SFLS Program.

83.    Certain of the loans being subserviced by LoanCare for Freedom pursuant to the Subservicing Agreement were eligible for assignment to HUD through the SFLS Program.

4852-2765-6497v.1

84.     Pursuant to the Subservicing Agreement, as amended by the SFLS SOWs, LoanCare was responsible for filing and pursuing through completion all HUD Part A and HUD Part B Claims as to the FHA-insured loans being assigned to HUD through the SFLS Program.

85.     In filing and pursuing these HUD Part A and Part B Claims, LoanCare failed to comply with the applicable rules and guidelines, resulting in losses of approximately $1,115,093.43 to Freedom as calculated by Freedom through January 31, 2016.

### 3.     *Private Mortgage Insurance Claims*

86.     Private Mortgage Insurance or "PMI" is insurance that protects lenders from mortgage default risk.

87.     PMI is designed to shift the risk of loss from the lender to the insurer in the event that the borrower defaults on the mortgage note and there is a deficiency after foreclosure and sale.

88.     Under the Subservicing Agreement, LoanCare was responsible for filing and pursuing through completion PMI claims on behalf of Freedom with respect to loans on which the borrower defaulted.

89.     In filing and pursuing certain PMI claims under policies which protected Freedom, LoanCare failed to comply with the applicable policy requirements.

90.     As a result, certain PMI claims filed by LoanCare on behalf of Freedom were denied, in whole or in part, resulting in losses to Freedom.

91.     Freedom has identified that LoanCare's contractual breaches, acts, omissions and delays resulted in the denial, in whole or in part, of approximately seven (7) PMI claims calculated by Freedom through March 31, 2016, and resulting in approximately $318,410.20 losses to Freedom.

4852-2765-6497v.1

### 4.    *Veterans Administration Claims*

92.    The VA provides housing assistance to qualified veterans by guaranteeing certain home mortgage loans made to veterans by lenders.

93.    In the event of a default by a borrower on a VA-guaranteed mortgage loan, the lender is required to notify the VA in accordance with the applicable VA rules, regulations and requirements before foreclosing on the mortgaged property.

94.    The VA may then either purchase the loan, or advise the lender to proceed with the foreclosure action.

95.    If the VA directs the lender to proceed with foreclosure, the foreclosure proceeds in accordance with applicable state law.

96.    If a deficiency remains on the loan after the foreclosure sale, a claim for the deficiency may be submitted by the lender to the VA in accordance with the applicable VA rules, regulations and requirements.

97.    After the foreclosure sale has occurred, the lender may convey title to the property to the VA in accordance with the applicable VA regulations.

98.    If the lender fails to timely convey the property to the VA or to timely submit a claim for reimbursement, the VA reimburses the lender less than the full amount that would otherwise have been reimbursed had the lender acted timely.

99.    Numerous loans which LoanCare was subservicing for Freedom pursuant to the Subservicing Agreement were guaranteed by the VA.

100.    Under the Subservicing Agreement, LoanCare was responsible for filing and pursuing

to completion all claims to the VA on behalf of Freedom with respect to loans on which the borrower defaulted.

101.   In filing and pursuing claims with the VA, LoanCare failed to comply with the applicable VA rules, regulations and requirements.

102.   As a result, claims filed with the VA by LoanCare on behalf of Freedom were denied, in whole or in part, and curtailments occurred, resulting in losses to Freedom.

103.   Freedom has identified that LoanCare's contractual breaches, acts, omissions and delays resulted in the significant curtailments associated with claims filed with the VA, which have caused losses to Freedom, which losses are still accruing.

### 5.   *Fannie Mae "Compensatory Fees" and Other Omissions*

104.   Fannie Mae purchases residential mortgage loans from mortgage originators and holds the loans in its own portfolio or packages them into mortgage-backed securities sold to investors.

105.   Fannie Mae contracts with loan servicers to collect mortgage payments and handle other customary loan servicing functions.

106.   Under Fannie Mae's servicing guidelines, it is permitted to charge servicers certain "compensatory fees" in the event of certain delays related to the servicing or foreclosure of loans in Fannie Mae's portfolio.

107.   With respect to a servicer's actions related to a foreclosure, Fannie Mae will assess compensatory fees against a servicer when the time period from the date a loan delinquency began through the foreclosure sale date is longer than the maximum number of allowable days as

17

established by Fannie Mae, which varies by state.

108.   Numerous loans which LoanCare was subservicing for Freedom pursuant to the Subservicing Agreement were Fannie Mae loans.

109.   Under the Subservicing Agreement, LoanCare was responsible for filing with Fannie Mae and pursuing through completion all claims on behalf of Freedom as to Fannie Mae loans on which the borrower defaulted.

110.   LoanCare's contractual breaches, acts, omissions and delays resulted in Fannie Mae assessing compensatory fees against Freedom, which Freedom has paid, with respect to approximately 678 loans in the approximate amount of $3,341,640.16.

111.   Additionally, prior to conveyance of foreclosed-upon mortgaged properties to Fannie Mae, the servicer is obligated to assure that title is free and clear of any encumbrances.

112.   During foreclosure proceedings related to certain mortgaged properties which served as collateral for Fannie Mae loans, LoanCare failed to assure that title was free and clear when transferred from Freedom to Fannie Mae.

113.   For example, LoanCare failed to assure that homeowner's association fees, taxes and/or utility bills were paid before title was transferred to Fannie Mae.

114.   As a result, Fannie Mae was compelled to pay approximately $300,404.84 of these outstanding fees, bills and taxes and is seeking reimbursement from Freedom.

115.   Freedom must reimburse $300,404.84 to Fannie Mae.

   6.   ***Fannie Mae Form 571 Advances***

116.   Fannie Mae permits servicers to seek reimbursement for funds it has advanced for

4852-2765-6497v.1

certain purposes in connection with servicing or foreclosing upon Fannie Mae loans.

117.    Such advances in connection with foreclosures may be, for example, for attorneys'
fees, recordation fees, publication costs, sheriff's fees, costs of title examination/abstract and/or costs
related to preservation of the property (such as cleaning, maintenance, pest inspection, and trash and
snow removal).

118.    A servicer seeks reimbursement for such advances by timely submitting a "Form 571"
to Fannie Mae in accordance with Fannie Mae's rules and regulations.

119.    Fannie Mae will not reimburse a servicer's advances if the Form 571 is not submitted
timely or if an advance is not included on the submitted Form 571.

120.    Numerous loans which LoanCare was subservicing for Freedom pursuant to the
Subservicing Agreement were Fannie Mae loans.

121.    Under the Subservicing Agreement, LoanCare was responsible for filing and pursuing
to completion the reimbursement of advances made as to Fannie Mae loans by timely submitting a
properly detailed Form 571.

122.    LoanCare's contractual breaches, acts, omission and delays have resulted in Fannie
Mae's rejection of requests for reimbursement of advances set forth on Form 571s submitted by
LoanCare on behalf of Freedom as to approximately 90 Fannie Mae loans and resulted in losses to
Freedom of approximately $143,348.17.

### 7.    *Fannie Mae "REO Grams"*

123.    Servicers of Fannie Mae loans are required to notify Fannie Mae via a REO Gram
within 24 hours after a foreclosure sale of a Fannie Mae REO (real estate owned) property.

4852-2765-6497v.1

124. Under Fannie Mae's rules and regulations, Fannie Mae is entitled to assess compensatory fees against the servicer in the event the REO Gram is not submitted timely to Fannie Mae.

125. LoanCare failed to timely submit REO Grams to Fannie Mae in connection with numerous foreclosure sales, resulting in $43,600 in compensatory fees being assessed against Freedom.

### 8. *Failure to Cancel Homeowner's Insurance on Fannie Mae REO Properties*

126. When servicers of Fannie Mae loans are notified by Fannie Mae that any REO property has been sold, the servicer is required to cancel the homeowner's insurance on the property.

127. LoanCare failed to cancel the homeowner's insurance covering several Fannie Mae REO properties after they were sold.

128. LoanCare's failures resulted in losses to Freedom in the amount of $2,696.97.

### 9. *Loss Mitigation Incentive Fee Claims*

129. Certain owners, insurers or guarantors of mortgage loans, including Fannie Mae, FHA/HUD and the VA, offer incentives to servicers to evaluate delinquent mortgage loans for potential loss mitigation options as an alternative to foreclosure.

130. Loss mitigation options include entering into an informal payment plan, a formal forbearance or repayment plan, a loan modification, a short sale or a deed-in-lieu of foreclosure.

131. Because these and other available loss mitigation options may reduce the losses they might sustain through foreclosure, certain mortgage loan owners, insurers and guarantors (including

4852-2765-6497v.1

Fannie Mae, FHA/HUD and the VA) offer financial incentives to their servicers to successfully identify loans appropriate for loss mitigation workouts.

132.     Under the Subservicing Agreement, LoanCare was obligated to perform all required loss mitigation options and to file all claims with the appropriate agency for collection of the incentive fee. (Exh. G, § VII(B), p. 68).

133.     LoanCare implemented loss mitigation alternatives as to numerous loans it was servicing for Freedom pursuant to the Subservicing Agreement, but failed to submit a claim to the appropriate agency to collect the incentive fee on behalf of Freedom.

134.     LoanCare's contractual breaches, acts and omissions with respect to its failure to file claims for loss mitigation incentive fees resulted in losses to Freedom.

### 10.    *USDA Claims*

135.     The United States Department of Agriculture ("USDA") acts as a guarantor of certain mortgage loans issued by approved lenders to assist borrowers in purchasing single-family homes in certain rural areas.

136.     USDA-guaranteed loans provide lenders with a guarantee as to a portion of the loss of principal and interest in the event of foreclosure on the loan.

137.     Numerous loans which LoanCare was subservicing for Freedom pursuant to the Subservicing Agreement were guaranteed by the USDA.

138.     Under the Subservicing Agreement, LoanCare was responsible for filing and pursuing to completion all claims to the USDA on behalf of Freedom with respect to USDA-guaranteed loans on which the borrower defaulted.

21

139.     In filing and pursuing claims with the USDA, LoanCare failed to comply with the applicable USDA rules and regulations.

140.     As a result, claims filed with the USDA by LoanCare on behalf of Freedom were denied, in whole or in part, resulting in losses to Freedom.

141.     Freedom has identified that LoanCare's contractual breaches, acts, omissions and delays resulted in the denial, in whole or in part, of approximately eleven (11) claims filed with the USDA, resulting in approximately $1,132,969.50 in losses to Freedom.

### *11.     Miscellaneous Servicing Errors*

142.     In servicing loans on behalf of Freedom under the Subservicing Agreement, LoanCare breached a number of its other contractual obligations, resulting in losses and damages to Freedom.

143.     For example, LoanCare is obligated under the Subservicing Agreement to preserve or protect vacant or abandoned mortgage properties serving as collateral for numerous mortgage loans subserviced by LoanCare.  (§ 2.3(i); Exh. G, § VII(G), p. 70).

144.     LoanCare breached this obligation as to numerous mortgaged properties by, for example, failing to make necessary repairs to the property or failing to perform preventative or seasonal maintenance (such as preparing the property for the cold during winter months), which resulted in physical damage to the mortgaged property.

145.     As a further example, LoanCare is obligated to maintain hazard insurance on the mortgaged properties and pursue hazard insurance claims.  (§ 2.3 (j); Exh G, § VII(E), p. 70).

146.     With respect to certain mortgaged properties, LoanCare failed to maintain hazard insurance and, as a result, property damage at certain mortgaged properties occurred, but was not

insured.

147.   As to other properties, LoanCare failed to file, timely file or diligently pursue hazard insurance claims.

148.   As a result of LoanCare's foregoing contractual breaches, acts and omissions, Freedom incurred losses and damages.

149.   For example, Freedom was compelled to incur costs to perform repairs or preventative maintenance which LoanCare failed to undertake.

150.   By way of further example, Freedom was compelled to repair damages to mortgaged properties which were uninsured due to LoanCare's failure to assure that proper insurance was in place.

151.   Freedom has identified that LoanCare's contractual breaches, acts, omissions and delays as set forth above caused damages and losses in the approximate amount of $2,051,273.45 as calculated by Freedom through March 31, 2016 with respect to properties that are the subject of eight (8) loans which were subserviced by LoanCare for Freedom pursuant to the Subservicing Agreement.

152.   Upon information and belief, LoanCare's contractual breaches, acts, omissions and delays are likely to expose Freedom to similar damages and losses with respect to hundreds of additional properties that are the subject of loans which were serviced by LoanCare for Freedom pursuant to the Subservicing Agreement.

### 12.   *LoanCare's Loss of Loan Files*

153.   During the course of its subservicing of Freedom's loans, LoanCare has lost several loan files which had been in its custody, possession and control.

154.    As a result of LoanCare's loss of these files, Freedom faces a variety of potential losses or damages in the future, including those associated with Freedom's potential obligation to re-purchase the missing loans from investors.

**D.    Freedom's Agreements with EverBank**

155.    Freedom and EverBank entered into Sale Agreements dated July 1, 2010, September 1, 2010 and December 1, 2010 ("the EverBank Sale Agreements").

156.    In the EverBank Sale Agreements, Freedom sold to EverBank its ownership interest in numerous FHA-insured mortgage loans ("the EverBank Loans").

157.    Although Freedom sold the EverBank Loans to EverBank, it retained the obligation to service them.

158.    Freedom and EverBank entered into Servicing Agreements dated July 1, 2010, September 1, 2010 and December 1, 2010 ("the EverBank Servicing Agreements").

159.    In the EverBank Servicing Agreements, Freedom agreed to continue to service (directly or through LoanCare) the EverBank Loans.

160.    In the EverBank Servicing Agreements, Freedom and EverBank acknowledged that Freedom had previously contracted with LoanCare for the servicing of the EverBank Loans.

161.    Under the EverBank Servicing Agreements, Freedom agreed to service the EverBank Loans in accordance with the EverBank Servicing Agreements, or to cause LoanCare to do so.

162.    Under the EverBank Sale Agreements, Freedom agreed to indemnify and hold EverBank harmless in connection with, *inter alia*, losses related to: (a) the "liquidation of" an EverBank Loan; and (b) the non-fulfillment by Freedom of any covenant set forth in the EverBank

24

Sale Agreements or in the EverBank Servicing Agreements.

163.    Under the EverBank Servicing Agreements, Freedom agreed to indemnify and hold EverBank harmless in connection with, *inter alia*, losses related to: (a) the "liquidation of" an EverBank Loan; and (b) the failure of Freedom or LoanCare to service the EverBank Loans in accordance with the EverBank Servicing Agreements.

164.    LoanCare's subservicing of the EverBank Loans is also subject to the Subservicing Agreement.

165.    LoanCare has committed various contractual breaches, acts, omissions and delays in connection with the prosecution of HUD Part A and Part B claims related to certain of the EverBank Loans, which have caused EverBank to sustain losses.

166.    As a result, EverBank has sought indemnity and reimbursement from Freedom.

167.    As a result of LoanCare's contractual breaches, acts, omission and delays in subservicing the EverBank Loans, Freedom has paid significant monies to reimburse and indemnify EverBank (such amounts are included within the losses set forth in ¶¶ 72, 73, *supra*).

E.    **LoanCare's Misrepresentations**

168.    On a monthly basis, LoanCare provided written reports to Freedom which included information as to the loans it was servicing for Freedom pursuant to the Subservicing Agreement.

    *1.    Number of Active Loans*

169.    Among the information that LoanCare reported to Freedom on a monthly basis was a list of the active loans currently then being serviced by LoanCare.

170.    Under the Subservicing Agreement, LoanCare was entitled to a monthly credit against

monies it owed to Freedom in the amount of its monthly standard base fee.

171.    LoanCare's monthly standard base fee was determined based upon the number of active loans appearing on LoanCare's monthly written report to Freedom.

172.    Accordingly, the monthly fee that LoanCare retained, and deducted from amounts owed by LoanCare to Freedom, was based directly upon the number of active loans LoanCare listed on its applicable monthly report to Freedom.

173.    On numerous LoanCare monthly written reports to Freedom, LoanCare misrepresented that numerous loans were active when, in truth, the loans were no longer active and were not being serviced by LoanCare.

174.    LoanCare was not entitled to any fees as to those inactive loans.

175.    As a result of the foregoing misrepresentations contained in LoanCare's monthly written reports supplied to Freedom, Freedom paid significant standard base fees to LoanCare to which LoanCare was not entitled under the Subservicing Agreement.

### 2.    *Loans in Loss Mitigation and Foreclosure*

176.    Among the information that LoanCare reported to Freedom on a monthly basis was a listing of loans for which LoanCare was then providing loss mitigation and foreclosure services.

177.    The Subservicing Agreement also entitled LoanCare to a monthly credit against monies owed to Freedom for fees associated with LoanCare's rendering of loss mitigation and foreclosure services.

178.    The amount of LoanCare's additional fees for loss mitigation and foreclosure services was based upon the number of active loans shown on LoanCare's monthly written reports to

4852-2765-6497v.1

Freedom as involving loss mitigation and foreclosure services.

179.     Accordingly, the additional monthly fee for loss mitigation and foreclosure services that LoanCare retained, and deducted from amounts owed to Freedom, was based directly upon the number of active loans reported by LoanCare on its monthly reports as involving loss mitigation and foreclosure services.

180.     On numerous of LoanCare's monthly written reports supplied to Freedom, LoanCare misrepresented the number of loans involving loss mitigation and foreclosure services.

181.     In truth, LoanCare was not performing loss mitigation or foreclosure services as to at least 886 loans listed on LoanCare's monthly statements and was not entitled to collect any loss mitigation or additional foreclosure fees as to those loans.

182.     As a result of the foregoing misrepresentations contained in LoanCare's monthly written reports supplied to Freedom, Freedom paid at least $247,071.23 in fees to LoanCare for loss mitigation and foreclosure services which LoanCare never provided.

**F.     LoanCare's Wrongful Retention of Certain Fees upon Transfer of Loans**

183.     As of approximately May 2, 2016, LoanCare no longer services loans for Freedom pursuant to the Subservicing Agreement.

184.     On or about May 2, 2016, LoanCare and Freedom transferred handling of all loans from LoanCare to Freedom for direct servicing by Freedom.

185.     In connection with the transfer of the loans to Freedom, LoanCare held back and did not pay to Freedom significant monies on the ground that such monies constituted deconversion fees under § 4.4 of the Subservicing Agreement which LoanCare was allegedly entitled to retain in

27

consideration of its work in assisting with the transfer of such loans.

186.    LoanCare, however, improperly retained at least $19,461.72 in deconversion fees for loans which were no longer active at the time of the transfer to Freedom and, as a result, for which LoanCare was not entitled to a deconversion fee.

187.    LoanCare's retention of the foregoing monies was wrongful and constituted a breach of the Subservicing Agreement which has caused Freedom to sustain losses.

**G.    Freedom's Continuing Investigation**

188.    Freedom is continuing its investigation into LoanCare's contractual breaches, acts, omissions, delays and misrepresentations with respect to loans that it serviced for Freedom.

189.    Freedom expects that it has sustained losses and damages well in excess of the estimated damages and losses specifically set forth herein.

190.    Freedom intends to seek damages in this lawsuit for those losses which are presently unknown or which are not yet quantified.

**COUNT I**

**(Breach of Subservicing Agreement)**

191.    Freedom realleges and incorporates the allegations contained in paragraphs 1 through 190 of the Complaint.

192.    The Subservicing Agreement, as supplemented and amended, constitutes a valid, binding and enforceable contract between Freedom and LoanCare.

193.    LoanCare's acts, omissions and delays as described herein constitute material breaches of its duties and obligations under the Subservicing Agreement, including, but not limited

28

to, LoanCare's failure to:

a.    timely file and pursue numerous HUD Part A and Part B Claims as to FHA-insured mortgage loans, including those ultimately assigned to HUD through the SFLS Program;

b.    timely file and pursue numerous PMI claims;

c.    timely file and pursue numerous claims as to mortgage loans guaranteed by the VA, Fannie Mae and the USDA;

d.    timely file and pursue claims for reimbursement of numerous advances through the submission to Fannie Mae of a Form 571;

e.    timely file and pursue claims for the collection of incentive fees as to successfully implemented loss mitigation options;

f.    timely notify Fannie Mae via REO Grams;

g.    timely cancel homeowner's insurance policies covering numerous Fannie Mae REO properties;

h.    preserve, secure, repair or maintain numerous properties serving as collateral for mortgage loans;

i.    assure necessary hazard and property insurance was in place as to numerous mortgage properties; and

j.    timely file and pursue hazard and/or property insurance claims with respect to numerous mortgaged properties.

194.    The foregoing known acts, omissions and delays of LoanCare in material breach of the Subservicing Agreement have directly and proximately caused losses and damages to Freedom.

4852-2765-6497v.1

195.   LoanCare's known acts, omissions and delays have directly and proximately caused:

a.   Numerous denials and curtailments of HUD Part A and HUD Part B claims filed by LoanCare on behalf of Freedom, which caused Freedom to lose reimbursement of unpaid principal and interest and various costs/fees in excess of approximately $18,000,000;

b.   Numerous denials or lost recoveries under PMI, which caused Freedom to suffer approximately $318,410.20 in losses;

c.   Numerous denials of claims filed by LoanCare on behalf of Freedom with the VA, which caused Freedom to suffer severe losses that are still accruing;

d.   Numerous denials of claims filed by LoanCare on behalf of Freedom with the USDA, which caused Freedom to suffer approximately $1,132,969.50 in losses;

e.   Fannie Mae to assess numerous compensatory fees against Freedom in the approximate amount of $3,341,640.16, which Freedom has paid;

f.   Fannie Mae to seek reimbursement from Freedom of unpaid homeowners association fees, unpaid or delinquent taxes and unpaid utility bills in the approximate amount of $300,404.84;

g.   Fannie Mae to reject numerous requests for reimbursement by LoanCare on behalf of Freedom pursuant to Form 571s, causing Freedom to lose $143,348.17 in reimbursements;

h.   Freedom to suffer lost loss mitigation incentive fees; and

i.   Fannie Mae to assess $43,600 in compensatory fees against Freedom arising from LoanCare's failure to timely submit REO Grams;

j.   Freedom's loss of $2,696.97 in refunds of premiums under homeowner's

insurance policies covering Fannie Mae properties because LoanCare failed to cancel the subject policies; and

        k.     Freedom to incur extensive costs to preserve, secure, repair or maintain numerous mortgage properties, including in instances where such properties were not covered by hazard or property insurance, which losses amount to at least $2,051,273.45.

196.    LoanCare also materially breached the Subservicing Agreement when, in its monthly written reports to Freedom, it misrepresented the number of loans that it was actively servicing

197.    These misrepresentations in LoanCare's monthly reports caused Freedom to pay standard base fees to LoanCare in amounts that were in excess of those to which LoanCare was entitled under the Subservicing Agreement.

198.    LoanCare also materially breached the Subservicing Agreement when, in its monthly written reports to Freedom, it misrepresented the number of loans as to which it was performing loss mitigation and foreclosure services.

199.    These misrepresentations in LoanCare's monthly reports (which involved at least 886 loans) caused Freedom to pay at least $247,071.23 in fees to LoanCare for loss mitigation and foreclosure services to which LoanCare was not entitled under the Subservicing Agreement.

200.    LoanCare also materially breached the Subservicing Agreement when, during the transfer of the loans to Freedom for servicing, LoanCare retained and did not transfer at least $19,461.72 on the purported basis that LoanCare was entitled to retain such funds as deconversion fees pursuant to §4.4 of the Subservicing Agreement, when in fact, such fees were retained by LoanCare for loans which no longer existed.

201.    Additionally, LoanCare materially breached the Subservicing Agreement by losing loan files, thereby exposing Freedom to potential damages or losses, including, but limited, to damages or losses resulting from Freedom's potential obligation to repurchase the loans.

202.    Each of the foregoing acts, omissions, delays and misrepresentations by LoanCare constitutes gross negligence and willful misconduct on the part of LoanCare, and do not result from: (a) any default by Freedom of its obligations under the Subservicing Agreement; (b) any directive by Freedom to LoanCare; or (c) any failure by Freedom or any other person or entity to comply with the Applicable Requirements (as defined in the Subservicing Agreement).

203.    Accordingly, Freedom is entitled to damages and to indemnification from LoanCare pursuant to the Subservicing Agreement (§ 8.2) for all losses resulting from LoanCare's contractual breaches, acts, omissions, delays and/or misrepresentations.

204.    Freedom is also entitled under the applicable law and the Subservicing Agreement (including, but not limited to, Article IV and § 5.5 thereof) to a full and complete accounting from LoanCare of all amounts withheld or retained by LoanCare during transfer of the loans to Freedom in May 2016 (or at any other time).

205.    Freedom's investigation into LoanCare's subservicing of loans for Freedom is continuing and Freedom expects to identify additional contractual breaches, acts, omissions, delays and misrepresentations by LoanCare which have resulted in additional damages and losses to Freedom.

4852-2765-6497v.1

## COUNT II

### (Breach of Subservicing Agreement - Implied Covenant of Good Faith and Fair Dealing)

206.    Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 205.

207.    The Subservicing Agreement contains an implied covenant of good faith and fair dealing.

208.    As Freedom discovered LoanCare's various breaches of the Subservicing Agreement, Freedom notified LoanCare of the breaches.

209.    In addition to notifying LoanCare of its breaches of the Subservicing Agreement, Freedom requested that LoanCare act in accordance with the Subservicing Agreement in the future.

210.    Despite receiving these numerous notices from Freedom and requests to correct its conduct, LoanCare continued to engage in the same conduct and continued to breach the Subservicing Agreement.

211.    LoanCare's repeated contractual breaches, acts, omissions and delays - - in the face of express notices from Freedom and requests from Freedom that LoanCare discontinue such conduct in the future - - constitutes bad faith, purposeful and dishonest conduct by LoanCare, over and above its contractual breaches of the Subservicing Agreement.

212.    LoanCare's monthly written reports to Freedom contained misrepresentations as to the number of loans that LoanCare was actively servicing and the number of active loans as to which LoanCare was performing loss mitigation and foreclosure services.

213.    As a result of these misrepresentations in LoanCare's monthly written reports,

4852-2765-6497v.1

Freedom paid LoanCare fees in excess of those to which LoanCare was entitled under the Subservicing Agreement.

214.    LoanCare's retention of excessive fees through the misrepresentations contained in its monthly reports to Freedom constitutes bad faith, purposeful and dishonest conduct by LoanCare, over and above its breaches of the Subservicing Agreement.

215.    The foregoing conduct by LoanCare constitutes a breach of the covenant of good faith and fair dealing implicit in the Subservicing Agreement.

216.    LoanCare's breach of the implied covenant of good faith and fair dealing has resulted in monetary losses and damages to Freedom.

<u>COUNT III</u>

<u>(Fraud)</u>

217.    Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 216.

218.    LoanCare's monthly written reports to Freedom contain misrepresentations of fact as to the number of loans that LoanCare was actively servicing and the number of active loans as to which LoanCare was performing loss mitigation and foreclosure services.

219.    LoanCare's misrepresentations of fact in its monthly reports to Freedom were made intentionally with knowledge by LoanCare of their falsity.

220.    Alternatively, these misrepresentations by LoanCare in its monthly reports to Freedom were made negligently and/or recklessly by LoanCare.

221.    LoanCare's misrepresentations of fact in its monthly reports to Freedom were

material.

222.    LoanCare made its material misrepresentations of fact in its monthly reports to Freedom with the intention that Freedom would rely upon them in paying LoanCare excessive standard base fees and additional fees for loss mitigation and foreclosure services which LoanCare never rendered.

223.    Alternatively, LoanCare should have known that these material misrepresentations of fact in its monthly reports to Freedom would have induced Freedom's reliance in order to pay LoanCare excessive standard base fees and additional fees for loss mitigation and foreclosure services.

224.    Freedom, in fact, relied upon LoanCare's false monthly reports to establish the amount of the standard base fees and additional loss mitigation and foreclosure fees due to LoanCare under the Subservicing Agreement.

225.    Such reliance by Freedom upon the material misrepresentations in LoanCare's monthly reports was reasonable.

226.    As a direct result of LoanCare's material misrepresentations in its monthly reports to Freedom, Freedom was caused to sustain damages by paying LoanCare standard base fees and additional loss mitigation and foreclosure fees in excess of those to which LoanCare was entitled under the Subservicing Agreement.

227.    The foregoing constitutes legal, actual, constructive and/or equitable fraud on the part of LoanCare.

4852-2765-6497v.1

## COUNT IV

### (Unjust Enrichment)

228.    Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 227.

229.    Freedom reasonably expected that LoanCare would retain standard base fees associated with loans that it was actually servicing for Freedom.

230.    In truth, however, LoanCare knowingly retained standard base fees for loans that it was no longer servicing.

231.    Freedom reasonably expected that LoanCare would retain additional fees for loss mitigation and foreclosure services only if was actually performing such services with respect to a particular loan.

232.    In truth, LoanCare knowingly retained additional fees for loss mitigation and foreclosure services as to loans for which it was not performing any loss mitigation or foreclosure services.

233.    Freedom reasonably expected that LoanCare would retain deconversion fees only with respect to loans actually transferred from LoanCare to Freedom in May 2016.

234.    In truth, LoanCare knowingly retained deconversion fees for loans which were no longer active at the time of the transfer to Freedom and, as a result, for which LoanCare was not entitled to a deconversion fee.

235.    To the extent that LoanCare retained such standard base fees, additional fees for loss mitigation and foreclosure services, and deconversion fees, LoanCare has been unjustly enriched

4852-2765-6497v.1

beyond its rights under the Subservicing Agreement and has obtained a benefit to which it was not entitled.

236.    It is unjust and inequitable for LoanCare to retain these improperly obtained standard base fees, additional fees for loss mitigation and foreclosure services, and deconversion fees.

237.    LoanCare's unjust retention of these fees has caused damages to Freedom.

## COUNT V

### (Tortious Interference with Contract)

238.    Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 237.

239.    The EverBank Sale Agreements and the EverBank Servicing Agreements constitute valid and binding contracts between EverBank and Freedom.

240.    At all relevant times, LoanCare was aware of the EverBank Sale Agreements and the EverBank Servicing Agreements.

241.    At all relevant times, LoanCare was aware that, pursuant to the EverBank Sale Agreements and the EverBank Servicing Agreements, Freedom was obligated to properly service (or assure that LoanCare properly serviced) the EverBank Loans.

242.    At all relevant times, LoanCare was aware of Freedom's obligation under the EverBank Sale Agreements and/or the EverBank Servicing Agreements to indemnify EverBank with respect to any damages or losses arising from the servicing of the EverBank Loans by LoanCare.

243.    LoanCare was aware, or should have been aware, that its failure to properly service, or its gross negligence or willful misconduct in servicing, the EverBank Loans was certain or

37

substantially certain to interfere with Freedom's contractual relationship with EverBank and/or cause Freedom to be in breach of the EverBank Sale Agreement and/or the EverBank Servicing Agreement.

244.    LoanCare acts, omissions, delay and/or misrepresentations in connection with its servicing of the EverBank Loans constituted a purposeful, malicious and intentional interference, without justification or excuse, with Freedom's contractual relationship with Everbank and/or caused Freedom to be in breach of the EverBank Sale Agreement and/or the EverBank Servicing Agreement.

245.    As a result of LoanCare's failure to properly service the EverBank Loans, Freedom has sustained damages because it has been compelled to indemnify EverBank pursuant to the EverBank Sale Agreements and/or the EverBank Servicing Agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, Freedom respectfully request that judgment be entered against defendant LoanCare, LLC:

1.    for compensatory damages in an amount to be determined at trial, including, but not limited to disgorgement and restitution of any and all excessive fees improperly retained by LoanCare;

2.    compelling LoanCare, LLC to provide a complete accounting of all amounts withheld or retained by LoanCare during transfer of the loans to Freedom in May 2016 (or at any other time);

3.    for punitive damages in an amount to be determined at trial;

4.    for pre and post judgment interest;

4852-2765-6497v.1

5.      for reasonable attorneys' fees and costs incurred in prosecuting this action; and

6.      for such other and further relief the Court deems just and proper.

**LANDMAN CORSI BALLAINE & FORD P.C.**
**Attorneys for Plaintiff Freedom Mortgage Corp.**

Dated: May 6, 2016
Newark, NJ

Jerry A. Cuomo (JC-4253)

39

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify that the matter in controversy in this action is not now known to me to be the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Dated: May 6, 2016
      Newark, NJ

Jerry A. Cuomo (JC-4253)

40