Robert J. Lack
Andrew M. Englander
FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP
One Gateway Center, 25th Floor
Newark, NJ 07102-5311
(973) 877-6400

Stuart H. Singer, *pro hac vice*
Sabria A. McElroy, *pro hac vice*
Pascual A. Oliu, *pro hac vice*
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011

*Attorneys for Defendant-Counterclaimant
LoanCare, LLC*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

FREEDOM MORTGAGE CORPORATION,

    Plaintiff-Counterclaim Defendant,

v.

LOANCARE, LLC (as successor to FNF
Servicing, Inc. and LoanCare, a Division of
FNF Servicing, Inc.),

    Defendant-Counterclaimant.

Civil Action No.
1:16-cv-02569-RMB-AMD

Motion Day: April 4, 2022

ORAL ARGUMENT
REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF
<u>LOANCARE'S MOTION TO EXCLUDE FREEDOM'S EXPERTS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

I.  LYONS'S OPINIONS SHOULD BE EXCLUDED. ........................................................ 1

    A.  Lyons did not analyze any loans against the SSA's liability standards. ................. 1

    B.  Lyons improperly attributes damages for which LoanCare cannot be liable. ........ 4

    C.  Lyons is an impermissible conduit for other, undisclosed experts. ........................ 6

    D.  Lyons cannot opine on industry averages or LoanCare policies he never reviewed. ................................................................................................................ 7

II. CONNALLY'S OPINIONS SHOULD BE EXCLUDED. ............................................... 7

    A.  Connally did not analyze loans against the SSA's liability standards. ................... 8

    B.  Connally improperly assigns damages to LoanCare beyond the maximum amount that the VA will pay. ................................................................................. 9

    C.  Connally's rebuttal opinions are unreliable. ......................................................... 10

CONCLUSION .................................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page(s)**

*11333 Inc. v. Certain Underwriters at Lloyd's, London*,
   261 F. Supp. 3d 1003 (D. Ariz. 2017) ........................................................................... 4

*A.H. Meyers & Co. v. CNA Ins. Co.*,
   88 F. App'x 495 (3d Cir. 2004) ..................................................................................... 5

*Cerabio LLC v. Wright Med. Tech., Inc.*,
   410 F.3d 981 (7th Cir. 2005) .......................................................................... 3, 4, 5, 8

*Cowan v. Hospice Support Care, Inc.*,
   268 Va. 482 (2004) ....................................................................................................... 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)...................................................................................................... 1

*E.E.O.C. v. Kaplan Higher Learning Educ. Corp.*,
   2013 WL 322116 (N.D. Ohio Jan. 28, 2013).............................................................. 7

*Frazier v. City of Norfolk*,
   234 Va. 388 (1987) ....................................................................................................... 4

*Hemisphere Holdings I, LLC v. Wal-Mart Stores E., LP*,
   No. 15-23404-CIV, 2016 WL 7538219 (S.D. Fla. Aug. 12, 2016) ......................... 10

*Hutton Contracting Co., Inc. v. City of Coffeyville*,
   No. 02-4130-JAR, 2004 WL 2203449 (D. Kan. Sept. 24, 2004) ...................... 3, 4, 8

*In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   174 F. Supp. 3d 911 (D.S.C. 2016)............................................................................. 7

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) .................. 5, 6

*James v. Harrah's Resort Atl. City*,
   No. CV 14-5434 (JBS/JS), 2016 WL 7408845 (D.N.J. Dec. 22, 2016) .............. 7, 10

*Kuykendall v. Young Life*,
   261 F. App'x 480 (4th Cir. 2008) ................................................................................ 4

*Lasorsa v. Showboat: The Mardi Gras Casino*,
   Civ. No. 07–4321, 2009 WL 2929234 (D.N.J. Sept. 9, 2009).................................. 7

*Leese v. Lockheed Martin Corp.*,
   6 F. Supp. 3d 546 (D.N.J. 2014) ................................................................................. 6

*Leverette v. Louisville Ladder Co.*,
   183 F.3d 339 (5th Cir. 1999) .................................................................................. 3, 4

*Montgomery Cnty. v. Microvote Corp.*,
   320 F.3d 440 (3d Cir. 2003).......................................................................................... 5

*O'Conner v. Commonwealth Edison Co.*,
   13 F.3d 1090 (7th Cir.1994) ......................................................................................... 8

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000).................................................................................... 3, 4

*Parkridge Phase Two Assocs. v. Lockheed Martin Corp.*,
   172 F.3d 44  (4th Cir. 1999) ......................................................................................... 5

*Soldo v. Sandoz Pharm. Corp.*,
   244 F. Supp. 2d 434 (W.D. Pa. 2003)......................................................................... 8

**<u>Rules</u>**

Fed. R. Evid. 702 ................................................................................................................ 1

LoanCare respectfully requests that Freedom's experts, Robert Lyons and Susan Connally, be excluded from testifying in this matter, as neither satisfies the requirements of Fed. R. Evid. 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Neither expert can help the jury resolve Freedom's claims for breach of contract because they assign fault and damages to LoanCare without having considered the relevant standards of the parties' Subservicing Agreement (the "SSA"), Ex. A.[1] Moreover, their analysis, reflected in spreadsheets assigning damages to LoanCare on over 7,000 individual loans, does not provide a reliable foundation for their conclusions.

## I.     LYONS'S OPINIONS SHOULD BE EXCLUDED.

Lyons is Freedom's expert on all loans in this case except for those guaranteed under the VA program. He served five reports in this case: two affirmative reports and rebuttals to three of LoanCare experts.[2] All of his opinions are methodologically flawed and should be excluded.

### A.     Lyons did not analyze any loans against the SSA's liability standards.

Lyons opines that Freedom is entitled to compensation from LoanCare for almost all loans in a set of over 6,000 that Freedom selected for this case. But his review was so fundamentally flawed that he could not reliably make such a determination under any circumstances, let alone under the high bar to liability established by the SSA, which provides that LoanCare:

> shall be liable to [Freedom] only for [LoanCare]'s **willful misconduct** or **gross negligence** arising **solely from its own acts or omissions** and shall not be under any liability to [Freedom] for any action taken or for refraining from the taking of any action in **good faith** pursuant to this Agreement, or for **good faith errors in judgment**[.]

---

[1] Exhibits are attached to the accompanying Declaration of Sabria A. McElroy dated Feb. 14, 2022 and are hereinafter cited to as "Ex. __."
[2] *See* Ex. B, Lyons Amended FHA Analysis, Aug. 9, 2019; Ex. C, Lyons Amended Fannie Mae Analysis, Aug. 9, 2019; Ex. D, Lyons Rebuttal to Charles, Sept. 13, 2019; Ex. E, Lyons Rebuttal to Sicuranza, Sept. 13, 2019; Ex. F, Lyons Rebuttal to Brazier, Sept. 13, 2019.

SSA § 8.3 (emphasis added). This is a demanding standard: under applicable Virginia law, gross negligence "is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487 (2004). It "requires a degree of negligence that would shock fair-minded persons." *Id*.

However, Lyons did not consider *any* of these aspects of the SSA in his attempt to determine who should bear the losses for the loans he reviewed, deeming them irrelevant to his assessment of liability and damages. Ex. G, Lyons Dep. Tr. 136:17–137:19 (hereafter "Lyons Tr.").[3] Instead, Mr. Lyons's methodology conformed to the desired approach of Freedom's CEO, who instructed his employees to find LoanCare's "share of losses for everything down to paper clips" and identify "[e]very blunder, delay, penalty, payment missed and any place that a loss was incurred that *may* have been their fault." Ex. H, Middleman Dep. Tr. 307:19–310:15 (emphasis added). Consistent with this directive, Lyons assumed that LoanCare was responsible for all losses *unless* he could find documentation indicating that someone else was responsible. Lyons Tr. 123:8–10. In many instances, where his team found "insufficient documentation" to determine the cause of the loss, he assigned the loss to LoanCare. *Id*. 193:1–5; 206:5–12. Lyons admitted that even if *Freedom* had caused a delay, but it was not documented in the claim file, he would "say that LoanCare is solely responsible for that curtailment." *Id*. 196:14–19. As a result of his failure

---

[3] *Id.* ("Q. [F]or each of these loans, did you instruct the team to determine whether whatever error they identified resulted from willful misconduct by LoanCare? **A. No.** Q. Did you ask them to determine whether the error identified resulted from an utter disregard of prudence by LoanCare? **A. No.** Q. Did you ask them to determine whether the LoanCare error resulted from gross negligence? **A. No.** Q. Did you ask them to consider whether the error was a good faith error of judgment? **A. No.** Q. Did you ask them to consider whether LoanCare had been acting in good faith on that loan? **A. No.** Q. And, again, none of those considerations would have entered the process for any individual loan before it got onto your appendices, correct? **A. Correct. None of those considerations were relevant.**")

2

to apply the relevant contractual standard, Lyons's opinions do not meet *Daubert's* "fit" requirement and should be excluded. *Hutton Contracting Co., Inc. v. City of Coffeyville*, No. 02-4130-JAR, 2004 WL 2203449, at *12–*13 (D. Kan. Sept. 24, 2004) (excluding expert who applied erroneous legal standard based on industry custom instead of contract); *see also Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 997 (7th Cir. 2005) (affirming exclusion of expert whose opinions ignored contractual prohibition on consequential damages); *cf. Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341 (5th Cir. 1999).

The unreliability of Lyons's methodology was made painfully obvious when LoanCare's experts found that many of the errors Lyons attributed to LoanCare actually occurred while the loan was being handled by a different subservicer altogether—***before Freedom even sent the loan to LoanCare for subservicing***. In other words: because Lyons assumed that all errors were solely LoanCare's fault unless proven otherwise, he and his team never bothered to check whether LoanCare was actually the subservicer when the errors occurred. After his deposition, Lyons retracted his determination on many of these loans, but this post-hoc retraction does not cure the basic methodological flaw in his approach which fails to reliably identify errors for which LoanCare is "solely responsible," as required under the SSA. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 157–58 (3d Cir. 2000) (affirming exclusion of expert who failed to test whether injury was attributable to causes other than alleged defective design). This approach also led Lyons to fault LoanCare for errors that he and his team acknowledged were unavoidable or attributable to Freedom. For example, when his team concluded that an error was caused by a delay in clearing title, he attributed that delay to LoanCare[4]—even though Freedom's own witnesses testified that

---

[4] Lyons Tr. 152:1–154:18. *See, e.g.*, Ex. I, Excerpts from Lyons FHA App'x 5, Rows 131, 148, 580, 811, 1096, 1099, 1110 (all listing "title issues" as reason for delays and missed deadlines).

3

*Freedom*, not LoanCare, handled the title clearing on these loans. Ex. J, Powell Dep. Tr. 17:6–22. In another example, Lyons blamed LoanCare for an amount charged by Fannie Mae, even though he did not know why the agency charged that amount. Lyons Tr. 278:16–25, 279:21–280:11.[5]

Courts routinely exclude such unreliable analysis. *E.g., Oddi*, 234 F.3d at 157. And because Lyons failed to consider the contractual standard, and assumed that anything less than perfection results in liability, his opinions cannot help the jury, who will be required to apply the contractual liability standard. *Hutton,* 2004 WL 2203449, at *12–*13; *Cerabio,* 410 F.3d at 997; *Leverette*, 183 F.3d at 341. Moreover, Lyons's opinions are offered on a "take it or leave it basis": his spreadsheets assign fault to LoanCare but offer no way for the jury to re-assess liability based on the appropriate contractual standard and lack any detail that the jury could use to determine whether LoanCare might be responsible for any given error identified by Lyons.[6]

### B. Lyons improperly attributes damages for which LoanCare cannot be liable.

Lyons also concluded that LoanCare was responsible for nearly every unreimbursed dollar Freedom spent on the loans at issue, even if those expenses were attributable to Freedom's conduct and decision-making. For example, in situations where Freedom repaired a property allegedly as

---

[5] Lyons also blamed LoanCare for failing to meet the 30-day conveyance milestone, even though he conceded that it's "impossible" to meet this requirement "in a majority of cases." Lyons Tr. 218:11–23. He justified this by saying that LoanCare could have requested extensions, but admitted that the extension process was flawed. *Id*. 218:11–219:18. Elsewhere, he has opined that the extension process is so flawed that servicers should not be penalized for missing this milestone. Ex. K, Sept. 4, 2015 Comment to HUD by Lyons McCloskey LLC at 8.

[6] Similarly, Lyons cannot satisfy the liability standard by inviting the jury to aggregate many errors, none of which constitute gross negligence individually, into some sort of "cumulative" gross negligence or bad faith. *See 11333 Inc. v. Certain Underwriters at Lloyd's, London*, 261 F. Supp. 3d 1003, 1028 (D. Ariz. 2017) ("It departs from settled law to say these amount to bad faith in the aggregate despite falling short or passing muster individually. Conclusions from that invalid methodology are not valid, admissible expert opinions."). Applicable Virginia cases reject attempts to prove gross negligence even where the defendant committed multiple acts of lesser negligence. *See, e.g.*, *Frazier v. City of Norfolk*, 234 Va. 388, 362 (1987); *Kuykendall v. Young Life*, 261 F. App'x 480, 490 (4th Cir. 2008).

a result of an error attributed to LoanCare, Lyons assessed the full amount of money that Freedom spent on such repairs—without considering the necessity or reasonableness of those expenses. Lyons Tr. 232:10–16, 233:2–12. In many instances, when unable to find documents to support Freedom's expenses, Lyons accepted whatever numbers Freedom provided and used those numbers as the amount LoanCare should pay. *Id.* 235:24–236:4, 237:11–14, 238:24–239:3; Ex. L, Lyons Dep. Ex. 13 (citing "costs incurred . . . per data provided by Freedom Mortgage"). This uncritical acceptance of data provided by Freedom renders his opinion unreliable. *Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003); *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000).

Lyons also assigned blame to LoanCare for so-called "pass-through" damages, which are non-reimbursable interest payments that Freedom *chose* to advance on delinquent loans, instead of making a fully reimbursable "buyout" payment to avoid further interest. Lyons Tr. 143:18–144:13, 149:14–22; 150:6–11. Freedom's business decision to continue advancing interest that would never be repaid is not a loss "arising solely from [LoanCare's] own acts or omissions," as required for liability under the SSA. SSA § 8.3.[7] Indeed, Lyons admitted that there is no evidence of an industry-wide standard for determining whether a subservicer, like LoanCare, or a servicer, like Freedom, is responsible for making such pass-through payments in these situations. Lyons Tr. 149:23–150:5. Expert testimony on damages must be excluded where the expert, like Lyons, fails to apply the correct standard of damages under the applicable law or contract. *A.H. Meyers & Co. v. CNA Ins. Co.*, 88 F. App'x 495, 500 (3d Cir. 2004); *Cerabio*, 410 F.3d at 997.

---

[7] Moreover, because these expenses were incurred voluntarily, they are consequential damages under Virginia law and not recoverable under the SSA. SSA § 8.3 (excluding recovery of "any special, indirect, punitive or consequential damages"); *Parkridge Phase Two Assocs. v. Lockheed Martin Corp.*, 172 F.3d 44 n.3 (4th Cir. 1999) (table) (damages dependent on plaintiff's decision are consequential).

5

### C. Lyons is an impermissible conduit for other, undisclosed experts.

Lyons should be precluded from testifying for the additional reason that he is merely serving as a conduit for the opinions of others who have not been disclosed. Although individuals working at an expert's direction may assist an expert in reaching opinions, experts may not abdicate their own role and rely on the opinions of non-testifying experts. *In re TMI Litig.*, 193 F.3d at 716 (holding that expert's "unblinking reliance" on the opinions of other experts failed *Daubert*); *see also Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014). Here, Lyons did not conduct any of the training for loan-level reviewers, design the templates used to gather data, provide instructions, or resolve disputes between team leads and the line-level reviewers. Lyons Tr. 111:7–112:7, 117:24–118:23. Instead, he deferred to "the judgment of the team leads with their . . . expertise and knowledge." *Id*. 135:3–6. He even admitted that he had not reviewed every line of the appendices that contain the loan-level conclusions for the loans on which he is offering opinions. *Id*. 156:6–18. Indeed, whole portions of Lyons's report were drafted by non-testifying witnesses, to whom he delegated critical decision-making. For example, Lyons relied solely on an undisclosed expert (named Karen Garner) and her "expertise as a subject matter expert" to determine whether Freedom made origination errors on loans. *Id*. 261:20–262:23, 266:10 –267:24. Additionally, Lyons was unable to explain language in an appendix to his report stating: "Where documentation provided was insufficient the damage amount represents the preservation costs . . . per data provided by Freedom Mortgage." Ex. L, Lyons Dep. Ex. 13; Lyons Tr. 235:24–236:4, 237:11–14, 238:24–239:3. During a break, Lyons called the (non-testifying) person who had prepared this appendix—only to learn that *even she* could not explain this text. *Id*. 237:15–239:3. This was not the only instance in which Lyons deferred to other, non-disclosed experts when asked questions about his methodology or the contents of his report. *E.g.*, *id*. 183:16–25, 277:12–19, 278:9–280:11.

6

**D. Lyons cannot opine on industry averages or LoanCare policies he never reviewed.**

Lyons should not be allowed to offer his wholly unsupported opinions about LoanCare's performance relative to industry averages. Lyons admits that he knows of no reliable industry data to establish average curtailment rates yet he nonetheless offered speculation about those rates and opined that LoanCare had "higher than average" curtailment rates. Ex. D at 7, 10; Lyons Tr. 247:5–18. *See James v. Harrah's Resort Atl. City*, No. CV 14-5434 (JBS/JS), 2016 WL 7408845, at *5 (D.N.J. Dec. 22, 2016); *Lasorsa v. Showboat: The Mardi Gras Casino*, Civ. No. 07–4321, 2009 WL 2929234, at *4 (D.N.J. Sept. 9, 2009). Moreover, even if he had some evidence of industry averages, Lyons never reviewed a representative sample of the loans that LoanCare serviced for Freedom; he compared his speculation about industry averages against a set of loans that had been selected for him *by Freedom*.[8] Lyons Tr. 248:2–249:5, 251:14–25. *See In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 933 (D.S.C. 2016); *E.E.O.C. v. Kaplan Higher Learning Educ. Corp.*, 2013 WL 322116, at *10–*11 & n.11 (N.D. Ohio Jan. 28, 2013). Lyons also intends to offer opinions about LoanCare's policies and procedures, despite admitting that he has *never reviewed those policies and procedures*. Lyons Tr. 252:16–253:3. These opinions, plainly lacking any foundation, must be excluded. *Harrah's*, 2016 WL 7408845, at *6.

**II. CONNALLY'S OPINIONS SHOULD BE EXCLUDED.**

Connally, Freedom's expert on VA guaranteed loans, submitted an affirmative expert report and a rebuttal report responding to the opinions of three of LoanCare's experts regarding the servicing of VA loans.[9] These opinions should be excluded.

---

[8] Lyons did not know how many loans LoanCare had handled for Freedom, Lyons Tr. 100:9–20, but in fact it was hundreds of thousands of loans. D.E. 69, Amended Complaint ¶ 1.

[9] Ex. M, Connally VA Review, July 12, 2019; Ex. N, Connally Rebuttal Rep., Sept. 13, 2019.

A. **Connally did not analyze loans against the SSA's liability standards.**

In assigning losses to LoanCare, Connally—like Lyons—failed to consider the relevant contractual limitation on liability. SSA § 8.3. Rather than apply this standard, Connally assigned fault to LoanCare for "any error," Ex. O, Connally Dep. Tr. 69:1–3 (hereafter "Connally Tr."), which she defined as any "activity performed by LoanCare that resulted in a delay outside of expectations within the termination timeline for VA," *id*. 64:18–22. She admittedly made no effort to consider the contractual standard in assigning fault. *Id*. 63:17–19[10]; *see also id*. 267:18–20; 270:10–16. Indeed, where the VA was silent, Connally looked to what she viewed as "industry ***best*** practice," rather than the standard set forth in the SSA. *Id*. 21:16–22:9 (emphasis added). As a result, her opinions cannot assist the jury who must analyze LoanCare's liability under the SSA, and should be excluded. *Cerabio*, 410 F.3d at 997; *Hutton*, 2004 WL 2203449, at *12–*13.[11]

Connally's opinions are also unreliable because she and her reviewers failed to apply her described methodology consistently. *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106–07 (7th Cir.1994); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 561 (W.D. Pa. 2003). Her analysis, reflected in a spreadsheet attached as Appendix 3 to her report, buckets fault for the number of days that exceeded the VA termination deadline into three categories: LoanCare, Freedom, and uncontrollable.[12] Connally claimed that the only losses assigned to LoanCare were those that resulted "solely from LoanCare's failure to comply with VA servicing requirements (or the failure of a third-party retained, managed and/or supervised by LoanCare to comply with those requirements)." Ex. M, Connally VA Review, at 4. Yet, Connally's spreadsheet attributed damages

---

[10] *Id*. ("Q. And did you consider the subservicing agreement when deciding how to define an error? **A. We did not**.")

[11] As discussed in note 6, *supra*, as a matter of Virginia law, Freedom cannot prove gross negligence by pointing to multiple lesser errors.

[12] *See* Ex. P, Connally Dep. Ex. 3, which is an excerpt from Connally Appendix 3. Total days past the termination deadline are recorded in column AD, "Total Foregone Interest Days."

8

to LoanCare on a loan in which the reviewer indicated "no noticeable servicing delays of note." Connally Tr. 155:20–158:1. Connally was unable to explain the discrepancy between these damages and her purported methodology and could only speculate that it was an error in her spreadsheet, which she admitted that she did not review in full. *Id*. 158:5–159:20.[13] In fact, in this case and elsewhere, Connally's reviewers simply assigned the balance of any delay days that were not clearly attributable to Freedom or uncontrollable delays to LoanCare. Connally's testimony showed that she was unfamiliar with the methodology employed by some of her reviewers.[14]

### B. Connally improperly assigns damages to LoanCare beyond the maximum amount that the VA will pay.

Unlike the FHA, the VA will only insure loans up to a capped amount called the maximum guaranty, which is equal to a percentage of the original loan. *Id*. 96:3–5; 97:19–20. Of the 1,318 VA-guaranteed loans that Connally and her team reviewed, Freedom sustained losses on 721 loans solely because the deficiency remaining on the loan after the foreclosure sale was greater than the maximum guaranty. LoanCare recovered the maximum guaranty for these loans. Connally nonetheless attributed damages to LoanCare on these loans, which collectively account for over 75 percent of the damages, even though Freedom would have received the same claim payment in the absence of LoanCare's alleged breaches.[15] This methodology would give Freedom a windfall, placing it in a ***better*** position than it would have been in but for LoanCare's alleged breach. The damages that Connally attributes to LoanCare on these and other loans is divided into two

---

[13] In other instances, Connally—like Lyons—attributed damages to LoanCare for delays associated with clearing title defects, despite testifying that such delays were only attributed to Freedom. *Id*. 181:21–182:7.

[14] Connally testified that because she instructed her reviewers to only assign specifically identifiable delays to LoanCare, the sum of days in each of her three buckets was less than the total number of days past the termination deadline recorded in column AD for some loans. *Id*. 154:2-155:3. This testimony is wrong. The three buckets (recorded in columns AH, AK, and AN) always add up to the total number of days in column AD. *See* Ex. P.

[15] These loans are identified in Exhibit Q.

categories: (1) foregone interest, which Connally described as interest Freedom advanced after the VA termination deadline to the investor on the loans, Ginnie Mae, *id*. 54:8–21; and (2) expenses that the VA did not reimburse, *id*. 50:1-17. The first category is impermissible because Freedom chose to advance this interest rather than make a reimbursable buy-out payment, just like the "pass-through" damages discussed above. *See* Point I(B), *supra*; Connally Tr. 251:3–19. And there is no basis for the second category: nothing in Connally's analysis indicates that these expenses should not have been incurred and even if LoanCare had not made any errors in the expense process, the VA would have refused to reimburse them solely because Freedom received the maximum guaranty. As Connally put it, there is simply "no way to get more from the VA in that situation." *Id*. 115:4–5. And, yet, by assigning damages for these expenses to LoanCare, Connally's methodology attempts to extract more money from LoanCare than Freedom would have received in the but-for world in which there was no alleged expense error, contrary to the proper measure of damages under a contract. *Hemisphere Holdings I, LLC v. Wal-Mart Stores E., LP*, No. 15-23404-CIV, 2016 WL 7538219, at *2, *4 (S.D. Fla. Aug. 12, 2016).

### C. Connally's rebuttal opinions are unreliable.

Like Lyons, Connally's rebuttal report contains improper opinions about LoanCare's policies and procedures, as well as its attorney monitoring system, which she never reviewed. Connally Tr. 267:21–268:2. As discussed above, that testimony must be excluded. *Harrah's*, 2016 WL 7408845, at *6. She also attempted to compare LoanCare's error rates against those of a so-called "prudent" servicer, but as with Lyons, she admitted that she did not rely on any industry data in making this determination, and could not state what a "prudent" servicer's error rates might be. Connally Tr. 245:13–247:1.

## **CONCLUSION**

For the reasons stated above, the testimony of Freedom's experts should be excluded.

10

Dated: February 14, 2022

                                 s/ Robert J. Lack
                                 Robert J. Lack
                                 Andrew M. Englander
                                 FRIEDMAN KAPLAN SEILER
                                    & ADELMAN LLP
                                 One Gateway Center, 25th Floor
                                 Newark, NJ 07102-5311
                                 (973) 877-6400

                                 Stuart H. Singer, *pro hac vice*
                                 Sabria A. McElroy, *pro hac vice*
                                 Pascual A. Oliu, *pro hac vice*
                                 BOIES SCHILLER FLEXNER LLP
                                 401 East Las Olas Blvd., Suite 1200
                                 Fort Lauderdale, FL 33301
                                 (954) 356-0011

                                 *Attorneys for Defendant-Counterclaimant*
                                 *LoanCare, LLC*