[Docket Nos. 212, 213]

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

FREEDOM MORTGAGE
CORPORATION,

      Plaintiff-Counterclaim Defendant,

      v.

LOANCARE, LLC (as successor to
FNF Servicing, Inc. and LoanCare, a
Division of FNF Servicing, Inc.),

      Defendant-Counterclaimant.

Civil No. 16-02569 (RMB/AMD)

**OPINION**

**APPEARANCES:**

LANDMAN CORSI BALLAINE & FORD, P.C.
By: Jerry A. Cuomo, Esq.; Timothy Collazzi, Esq.;
Mark S. Landman, Esq. (*pro hac vice*)
One Gateway Center, 4th Floor
Newark, New Jersey 07102

    *Counsel for Freedom Mortgage Corporation*

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
By: Robert J. Lack, Esq.; Andrew M. Englander, Esq.
One Gateway Center, 25th Floor
Newark, New Jersey 07102

    *Counsel for LoanCare, LLC*

BOIES SCHILLER FLEXNER LLP
By: Stuart H. Singer, Esq. (*pro hac vice*); Sabria A. McElroy, Esq. (*pro hac vice*);
Pascual A. Oliu, Esq. (*pro hac vice*)
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301

    *Counsel for LoanCare, LLC*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter comes before the Court upon two motions to preclude expert testimony in this breach-of-contract action. On February 14, 2022, Defendant-Counterclaimant LoanCare, LLC ("**LoanCare**") filed a motion to preclude the expert testimony of Susan Connally and Robert Lyons. [Docket No. 212 ("**LoanCare's Motion**").] On the same day, Plaintiff-Counterclaim Defendant Freedom Mortgage Corporation ("**Freedom**") filed a motion to preclude the expert testimony of Christopher Sicuranza, Genger Charles, Marcel Bryar, and Nigel Brazier. [Docket No. 213 ("**Freedom's Motion**").] On July 26, 2022, indicating that it would hold a *Daubert* hearing, the Court administratively terminated the parties' Motions pending the hearing, [Docket No. 234], which occurred on October 24 and 25, 2022, [see Transcript of *Daubert* Hearing, Docket Nos. 247, 248 ("**Hrg. Tr.**").] Thereafter, the Court received the parties' Post-*Daubert* Briefs. [Docket Nos. 245 ("**Def.'s Post-Daubert Br.**"), 246 ("**Pl.'s Post-Daubert Br.**").] As these Motions are fully briefed,[1] and live testimony has been taken, they are ripe for adjudication.

For the reasons stated on the record of October 24 and 25, 2022, and more specifically below, LoanCare's Motion will be **GRANTED** and Freedom's Motion

---

[1] The Court refers to the parties' principal submissions as follows: Def.'s Br. Supp. LoanCare's Mot., Docket No. 214 ("**Def.'s Br.**"); Pl.'s Opp'n to LoanCare's Mot., Docket No. 226 ("**Pl.'s Opp'n**"); Def.'s Reply Br. Supp. LoanCare's Mot., Docket No. 228 ("**Def.'s Reply Br.**"); Pl.'s Br. Supp. Freedom's Mot., Docket No. 213-1 ("**Pl.'s Br.**"); Def.'s Opp'n Freedom's Mot., Docket No. 227 ("**Def.'s Opp'n**"); Pl.'s Reply Br. Freedom's Mot., Docket No. 229 ("**Pl.'s Reply Br.**").

will be **GRANTED, IN PART**, and **DENIED**, **IN PART**.

## I.    BACKGROUND

The Court assumes the parties' familiarity with the factual and procedural history of this long-running matter and recites only those details it deems necessary to dispose of the pending *Daubert* Motions.[2]

Freedom is a full-service residential mortgage lender and LoanCare is a mortgage subservicer.   Both are in good standing with the Federal Housing Administration ("**FHA**"), the Department of Veterans Affairs ("**VA**"), the Federal National Mortgage Association ("**Fannie Mae**"), and the Government National Mortgage Association ("**Ginnie Mae**").   For approximately 15 years, LoanCare serviced a portfolio of Freedom's mortgage loans.   Between February 2010 through June 2016, the parties' relationship was governed by the Amended and Restated Subservicing Agreement, effective February 1, 2010 (the "**Subservicing Agreement**"). For a variety of reasons, that relationship eventually deteriorated.

In January 2016, Freedom advised LoanCare that it planned to terminate the Subservicing Agreement on June 30, 2016, and it instructed LoanCare to transfer back to Freedom all loans that LoanCare was servicing.   Freedom contends that LoanCare committed repeated errors and omissions while subservicing Freedom's FHA, VA, Fannie Mae, and Ginnie Mae loans—on which the relevant borrowers had defaulted.

---

[2] The Joint Final Pretrial Order and the Court's prior Opinions adequately set forth the factual background of this action, which the Court incorporates herein by reference.  [Docket Nos. 84, 116, 177, & 196.]

Freedom believes that LoanCare's errors and omissions constituted material breaches of the Subservicing Agreement, causing Freedom some $38 million in damages.

Additionally, during the process of unwinding the relationship, and pursuant to Freedom's instruction, LoanCare attempted to return to Freedom around $111 million from shared custodial accounts at various banks. Simultaneously, however, Freedom worked directly with the banks to block LoanCare's access to these accounts, and, through a series of transactions, the banks ultimately transferred the $111 million from LoanCare's own cash accounts. While LoanCare recovered a substantial portion of this amount, Freedom withheld some $23 million because LoanCare allegedly could not establish its entitlement to the funds. LoanCare believes that Freedom fraudulently obtained and converted this sum. Separately, LoanCare asserts that Freedom breached the Subservicing Agreement by failing to notify LoanCare of Freedom's breaches of warranties concerning its origination of "subprime" loans that LoanCare agreed to service. LoanCare believes that origination deficiencies directly impacted or "hampered" its ability to service Freedom's loans.

This litigation soon commenced. On May 6, 2016, Freedom asserted breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, unjust enrichment, and tortious interference with contract claims against LoanCare. After motion practice, on December 31, 2018, LoanCare filed a Second Amended Counterclaim asserting fraudulent inducement, conversion, breach of contract, and unjust enrichment claims against Freedom. On September 23, 2019, the Court dismissed one of LoanCare's conversion claims, [Docket No. 117], and on July 23,

4

2020, the Court granted summary judgment in favor of LoanCare on Freedom's

tortious interference claim, [Docket No. 177].  As a jury trial approaches, the parties

filed the pending *Daubert* Motions seeking to exclude each other's expert witnesses.

[Docket Nos. 212, 213.]

## II.   LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert testimony,

permitting a witness "qualified as an expert by knowledge, skill, experience, training,

or education" to testify in the form of an opinion, provided that:

> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Because Rule 702 "clearly contemplates some degree of regulation of the subjects and

theories" to which an expert may testify, the Supreme Court has stated:

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds" based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert*, 509 U.S. at 590; *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 144–45 (3d Cir.

2000).  In practice, this requires the court to act as a "gatekeeper" to prevent expert

testimony running afoul of Rule 702 from ever reaching the jury. *See Daubert*, 509 U.S. at 596–97. Thus, the court "must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

The Third Circuit has described Rule 702 as embodying a "trilogy of restrictions on expert testimony: [1] qualification, [2] reliability, and [3] fit." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)). First, the witness must be qualified to testify as an expert, which requires "that the witness possess specialized expertise." *Id.* This requirement, however, has been interpreted liberally to encompass "a broad range of knowledge, skills, and training." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (hereinafter, "*In re Paoli*").

Second, the testimony must be reliable, which demands that "the expert's opinion must be based upon the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'" *Calhoun*, 350 F.3d at 321 (quoting *In re Paoli*, 35 F.3d at 742). In other words, the Court must ensure that the evidence adduced is scientifically valid. *Daubert*, 509 U.S. at 590. In determining the reliability of expert testimony, the Court is guided by the following factors:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Calhoun*, 350 F.3d at 321 (quoting *In re Paoli*, 35 F.3d at 742 n.8). However, the Court is not restricted to any "definitive checklist or test." *Daubert*, 509 U.S. at 593. This inquiry is "a flexible one" focusing "solely on the principles and methodology, not on the conclusions that they generate." *Id.* at 595.

While reliability does not require "correctness," it does prohibit "too great a gap between the data and the [expert's] opinion proffered." *Oddi*, 234 F.3d at 146 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, the court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Id.* (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)).

Third, the expert's testimony must "fit" the case. *Daubert*, 509 U.S. at 592. Otherwise known as the "helpfulness" standard, this requires there to be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92. The fit requirement "goes primarily to relevance." *Id.* "[T]he expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404 (citations omitted). The party that proffers the expert testimony bears the burden of establishing its admissibility by a preponderance of the

evidence.  *Daubert*, 509 U.S. at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)).

## III.   DISCUSSION

Cognizant of the foregoing principles, the Court considers the parties' challenges to their respective experts in the order in which they were presented to the Court during the *Daubert* hearing—thus first addressing LoanCare's Motion before turning to Freedom's Motion.   At LoanCare's request, the Court also considers whether the reports of Susan Connally and Robert Lyons may be presented as summary evidence.

### A.   LoanCare's Motion to Exclude Susan Connally and Robert Lyons

LoanCare requests that Freedom's expert witnesses—Susan Connally and Robert Lyons—be excluded from testifying in this action.  Connally is Freedom's expert on VA-guaranteed loans, and Lyons is Freedom's expert on all other loans.  Generally, LoanCare contends that Connally and Lyons assign fault to LoanCare for any error or omission Freedom could identify in connection with LoanCare's subservicing of its loan portfolio, notwithstanding the applicable standards of the Subservicing Agreement.  LoanCare raises other issues concerning their methodology too.  While LoanCare bases its challenges to the opinions of Connally and Lyons on *Daubert's* "fit" and reliability requirements, the Court notes that these principles overlap and merge when applied to Freedom's experts.  LoanCare does not dispute the experts' qualifications, and in any case the Court finds that Connally and Lyons are sufficiently qualified to testify.  *See Daubert*, 509 U.S. at 592 & n.10.

8

### 1.    *Whether Susan Connally Should be Excluded*

Susan Connally, Freedom's expert on VA-guaranteed loans, offers an affirmative report and a rebuttal report.  Freedom offers Connally's affirmative opinions to establish that LoanCare's alleged misconduct in servicing Freedom's portfolio of VA-guaranteed loans caused it $4,790,707.35 of losses in foregone interest and expense reimbursements.  [Freedom Mortgage VA Claim Review 3, 10, Docket No. 215-13 ("**Connally Rpt.**").]  In reaching this conclusion, Connally and her team reviewed servicing files for 1,318 VA-guaranteed loans with VA claims filed by LoanCare on behalf of Freedom between 2010 and 2016.[3]  [*Id.* at 3.]  Of the loans reviewed, Connally determined that Freedom sustained losses on 1,137 *solely* because of LoanCare's "errors and omissions" concerning compliance with "applicable servicing requirements"—principally, LoanCare's apparent failure to observe VA-established deadlines and to successfully obtain reimbursement for eligible expenses. [*Id.* at 4, 7–8.]  These errors and omissions resulted in the VA's assessment of "claim curtailments," which refers to the reduction in a claim for reimbursement of eligible expenses due to an "infraction or violation" of a VA requirement.  [*Id.* at 5, 6; Hrg. Tr. 38.]  Specifically, Connally identified several trends in LoanCare's performance: delays in completing foreclosures due to missing documentation or miscommunications with foreclosure counsel, untimely and mistaken referrals of

---

[3] A claim is filed with the VA following the occurrence of a "terminating event," such as a foreclosure, to obtain reimbursement of eligible fees, costs, and losses up to a maximum figure allowed by the VA (the "**Maximum Guaranty**").  [Connally Rpt. 5.]

defaulted loans to counsel, failure to submit title documents to the VA, and other issues, to name a few.  [Connally Rpt. 8–10.]  The bulk of the monetary loss that Connally attributed to LoanCare appears to be loss arising from the VA's rejection of expenses for reimbursement that were incurred after VA-mandated deadlines to terminate a loan or prior to default, were ineligible for some other reason, or exceeded the Maximum Guaranty.  [*Id.* at 8.]  In total, she found that these errors and omissions represented $4,790,707.35 in foregone interest and reimbursements that Freedom would have been entitled to had LoanCare complied with the VA requirements.  [*Id.* at 10.]

Additionally, Connally offers opinions rebutting LoanCare's experts to demonstrate that LoanCare did not perform its contractual obligations as a "prudent" subservicer would have during the applicable period.  [*See generally* Freedom Mortgage: Clayton's Response to LoanCare LLC's Expert Rpts., Docket No. 215-14 ("**Connally Rebuttal Rpt.**").]

LoanCare challenges the relevance and reliability of these opinions.  It first argues that Connally did not consider applicable contractual standards when analyzing LoanCare's performance servicing Freedom's portfolio of VA-guaranteed loans.  [Def.'s Br. 8.]  LoanCare explains that § 8.3 of the Subservicing Agreement limits LoanCare's liability for "willful misconduct or gross negligence" and specifically excludes liability for actions taken (or not taken) in good faith, or for "good faith errors in judgment."  [*Id.*]  According to LoanCare, because Connally assigned fault for *any*

activity that resulted in a delay beyond the VA's timelines and disregarded the Subservicing Agreement, she adopted a "you erred, you're liable" standard that would mislead a jury. [Def.'s Reply Br. 1; Def.'s Br. 8.]

In opposition, Freedom argues that Connally applied the correct standard to assess LoanCare's conduct. Specifically, Freedom contends that the relevant provision of the Subservicing Agreement is § 2.2, which requires LoanCare to service Freedom's loans in compliance with the "Applicable Requirements" (including the VA Handbook and other servicing guides). Accordingly, Freedom believes that Connally's analysis is consistent with the correct contractual standard. [Pl.'s Opp'n 1.] Freedom also contends that Connally was precluded from opining whether LoanCare's errors resulted from "willful misconduct" or "gross negligence," and not "good faith" mistakes, as such ultimate issues involve legal conclusions within the province of the jury. [*Id.*] Next, Freedom claims that Connally in fact considered the relevant language of § 8.3 by assigning fault to LoanCare only for damages solely resulting from its failure to comply with the VA Guide, leaving the question of egregiousness to the jury's evaluation. [*Id.* at 1–2 & n.2.] Finally, Freedom says that LoanCare's generalized violation of industry practices is a violation of the VA Guide and the Subservicing Agreement because the VA Guide requires loans to be serviced "consistent with industry standards." [*Id.* at 2.]

The Court finds Freedom's opposition unpersuasive and agrees with LoanCare's first argument. It concludes that Connally's opinions are the product of an unreliable methodology and must be excluded as a result. *See In re Paoli*, 35 F.3d

11

at 746 (explaining that a court should exclude an expert's opinion where a methodological flaw is "largen enough that the expert lacks 'good grounds' for his or her conclusions").  Relatedly, the Court finds that Connally's opinions cannot assist a jury to determine liability because they do not apply the relevant limitations of the Subservicing Agreement.  *See Oddi*, 234 F.3d at 145–46 (explaining that expert testimony must "fit" the case to assist the trier of fact).  Indeed, one of the fatal flaws in Connally's analysis is that she did not construct a method of evaluating the VA loans to attribute Freedom's losses to LoanCare that properly considered the text of the Subservicing Agreement.  Section 8.3 is clear about the scope of LoanCare's liability:

> [LoanCare] shall be liable to [Freedom] only for [LoanCare's] ***willful misconduct*** or ***gross negligence*** arising ***solely from its own acts or omissions*** and shall not be under any liability to [Freedom] for any action taken or for refraining from the taking of any action ***in good faith*** pursuant to this Agreement, or ***for good faith errors in judgment***, . . . .  In no event shall [LoanCare] be held liable for any special, indirect, punitive or consequential damages, resulting from any action taken or omitted to be taken by it hereunder or in connection herewith.

[Subservicing Agreement § 8.3, Docket No. 1-2 (emphasis added).]  As Connally herself admitted, she defined an error to be "a servicing delay that was caused by something that was done outside of standard servicing practice" or "the VA Guide requirements," [Hrg. Tr. 41], and she looked for "***anything*** [she] viewed as a LoanCare error" when assigning losses to LoanCare, [*id.* at 42 (emphasis added)]. But she did not connect the dots for the jury to conclude whether LoanCare's conduct fell within the language of the contract.  Importantly, she did not consider whether an error was

intentional or deliberate, or the result of recklessness, or made in good faith.  [*See id.*]
Nor does her methodology measure servicing errors against an objective standard by
which a jury could reliably weigh whether an identified error was, for instance, the
result of bad faith.  Based on Connally's opinions, a reasonably jury could not infer
gross negligence or recklessness either because Connally does not compare LoanCare's
performance against others using accepted metrics to determine whether LoanCare
was out-of-step with its industry peers.   In other words, she simply attributed to
LoanCare *all* losses for which it was arguably "solely" responsible and failed to parse
LoanCare's conduct any more specifically.  Without this issue addressed, Connally's
expert testimony *may* explain the magnitude of Freedom's losses due to LoanCare's
mistakes, but not that for which LoanCare is contractually liable.  Accordingly, it is
both irrelevant and unreliable.  *See Oddi*, 234 F.3d at 145; *In re Paoli*, 35 F.3d at 746.
Section 8.3 limits LoanCare's liability notwithstanding its agreement in § 2.2 to service
Freedom's loans in compliance with the "Applicable Requirements."

This critical distinction was lost on Connally in her written reports, but not in
her testimony during the *Daubert* Hearing.  For example, the Court inquired about the
good faith limitation of § 8.3:

> THE COURT: Do you see a difference in your analysis of looking at
> practices done in good faith versus practices done pursuant to industry
> standards?
>
> [CONNALLY]: I think there can be scenarios in which there is a
> servicing error that does not align with industry best practice even though
> it is done in good faith. . . . But ultimately, failure to identify and
> remediate that issue before it becomes a delay or an error impacts the loss
> to whoever holds that loan.

THE COURT: [T]here's no way that your analysis is able to . . . determine whether it was done in good faith . . . ?

[CONNALLY]: Correct.

[Hrg. Tr. 42–43.]  The Court concludes from this testimony that Connally recognized that her analysis does not differentiate between servicing errors in the relevant sense. It merely infers that a purported LoanCare error results in a Freedom loss for which LoanCare is liable.  But liability is partly dependent on custom and industry practices—issues that Connally did not build into her methodology.  Rather, she documented each and every LoanCare error and omission irrespective of the contractual standard.  The Court also asked Connally how her testimony would assist a jury to understand whether LoanCare was, for instance, grossly negligent when she did not consider this standard in tallying LoanCare's errors:

[CONNALLY]: I think my testimony by understanding some of the nuances of these servicing issues and the number of issues would help the jury decide whether it rises to that standard of gross negligence.

THE COURT: But how would they take your report and do that?

[CONNALLY]: (No response.)

[Hrg. Tr. 87.]  Later, in its colloquy with counsel, the Court described the crux of the problem: Connally has not provided the "tools" with which a jury can decide whether LoanCare's errors and omissions rise to the level of gross negligence or otherwise render it contractually liable.  [*Id.* at 105.]  In response, Freedom pointed to its second

14

argument, [*id.* at 105–06], that under governing Virginia law,[4] LoanCare's gross negligence may be cobbled together from multiple instances of ordinary negligence. [*See* Pl.'s Opp'n 2–3.]  Freedom urged the Court to review the cases cited in its papers. [Hrg. Tr. 112; *see also* Pl.'s Post-*Daubert* Br. 2–3.]

The Court has read and re-read those cases.  They simply do not stand for such a convenient proposition as applied here. In Virginia, gross negligence is described as "utter disregard of prudence amounting to complete neglect of the safety of another," *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (Va. 1987), and a "heedless and palpable violation of legal duty respecting the rights of others," *Town of Big Stone Gap v. Johnson*, 35 S.E.2d 71, 73 (Va. 1945) (citation omitted); *see also Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004) (defining gross negligence as "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person," which would "shock fair-minded persons, although demonstrating something less than willful recklessness") (citations omitted). "Several acts of negligence which separately may not amount to gross negligence, when combined may have a cumulative effect showing a form of reckless or total disregard for another's safety." *Chapman v. City of Virginia Beach*, 475 S.E.2d 798, 801 (Va. 1996) (citing *Kennedy v. McElroy*, 81 S.E.2d 436, 439 (Va. 1954)).  Some degree of deliberateness thus appears to be a touchstone of gross negligence.  *See id.*

---

[4] The Subservicing Agreement provides for the application of Virginia law.  [See Subservicing Agreement § 10.6.]

In *Chapman*, bereaved parents filed a wrongful death action against the City of Virginia Beach after their eight-year-old died, hanged between the metal bars of a gate that the city maintained. 475 S.E.2d 798, 799–800 (Va. 1996). After a jury returned a verdict in favor of one of the parents, the trial court ruled that the evidence did not establish gross negligence. *Id.* at 800. Finding that the city was informed on multiple occasions that the gate was broken and that it made a deliberate decision not to order it repaired, the *Chapman* court reinstated the verdict. *Id.* at 801. "On this record, reasonable persons could differ upon whether the cumulative effect of these circumstances constitutes a form of recklessness or a total disregard of all precautions, an absence of diligence, or lack of even slight care," so the question was properly submitted to the jury. *Id.*

In *Finney v. Clark Realty Capital*, two tenants sued their landlord for, *inter alia*, negligent repair after they complained on several occasions about mold in their home. 2022 WL 303245, at *1 (E.D. Va. 2022). The complaints stretched over a year, and an unsuccessful attempt to remediate the mold only aggravated respiratory problems for one tenant, resulting in her hospitalization. *Id.* at *1–*2. Ultimately, the tenants were relocated. *Id.* at *2. Denying the landlord's motion for summary judgment as to the tenants' gross negligence claim, the *Finney* court found the following facts to be disputed: that "there were repeated attempts and requests made for mold remediation that were ignored"; that the landlord "had knowledge of mold in the residence . . . from the complaints of other tenants"; that the mold was visible for over a year; and that the landlord's unsuccessful attempt at remediation led to the hospitalization of a

tenant. *Id.* at *4. Thus, a jury could find the landlord grossly negligent. *Id.*

The present case is unlike *Chapman* and *Finney*. The theory of gross negligence that Freedom invokes to establish the relevance of Connally's (and Robert Lyons') opinions involves the aggregation of dissimilar errors and omissions without the same pattern of notice and deliberate action apparent in the "cumulative effects" cases. Unlike in *Chapman* where the city received notice of the broken gate on at least three separate occasions and deliberately chose not to repair it, 475 S.E.2d at 801, Connally's testimony does not establish that LoanCare deliberately and repeatedly made the same set of errors servicing the same set of loans. The comparison to *Finney* reveals the same conclusion. Freedom cannot treat losses arising from a LoanCare error—such as a missed deadline—on one loan as gross negligence by focusing on losses arising from other loans. The errors and the loan profiles are not necessarily the same. Furthermore, deliberate conduct is a touchstone of gross negligence. *See id.* As Connally admitted, her analysis was not designed to consider such questions. [*See* Hrg. Tr. 42–43; *see also supra* page 13.] Finally, *Chapman* involves personal injury and *Finney* landlord-tenant relations. In the instant contract dispute, a negotiated provision specifically addresses the scope of one party's liability, and it effectively excludes ordinary negligence. Freedom's expert testimony should not require such an inventive theory to satisfy the standards of *Daubert* and Federal Rule of Evidence 702.

Next, LoanCare seeks to exclude Connally because she assigns damages to LoanCare on loans for which Freedom received the VA's Maximum Guaranty. [Def.'s Br. 9–10.] Freedom apparently sustained losses on 721 loans solely because

17

the deficiency remaining on the loan after foreclosure was greater than the Maximum Guaranty, and LoanCare argues that Freedom would have recovered the same figure even if its alleged breaches of the Subservicing Agreement had not occurred. [Def.'s Br. 9.] LoanCare thus claims that Connally's methodological choice lacks an adequate foundation for two reasons. First, LoanCare disputes Connally's choice to attribute Freedom's foregone interest to LoanCare, as Freedom *chose* to advance interest to the loan's investor (Ginnie Mae) rather than buy out the loan. [*Id.* at 10.] Thus, arguably, such losses do not arise "solely" from LoanCare's acts or omissions. Second, LoanCare emphasizes the lack of a nexus between Freedom's claimed losses where the Maximum Guaranty was recovered and LoanCare's errors and omissions: even if LoanCare made no errors for these loans, the VA would not reimburse eligible expenses totaling more than the Maximum Guaranty. [*Id.*]

Freedom opposes. [Pl.'s Opp'n 4–5.] Freedom argues that, when a borrower defaults on a VA loan, nonbanks (such as Freedom) infrequently buy out the loan. [*Id.* at 5.] Rather, typically, they advance interest to Ginnie Mae until a foreclosure can be completed. [*Id.*] Because LoanCare failed to timely process foreclosures, Freedom sustained greater foregone interest than it otherwise would have. [*Id.*] Accordingly, Connally assigns LoanCare responsibility for foregone interest for which its errors and omissions are the "sole" cause. Similarly, Freedom claims that LoanCare is liable for Freedom's "pass-through" expenses that exceed the Maximum Guaranty, even though such costs are not reimbursable by the VA, as such losses would not have been incurred had LoanCare complied with § 2.2 of the Subservicing Agreement. [*Id.*]

18

Connally's testimony during the *Daubert* Hearing is particularly instructive to clarify these mechanics. She discussed an example loan that entered default: its Maximum Guaranty was around $112,000, its sale proceeds from foreclosure were over $260,000, and its unpaid principal balance was around $450,000. [Hrg. Tr. 49.] Sale proceeds minus unpaid principal balance represents, in this particular case, a loss of more than $182,000 to Freedom. [*Id.*] Because the Maximum Guaranty for this loan was around $112,000, Freedom sustained the differential (around $70,000) as a loss, as it could not recover more than $112,000 from the VA. [*Id.*] At the same time, Freedom was also responsible for paying interest to Ginnie Mae and servicing expenses until a foreclosure was completed. [*Id.* at 50–51.] While Connally explained that she did not attribute the delta to LoanCare automatically—as property value declines at this time appear to have been inherent to the loan's negative value—she did attribute the foregone interest and expenses to LoanCare where its error (such as a foreclosure delay) resulted in additional cost to Freedom. [*Id.* at 49–52.]

LoanCare's argument thus appears to depend on its view that foregone interest and expenses on loans that received the VA's Maximum Guaranty constitute "consequential damages" that are specifically excluded under § 8.3. [See Hrg. Tr. 54–55; Def.'s Br. 5 n.7.] The provision reads: "In no event shall [LoanCare] be held liable for any special, indirect, punitive or consequential damages, resulting from any action taken or omitted to be taken by it hereunder or in connection herewith." [Subservicing Agreement § 8.3.] The Court does not necessarily agree with LoanCare's assertion, but as the Court previewed during the *Daubert* hearing, it need not definitively decide

this issue now.  [Hrg. Tr. 101.]  Similarly, the Court need not determine whether foregone interest is a loss arising "solely" from LoanCare's own acts or omissions. Connally's methodology is fundamentally flawed because she failed to correctly distinguish between the acts and omissions that could render LoanCare contractually liable, even assuming its sole responsibility.

Finally, LoanCare asserts that Connally's rebuttal opinions must be excluded because she never reviewed LoanCare's policies and procedures and could not provide the error rates of, or define, a "prudent" servicer.  [Def.'s Br. 10.]  Essentially, Freedom replies that LoanCare's arguments are irrelevant, as Connally opines on LoanCare's compliance with applicable servicing requirements in practice and her opinions are based on her experience.  [Pl.'s Opp'n 5.]   The Court agrees with LoanCare. Connally's rebuttal opinions regarding LoanCare's policies and procedures lack foundation, as she never reviewed those policies and procedures and has not provided a persuasive explanation why such review was unnecessary.  *See Oddi*, 234 F.3d at 146. While the Court recognizes that industry data regarding "prudent" servicing do not appear to be available, [Hrg. Tr. 74], Connally was unable to provide objective support for her opinion that LoanCare acted imprudently, [*see id.* at 73–76].  Moreover, her firm's internal data—on which she partially relied to form her opinions—do not appear to have provided sufficiently detailed information regarding error rates specific to VA loans.  [*Id.* at 75.]  Without the required foundation, Connally's rebuttal opinions are too speculative, despite her generalized industry experience. *See In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999); *James v. Harrah's Resort Atl. City*, 2016 WL

7408845, at *5 (D.N.J. Dec. 22, 2016).  The Court thus finds that Freedom has not met its burden to establish that Connally's rebuttal opinions are sufficiently reliable. *See Daubert*, 509 U.S. at 592 n.10.

Accordingly, LoanCare's Motion will be granted as to the proffered testimony of Connally, and the Court will exclude her opinions pursuant to Federal Rule of Evidence 702.

### 2.    *Whether Robert Lyons Should be Excluded*

Next, the Court considers the proposed testimony of Robert Lyons.  Lyons is Freedom's expert concerning all loans except VA-guaranteed loans.  Freedom offers Lyons to demonstrate that LoanCare's servicing errors and omissions caused it to suffer $17,262,890.08 in financial losses.  [Collingwood Grp. Am. FHA Analysis ¶ 3.1(c), Docket No. 215-2 ("**Lyons Rpt.**").]  Specifically, Lyons opines that LoanCare committed errors and omissions in connection with its (i) handling of FHA Part A and Part B claims, (ii) property preservation and protection practices, (iii) reconveyances and improper conveyances of properties to HUD, (iv) expense reimbursements, (v) timely conveyance practices, (vi) vendor management, and (vii) compliance with FHA requirements prior to loan assignment.  [*Id.* ¶ 3.1.]  Furthermore, it is Lyons' opinion that LoanCare's errors and omissions required Freedom to advance "pass-through" principal and interest payments to Ginnie Mae that it otherwise would not have done had LoanCare complied with applicable servicing timelines.  [*Id.* ¶ 3.2.]  These errors and omissions caused Freedom to sustain 13,086,386.01 in damages.  [*Id.*] Additionally, Lyons submits various reports rebutting the opinions of LoanCare's

experts.  [Docket Nos. 215-4, 215-5, 215-6.]

LoanCare's arguments to exclude Lyons are nearly identical to those it submitted to exclude Connally.  First, it argues that Lyons' opinions are fundamentally flawed because he assigned fault to LoanCare for *any* error or omission it committed in connection with servicing Freedom's loan portfolio, not the applicable selection of errors and omissions that § 8.3 permits.  [Def.'s Br. 1–4.]  Second, relatedly, LoanCare argues that Lyons attributed damages to LoanCare for which it cannot be liable because the damages did not result *solely* from LoanCare's acts or omissions.  [*Id.* at 4–5.]  Third, LoanCare asserts that Lyons is an impermissible conduit for other experts who are not testifying in this action.  [*Id.* at 6.]  Fourth, LoanCare argues that Lyons' opinions are speculative, unrepresentative, and lack a proper foundation.  [*Id.* at 7.]

Freedom counters.  It first argues that Lyons applied the relevant contractual standards.  [Pl.'s Opp'n 6–7.]  Second, Freedom argues that Lyons appropriately assigned "pass-through" payments to LoanCare, as they directly resulted from LoanCare's servicing errors and omissions.  [*Id.* at 7–9.]  Third, Freedom points out that while Lyons employed more than a dozen subject matter experts, he was involved in "all of the drafting" and independently reviewed and analyzed his team's work.  [*Id.* at 9–10.]  Fourth, Freedom argues that Lyon's opinions are based on his extensive industry experience and that review of LoanCare's policies and procedures was not required to support his opinions.  [*Id.* at 10–11.]

As before, the Court finds LoanCare's primary argument to be convincing.  The Subservicing Agreement includes a limitation of liability that clearly defines the acts

and omissions for which LoanCare, in performing its obligations pursuant to the agreement, would face liability.  [See Subservicing Agreement § 8.3; see also *supra* Section III.A.1.]  In completing his analysis, however, Lyons did not instruct his team to consider whether an identified error resulted from LoanCare's willful misconduct, gross negligence, good faith error of judgment, or otherwise.  [Lyons Dep. Tr. 136:17– 137:19, Docket No. 215-7; Hrg. Tr. 148–49.]  Nor did he construct a methodology that appropriately accounts for these concepts either.   Rather, he assigned fault to LoanCare for *all* of its errors and omissions, including instances in which his team found insufficient documentation in the loan file and assumed LoanCare was at fault.[5] [Hrg. Tr. 150–51.]  Though the Court certainly agrees with Freedom that Lyons cannot opine that LoanCare acted willfully, with gross negligence, or in bad faith—as the opinion would address an ultimate legal conclusion that is not appropriately within an expert's domain, *see, e.g.*, *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (stating that, although Federal Rule of Evidence 704 permits an expert to give

---

[5] Freedom believes that Lyons reasonably assumed LoanCare's fault where a loan file did not clearly indicate that another party was at fault since "LoanCare had an obligation and a responsibility to document everything that they did in compliance with Fannie and Freddie guidelines" and the Subservicing Agreement, [Hrg. Tr. 127], so "[i]t was reasonable to conclude that [LoanCare] . . . caused the delay and losses," [Pl.'s Opp'n 6].  But this approach is highly suggestive of the underlying problem with Lyons' methodology.  For instance, as he testified, Lyons included 78 loans in his initial report that involved servicing errors that predated LoanCare's engagement with Freedom.  [Hrg. Tr. 140, 157–59.]  Though he subsequently amended his report and removed the loans, the mistake reveals that his methodology generated an overinclusive universe of errors and omissions.  Lyons' approach was not sufficiently tailored to the relevant inquiry, i.e., whether an identified error or omission would render LoanCare contractually liable pursuant to § 8.3.

testimony concerning an ultimate issue, the court must ensure that the expert does not render a legal opinion)—Lyons' opinions, like Connally's, do not enable a jury to make these determinations from the analysis provided.  He fails to provide testimony that a jury could reliably weigh to determine whether LoanCare is liable for the relevant errors and omissions, consistent with the text of the Subservicing Agreement. Accordingly, the Court finds that Lyons' opinions are the product of an unreliable methodology and, as a result, do not "fit" this case.  *See Daubert*, 509 U.S. at 591–92; *Oddi*, 234 F.3d at 146; *In re Paoli*, 35 F.3d at 742.

Next, the Court addresses LoanCare's second argument regarding "pass-through" damages.  [Def.'s Br. 4–5.]  As explained above, because the Court finds that Lyons should be precluded from testifying for the same reason as Connally, it need not rule as to whether LoanCare is liable for "pass-through" damages given the language of § 8.3 excluding special and consequential damages or, as pertinent here, whether Lyons misapplies such standard.  See *supra* Section III.A.1.  Because Lyons' methodology—by failing to identify the errors and omissions relevant pursuant § 8.3— is flawed at a more fundamental level, the Court also need not determine whether LoanCare is the "sole" cause of the "pass-through" losses.

Finally, the Court addresses LoanCare's remaining arguments.  LoanCare contends that Lyons is an impermissible conduit for other undisclosed experts.  [Def.'s Br. 6.]  But the Court observes that exclusion of an expert for serving as a conduit has typically required a more egregious scenario.  See *In re TMI Litig.*, 193 F.3d at 715–16 (discussing exclusion of expert that "assumed the correctness" of other experts'

propositions without independent validation). Thus, the Court rejects this reason for excluding Lyons. Next, to the extent LoanCare's fourth argument—that Lyons cannot opine on industry averages or policies he never reviewed—is focused on Lyons' rebuttal opinions as distinct from his affirmative opinions, the Court finds that the same reasons that preclude Connally's testimony must preclude Lyons' testimony. He cannot testify as to policies he never reviewed absent a persuasive explanation that review of such policies is not necessary. *See Oddi*, 234 F.3d at 146. Furthermore, Lyons' opinions regarding LoanCare's performance must rest on "good grounds," *see Daubert*, 509 U.S. at 590; because his opinions are flawed for the foregoing reasons and he cannot point to reliable industry data, as no such information exists, his intended testimony is too speculative to survive scrutiny. *See In re TMI Litig.*, 193 F.3d at 670; *James v. Harrah's Resort Atl. City*, 2016 WL 7408845, at *5 (D.N.J. Dec. 22, 2016).

Accordingly, LoanCare's Motion will be granted as to the proffered testimony of Lyons, and the Court will exclude his opinions pursuant to Federal Rule of Evidence 702.

### 3.   *Whether Connally or Lyons May Serve as Summary Witnesses*

In its post-*Daubert* brief, LoanCare submits that, assuming the Court excludes the opinions of both experts (as it does), the expert opinions of Connally and Lyons may not be used as summary evidence pursuant to Federal Rule of Evidence 1006. [Def.'s Post-*Daubert* Br. 1–2.] The Court agrees.

Under Rule 1006, a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be

conveniently examined in court." FED. R. EVID. 1006.  But Rule 1006 is "not a back-door vehicle for the introduction of evidence which is otherwise inadmissible." *Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3d Cir. 2007) (internal quotation marks and citation omitted).  To be admissible, summary evidence must not include the opinions of a barred expert.  *See id.* (explaining that evidence would be excluded where it "went beyond the data they summarized and included several assumptions, inferences, and projections," which represented the expert's opinion, "rather than the underlying information").

Here, the expert opinions of Connally and Lyons are embodied in their reports and accompanying appendices.  They used a similar approach regarding the selection of LoanCare errors and omissions, and their judgment was employed at every stage.  The Court cannot discern a viable way to "scrub" their analyses such that they can be presented in the form of summary evidence.  Because the Court found their approach fundamentally flawed, it further finds that any summary evidence extracted from their reports would be a "synthesis rather than a summary," and would mislead a jury as a result.  *See id.*

### B. Freedom's Motion to Exclude Christopher Sicuranza, Genger Charles, Marcel Bryar, and Nigel Brazier

Next, the Court addresses Freedom's Motion.  Freedom moves to exclude LoanCare's four experts—Christopher Sicuranza, Genger Charles, Marcel Bryar, and Nigel Brazier—for failing to comply with the requirements of Federal Rule of Evidence 702.  As with LoanCare's Motion, Freedom's arguments are directed to the

26

reliability of the experts' methodologies and the relevance of their conclusions, not their qualifications. As a preliminary matter, the Court finds that LoanCare's proffered experts are sufficiently qualified to testify. *See Daubert*, 509 U.S. at 592 & n.10.

### 1.   Whether Christopher Sicuranza Should be Excluded

LoanCare offers Sicuranza's testimony to show that it was servicing Freedom's portfolio of loans appropriately, in light of market circumstances and industry norms. [Def.'s Opp'n 6.]   His report summarizes several of his opinions, including that "LoanCare exceeded or performed in line with other industry servicers during the relevant period"; that "LoanCare acted in good-faith to reduce the amount of non-reimbursable losses Freedom incurred on defective loans"; that "LoanCare faced extraordinary circumstances resulting in uncontrollable delays on the loans in question"; and that "LoanCare was not intentionally acting in a way to delay foreclosure timelines or cause Freedom to incur non-reimbursable losses."   [Expert Rpt. of Christopher Sicuranza ¶¶ 11, 12, 13, 16, Docket No. 218-2 ("**Sicuranza Rpt.**"); *see also id.* ¶¶ 9–10, 14–15, 17–22.]  Sicuranza further elaborated on his conclusions and methodology during the *Daubert* hearing: "what I generally found was LoanCare was performing at the typical standard I would find at any servicing shop, at or above that standard."   [Hrg. Tr. 207.]   Unlike Freedom's experts, Sicuranza employed the statistical tool of sampling: from the total population of loans for which Freedom is claiming damages, he segmented them by "like characteristics" and designed samples for each category (e.g., HUD FHA Part A and B claims, VA claims) after reviewing the loan-level documentation.  [*Id.* at 204.]  This enabled him to extrapolate about the

27

entire population of loans.  [*Id.* at 204–05; *see also* Sicuranza Rpt. ¶¶ 371–81.]  He then assessed the samples against relevant servicing requirements.  [Sicuranza Rpt. ¶ 373.]

Freedom opposes Sicuranza's testimony for four reasons.  First, Freedom contends that Sicuranza's sampling methodology is unreliable because "no single loan can be considered 'representative' of another," so no conclusions can be reliably extrapolated from Sicuranza's samples.  [Pl.'s Br. 7.]  Second, Freedom argues that Sicuranza impermissibly opines that LoanCare is not liable under the Subservicing Agreement for losses arising from "third parties," such as foreclosure counsel and vendors.  [*Id.* at 8–9.]  Third, Freedom seeks to preclude Sicuranza from testifying that LoanCare acted in "good faith," as his opinion addresses an ultimate legal conclusion.  [*Id.* at 10.]  Finally, Freedom argues that Sicuranza should be precluded from "speculating" as to origination errors because he did not review Freedom's origination files.  [*Id.*]

In response, LoanCare argues that Sicuranza's methodology is reliable and that Freedom fails to appreciate fundamental principles of statistical sampling.  [Def.'s Opp'n 7.]  Next, LoanCare claims that §§ 7.1(h) and 8.3 preclude its liability for losses caused by third parties, and that Sicuranza's testimony demonstrates this point rather than offers a legal opinion as to the interpretation of the Subservicing Agreement.  [*Id.* at 9.]  Similarly, LoanCare argues that Sicuranza offers opinions as to industry norms, not opinions regarding legal conclusions.  [*Id.* at 10.]  Finally, it contends that Sicuranza's opinions regarding origination errors are reliable because, while he did not review the loans' underwriting files, he did review sufficient documentation to

28

demonstrate that the errors occurred.  [*Id.* at 10–11.]

The Court finds Sicuranza's testimony to be reliable, relevant, and otherwise permissible, except as set forth below.  First, Freedom's contention—that population-wide conclusions cannot reliably be drawn from Sicuranza's sampling methodology because each loan requires individualized analysis—lacks merit.  It is a truism in statistics that conclusions about a population can be drawn from a valid sample that is randomly selected and representative, notwithstanding differences in the characteristics of the population.  *See* David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* FJC Ref. Manual Sci. Evid. §§ 216, 223–230 (3d ed.); *see also, e.g.*, *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019–20 (5th Cir. 1997) ("The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole."); *Nelson v. Am. Standard, Inc.*, 2009 WL 4730166, at *3 (E.D. Tex. Dec. 4, 2009) ("The fundamental precept of statistics and sampling is that meaningful differences among class members can be determined from a sampling of individuals."); *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 261 (3d Cir. 2016) (Fuentes, J., concurring in part, dissenting in part) ("A valid statistical survey essentially has three steps: (i) identify a population of interest, (ii) take a random sample from that population, and (iii) use the observations in the sample to draw inferences about the population as a whole.").  Accordingly, Sicuranza selected a valid scientific method that is generally accepted in his field.  *See Calhoun*, 350 F.3d at 321 (quoting *In re Paoli*, 35 F.3d at 742 n.8).  Simply because the loans at issue here reflect unique

circumstances does not mean that a sample of them cannot be representative. Sicuranza addressed this contention head-on in his testimony:

> Q.     And does the fact that a loan [i]s unique as you say here mean that there's no way to obtain a sample that is representative of the population that you're looking at?
>
> A.     No.  So the loans are unique from where they're located, the types of property damage that may exist, the borrower that's in the property. But I'm evaluating LoanCare's performance on those loans, and so LoanCare is the one constant through all my samples.

[Hrg. Tr. 213.]  The Court thus concludes that Sicuranza's methodology is sound, *see Rosenbohm v. Cellco P'ship*, 2019 WL 2141901, at *2 (S.D. Ohio May 16, 2019) ("[O]ne can draw inferences about the larger population only if the sample is representative of that larger population.  And representatives is best ensured using random sampling."), and that his conclusions reliably flow from his methodology, *see Oddi*, 234 F.3d at 146. [*See also* Hrg. Tr. 260–61.]

Next, the Court addresses Sicuranza's testimony concerning losses arising from third parties, such as foreclosure counsel and property preservation vendors.  His report separately identifies errors and delays attributable to these third parties, [*see* Sicuranza Rpt. ¶¶ 277, 326], which he characterized as "uncontrollable" and "outside of the direct control of LoanCare," [Hrg. Tr. 217].  In LoanCare's words, "Sicuranza has permissibly determined, based on his review of the loan files, that many of the losses were caused by third parties rather than LoanCare."  [Def.'s Opp'n 9.]  His assessment was informed by "discussions with counsel and [his] reading of the [Subservicing Agreement]."  [Hrg. Tr. 217.]  While Sicuranza does not appear to be

opining that LoanCare is *not* liable for losses resulting from the acts and omissions of foreclosure counsel and property preservation vendors,[6] [*see id.* at 253–57], his testimony identifying "third-party" "uncontrollable events" is only relevant insofar as these "third parties" are not LoanCare's agents.  If they are, then losses resulting from their action or inaction would be appropriately attributed to LoanCare, provided they are not otherwise excluded by the limitation of liability.  As in the parties' summary judgment briefing, Freedom and LoanCare each urge the Court to adopt different readings of the relevant text of the Subservicing Agreement.  [*Compare* Pl.'s Br. 9–10, *with* Def.'s Opp'n 9.]  Previously, the Court declined to grant summary judgment concerning this issue based on the presence of genuine factual disputes.  [Docket No. 177, at 4.]  Now, the Court must determine whether Sicuranza can testify regarding this issue.  It concludes that he can, and that is all the Court decides at this juncture.[7]

The Subservicing Agreement provides that LoanCare is liable for losses arising "solely from its own acts or omissions," [Subservicing Agreement § 8.3], and it states that LoanCare "does not guaranty [Freedom] the obligations or performance of any third party," [*id.* § 7.1(h)].  These provisions, however, do not permit LoanCare to exclude from its liability any losses arising from its agents.  *See Miller v. Quarles*, 410

---

[6] Nor would the Court permit him to render an opinion in this regard.  Ultimate legal conclusions are not appropriate for expert testimony.  *Holman Enters. v. Fidelity Guar. Ins. Co.*, 563 F.Supp.2d 467, 472 (D.N.J. 2008).

[7] Freedom's Brief includes a footnote indicating that it has reserved the right to file a motion *in limine* to bar LoanCare from presenting evidence that LoanCare is not responsible for the errors and omissions of its foreclosure counsel and vendors.  [Pl.'s Br. 10 n.14.]  This Opinion should not be read to affect Freedom's right to do so.

S.E.2d 639, 647–48 (Va. 1991) ("a principal is liable to the other contracting party who has been damaged by the agent's negligent performance of the principal's contract with the other party.").  Indeed, in Virginia, an agency relationship is defined as "a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf ***and subject to his control***, and the other person's manifestation of consent so to act." *Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.*, 560 S.E.2d 246, 249 (Va. 2002) (quotation and citation omitted) (emphasis added). However, "whether an agency relationship exists is a question to be resolved by the fact finder unless the existence of the relationship is shown by undisputed facts or by unambiguous written documents." *Id.* at 250 (cleaned up) (citation omitted).  The Court previously declined to find that the third parties at issue—the foreclosure counsel and property preservation vendors—were LoanCare's agents as a matter of law, and it signaled that a jury must resolve the question.  [*Cf.* Docket No. 177, at 4.] Sicuranza's opinions as to uncontrollable delays, then, are relevant in connection with a jury's determination of the agency question, insofar as a jury credits the notion that the "third parties" at issue were *not* acting at LoanCare's behest.  For this reason, the Court declines to exclude Sicuranza's opinions concerning uncontrollable delays.

Freedom also argues that Sicuranza should be precluded from testifying that LoanCare acted in "good faith."  [Pl.'s Br. 10.]  LoanCare claims that Sicuranza is merely testifying that LoanCare's actions were consistent with industry norms and demonstrate that any missed deadlines or extensions, for instance, are the result of "good faith disagreements."  [Def.'s Opp'n 10.]  It is well-established that an expert

witness is prohibited from rendering a legal opinion, *see Berckeley*, 455 F.3d at 217, because it would usurp the role of the Court in explaining the law to a jury, *First Nat'l State Bank v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981). But "[w]here an expert is opining as to the custom and practice of a particular business, and where someone who is an expert in a particular field would be expected to understand the ways in which the laws affect the business, such testimony should be admitted." *Suter v. Gen. Acc. Ins. Co. of Am.*, 424 F. Supp. 2d 781, 792–93 (D.N.J. 2006) (citing *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir. 1991)). Therefore, here, as the Court observed during the *Daubert* hearing, Sicuranza "cannot testify that [LoanCare] acted in good faith, but he can go up to the line . . . . He can talk about that LoanCare complied with industry standards." [Hrg. Tr. 260.] Accordingly, the Court agrees with both parties: Freedom's Motion carries insofar as Sicuranza may not testify as to an ultimate legal conclusion, and LoanCare's assertion is credited that he is not proffered in this regard.

Finally, the Court addresses whether Sicuranza may testify regarding origination errors. The Court finds no basis to preclude him from doing so. Sicuranza opines that Freedom originated "defective loans" through various "streamlined re-finance programs that required little or no documentation and resulted in elevated losses due to borrowers[] who could not afford the payment terms." [Sicuranza Rpt. ¶ 20.] He further testified that "they tend to be higher risk with higher default rates which lead to higher losses," but he clarified that he was not offering an opinion that Freedom thus breached any of the representations or warranties of the Subservicing Agreement. [Hrg. Tr. 258–59.] From the Court's review of the record, sufficient

33

documentation supports his opinions, and Freedom has not set forth a persuasive reason to limit the opinions he intends to offer.  The Court finds that he had a proper foundation to support his opinions, and so his testimony is sufficiently reliable.  *See Daubert*, 509 U.S. at 597.

Accordingly, Freedom's Motion will be granted, in part, and denied, in part, as to the proffered testimony of Christopher Sicuranza; except as explained above, his expert opinions meet the requirements of Federal Rule of Evidence 702 and LoanCare has met its burden.  *See Daubert*, 509 U.S. at 592 n.10.

### 2.    *Whether Genger Charles Should be Excluded*

LoanCare proffers Genger Charles, a former Deputy FHA Commissioner, as a servicing industry expert.  [Def.'s Opp'n 16.]  She was instructed to opine on (a) the impact of deteriorating conditions in the housing market on FHA business operations, programs, and policies and (b) the factors that affected claim curtailment rates during the relevant period (between 2011 and 2016).  [Expert Rpt. of Genger Charles ¶ 1, Docket No. 223-4 ("**Charles Rpt.**"); *see also* Hrg. Tr. 275.]  She formed the following opinions:

> [D]ue to the macroeconomic conditions resulting in higher default rates across the FHA portfolio and FHA policy changes and governmental action, from 2011 – 2016 most servicers of FHA insured loans did not meet the claims timelines and consequently claim curtailments on FHA Part A and Part B foreclosure conveyance claims were common.

[Charles Rpt. ¶ 4.]  As applied to LoanCare, she opines that "LoanCare's performance . . . is thus consistent with the performance of other services during the Complaint Period."  [*Id.* ¶ 87; *see also id.* ¶¶ 88–101.]  She further testifies: "even if [] curtailment

rates were high [during the relevant period], it is not a reflection of the quality of the servicing that LoanCare was conducting on behalf of Freedom." [Hrg. Tr. 276.]

Freedom contends that Charles' testimony is unreliable and her opinions do not "fit" this case. [Pl.'s Br. 16.] Essentially, Freedom advances three arguments. First, it contends that Charles impermissibly relies on the data and assertions of third parties without independent validation and judgment. [*Id.* at 16–17.] According to Freedom, Charles thus demonstrates "unblinking reliance," which requires the Court to preclude her from testifying that LoanCare's performance was consistent with its peers. [*Id.* at 17–18.] Next, Freedom argues that Charles' opinions do not "fit" this case because LoanCare could have applied for extensions to avoid curtailments; failing to address this condition, her opinions could mislead a jury. [*Id.* at 18–19.] Finally, Freedom argues that Charles' opinions are speculative: she could not provide a precise figure representing the overall curtailment rate for FHA claims, [*id.* at 19], and she suggests that potential liability under the False Claims Act impacted LoanCare's decision (among other servicers' decisions) to seek extensions regarding applicable timelines, [*id.* at 20].

During the *Daubert* hearing, the Court reserved as to Freedom's challenges, but it set forth its observations preliminarily:

> I think Ms. Charles' testimony is exactly what is expected of a witness and is exactly what will assist the trier of fact. I think that she has the specialized knowledge. There's no dispute about that. I think that she's based her opinion upon sufficient data. She has relied upon that. She's given persuasive reasons as to these documents that are relied upon to render these types of opinions, and then she takes those and she applies them to the facts of this case, and it will be helpful to the jury. So I don't

35

see any problem, other than the False Claims Act at this point[.] I don't see why her testimony wouldn't be permitted.

[Hrg. Tr. 340.]  The Court now finds that Charles' proposed testimony is admissible, except as it relates to the False Claims Act.

First, Charles appropriately relied on her professional experience and review of third-party literature and data to set forth her expert opinions.  Under Rule 702, a testifying expert may base her opinions on her own specialized knowledge and professional experience.  *See, e.g.*, *Schneider*, 320 F.3d at 406 (explaining that invasive cardiologist's academic background, teaching position, and prior experience advising interventional cardiologists demonstrated that he could provide opinion about cardiology, no matter the sub-specialty).  Additionally, a testifying expert may rely upon the statements or data of a non-testifying third party, provided that the testifying expert independently assesses the validity of the opinions on which she relies.  *See In re TMI Litig.*, 193 F.3d at 715–16 (explaining that expert's opinions were unreliable because he "assumed the correctness" of other experts' propositions without further engagement).  The court in *TMI* characterized the expert's failure in this regard as his "unblinking reliance" on the other experts' opinions.  *Id.* at 716.

Here, Charles indicated that her opinions regarding curtailment rates and LoanCare's performance relative to other servicers in the industry were based on her substantial experience at the FHA and HUD.  [Hrg. Tr. 279–80.]  Additionally, in her roles as a senior policy adviser, Chief of Staff to the FHA Commissioner, and Deputy FHA Commissioner, she was "intimately involved in the policymaking process" and

36

routinely evaluated third-party assertions and data in connection with notice-and-comment rulemaking. [*Id.* at 279.] To that end, she cites in her report various letters and "comments" from industry participants as additional support for the opinions she bases on her experience, including, for example, a comment from Quicken Loans to HUD that claims it took around 1,000 days on average to complete a foreclosure in the State of Florida between 2011 and 2013 in the wake of the housing crisis. [Charles Rpt. ¶ 46.] Freedom claims that, because Charles did not independently validate Quicken Loans' assertion, Charles' opinions are unreliable. [Pl.'s Br. 17.] But unlike the expert in *TMI* who deferred wholesale to the other witness "who is an expert in that area," 193 F.3d at 715, Charles indicated that the "primary basis" for her opinions was her experience at HUD and the FHA and that the comments and data she cited "merely reinforce[] [her] understanding from that time," [Hrg. Tr. 293–94; *see also id.* 322–324]. Charles weighed and considered Quicken Loans' assertion against other letters and comments and in light of her experience and general expectations. [*See id.* at 325–26.] As the Court explained, Freedom misreads *In re TMI Litig.* [Hrg. Tr. 334 ("[Charles] testified that these documents that she relied upon were consistent with what her experience was and what was going on in the industry at the time. [*TMI*] doesn't mean that she has to then like probe deeper and go through all of the analysis"); *see also id.* at 333–36.]

Next, the Court rejects Freedom's assertion that Charles' opinions would be unhelpful to a jury because servicers such as LoanCare could have applied for extensions. Charles addressed this topic at length and provided explanations why the

extension process was "inadequate to meet the moment" and did not prevent high curtailment rates at the time.  [*See* Charles Rpt. ¶¶ 52–59; *see, e.g.*, Hrg. Tr. 296 (explaining that HUD would not have distinguished between origination errors and servicing errors in deciding whether to grant a servicer an extension); *see also id.* at 295–96.]  Accordingly, Freedom's contention that LoanCare is not excused despite prevailing economic conditions is a challenge to the inferences raised by Charles' opinions, not a legitimate basis to preclude her testimony.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *id.* ("These conventional devices, rather than wholesale exclusion . . . , are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.").

Finally, the Court addresses Freedom's claims that some of Charles' opinions are speculative.   Freedom points to Charles' opinions that: (a) LoanCare's performance was "consistent" with other servicers during the period because it was "common for curtailments to occur," [Charles Rpt. ¶ 87]; (b) even if an FHA claim was curtailed, that does not demonstrate LoanCare's "servicing performance on FHA loans was inadequate," [*id.* ¶ 33]; and (c) "servicers were reluctant to file extensions" because of the potential for liability under the False Claims Act," [*id.* ¶ 57].  According to Freedom, the first two opinions are speculative because no public data on curtailment rates exist, nor does any data on the cause of curtailments.  [Pl.'s Br. 20.] Additionally, the two non-public HUD documents on which Charles relies only cover

specific periods (i.e., fiscal years 2014 and 2015), not the entirety of the applicable servicing window. [*Id.* at 19–20.]

Still, both documents indicate that LoanCare's FHA curtailment rates were several percentage points *lower* than that of its peers, [*id.* at 20 n.23], and Charles testified that, based on these documents—which she described as consistent with her professional experience and recollection from the time—she concluded that the curtailment rate for foreclosure conveyance claims was "north of 90 percent" for LoanCare and other servicers in the industry during the complaint period and that LoanCare had a "lower average number of days and average dollars of curtailment," [Hrg. Tr. 291]. She further explained that she cannot provide specific curtailment rates outside of fiscal years 2014 and 2015 because she no longer has access to the same data and information she once did while working at HUD. [*Id.* at 307.]

The Court finds that Charles' testimony is reliable. Though she could not set forth an overall curtailment rate for FHA claims or the curtailment rates from outside the periods covered in the two non-public HUD documents, she explained that her opinion is founded on her relevant professional experience *as reinforced* by the materials she referenced. Also, Freedom did not establish that the challenged opinions have no basis in fact, nor has it provided a persuasive reason to bar or limit her testimony. Accordingly, additional specificity is not required for the Court to find her testimony in this regard non-speculative. *See Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995) (explaining that expert opinion was not too speculative as a matter of law because challenged opinion was based on sufficient facts to express a reasonably

39

accurate conclusion); *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1294 (M.D. Ala. 2001) (excluding expert who was "unable to articulate with any degree of specificity the basis for his cost calculations" or "explain how his experience led to his conclusion, or even why his experience is a sufficient basis for the conclusion"); *see also Joiner*, 522 U.S. at 144 (observing that an expert must account for "how and why" he or she reached a challenged opinion).

Still, the Court signaled that Charles' opinion regarding the False Claims Act seemed speculative insofar as it purported to actually explain LoanCare's reluctance to apply for extensions. [Hrg. Tr. 338–39.] Charles never spoke with anyone at LoanCare or reviewed any of its loan files, deeming such acts "not relevant to [her] report," [*id.* at 331], and she even admitted that she did not know whether False Claims Act liability specifically impacted LoanCare's decision to hold off on filing extensions, [*see id.*]. She merely reasserted that servicers, generally speaking, were affected by the existence of the False Claims Act. [*Id.*] Without additional information tailored to LoanCare's performance, the Court finds that "too great a gap" exists between Charles' foundation and the opinion proffered. *See Oddi*, 234 F.3d at 146 (quoting *Joiner*, 522 U.S. at 146). Accordingly, the Court excludes Charles' opinion concerning False Claims Act liability.

Therefore, Freedom's Motion will be granted, in part, and denied, in part, as to the proffered testimony of Genger Charles; except as explained above, her expert opinions meet the requirements of Federal Rule of Evidence 702 and LoanCare has met its burden. *See Daubert*, 509 U.S. at 592 n.10.

40

### 3.      *Whether Marcel Bryar Should be Excluded*

LoanCare contends that Freedom seized some $23 million of funds belonging to LoanCare without justification. [*See generally* Am. Countercl.]  As outlined previously, LoanCare believes that Freedom secretly blocked its access to certain custodial accounts while nevertheless accepting its funds as it was transferring loans back to Freedom.  In support of its theory of fraud and conversion, LoanCare proffers Marcel Bryar as an expert to set forth a coherent narrative of a complicated series of transactions—of credits and debits, advances, "netting," and "looping"—*and* to establish that Freedom's conduct was inconsistent with industry standards.  [*See* Expert Rpt. of Marcel Bryar ¶ 3, Docket No. 222-3 ("**Bryar Rpt.**") (summarizing opinions); *see also, e.g.*, Hrg. Tr. 409–10 (explaining purpose of Bryar's expert testimony.]

Freedom moves to exclude Bryar's testimony for a composite of reasons.  It argues that his testimony will not help a jury, as he merely parrots the testimony of Kim Bigham (one of LoanCare's fact witnesses).  Accordingly, Bryar's opinions should be precluded as cumulative pursuant to Federal Rule of Evidence 403.  [Pl.'s Br. 11–12.]  Relatedly, Freedom believes that Bryar's testimony is improper, as it involves "drawing simple inferences from uncomplicated facts."  [*Id.* at 13 (quoting *Carnegie Mellon Univ. v. Marvell Tech. Grp.*, 2012 WL 6562221, at *16 (W.D. Pa. Dec. 15, 2012)).]  Additionally, Freedom contends that LoanCare has failed to substantiate its entitlement to the $23 million in advances at issue.  [Pl.'s Br. 13–14.]  Because Bryar

did not review the loan-level documentation needed to confirm the advances and cannot reliably establish LoanCare's interest, Freedom argues that his testimony is irrelevant. [*Id.* at 14.] Furthermore, Freedom claims that Bryar's opinions concerning industry standards as to "netting" do not "fit" this case because it is up to the loan issuer to determine how funds should be transferred. Thus, Freedom believes it legitimately froze the custodial accounts to prevent LoanCare from withholding funds owed to Freedom. [*Id.* at 14–15.] Finally, Freedom seeks to prohibit Bryar from testifying that it "misled" LoanCare, as evidence by which state of mind may be inferred is not the province of expert testimony. [*Id.* at 15.]

As this Court made clear during the *Daubert* hearing, the helpfulness of Bryar's testimony depends on the testimony of Bigham and Freedom's argument at trial. [Hrg. Tr. 412–14.] While the factual testimony proffered does appear to track Bigham's narrative in a way that may have a tendency to "improperly bolster" that account, *see, e.g.*, *Zhen v. Safety-Kleen Sys., Inc.*, 2021 WL 4937888, at *2 (E.D.N.Y. May 27, 2021) (excluding opinion out of concern regarding bolstering where expert merely reconstructed the factual testimony of other witnesses); *Ely v. Cabot Oil & Gas Corp.*, 2016 WL 4169220, at *7 (M.D. Pa. Feb. 17, 2016) (rejecting expert whose opinions merely parroted the opinions of others); *Krys v. Aaron*, 112 F.Supp.3d 181, 206 (D.N.J. 2015) ("an expert cannot be presented to the jury *solely* for the purpose of constructing a factual narrative based on record evidence") (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F.Supp.2d 461, 469 (S.D.N.Y. 2005)), Freedom argues that it

42

legitimately blocked LoanCare's access to the custodial accounts to prevent LoanCare from "netting" funds due to Freedom and that no Ginnie Mae rule prohibited its course of conduct, [Pl.'s Br. 14–15 ("If Freedom allowed [LoanCare] to do this, it would have jeopardized Freedom's timely disbursement of borrower funds.")]. LoanCare challenges Freedom's assertion and claims that "netting"—or the process of withholding escrow funds while completing a servicing transfer [*see* Hrg. Tr. 361]— was consistent with customary industry practices.   [Def.'s Opp'n 4.]   Rebutting Freedom's argument, Bryar's testimony, then, is helpful insofar as he clarifies how industry participants would have understood Freedom's actions and instructions, and how LoanCare could have been misled thereby.  Thus, the Court will "wait and see," [Hrg. Tr. 414]: Freedom's Motion will be denied as to Bryar's proffered testimony, and he will be permitted to testify.  However, the Court will revisit its ruling and entertain an objection that Bryar's testimony would be cumulative, provided that appropriate circumstances obtain at trial.  None of Freedom's other arguments are convincing to exclude Bryar from testifying.

### 4.     *Whether Nigel Brazier Should be Excluded*

Nigel Brazier is LoanCare's expert concerning alleged origination defects in Freedom's portfolio of loans.  Brazier is proffered to support LoanCare's theory that servicing challenges were caused by Freedom's failure to properly originate loans consistent with its representations and warranties to LoanCare.  Generally, he opines that the "overwhelming majority" of the loans that he reviewed had "significant origination flaws," lacked minimum servicing documentation, and would be

characterized in the industry as "non-standard, sub-prime, high risk or impaired" loans.  [Expert Rpt. of Nigel Brazier, at 6–7, Docket No. 217-4 ("**Brazier Rpt.**"); *see also id.* at 7–17 (summarizing remainder of opinions).]   He further testified that origination deficiencies "put pressure" on LoanCare to perform its contractual duties and "ultimately caused the losses that were ultimately borne by FHA and, to a certain degree, Freedom."  [Hrg. Tr. 421.]  In forming these opinions, Brazier testified that, from a population of 4,800 unique loans, he selected and analyzed a 200-loan "judgmental sample" representing the largest monetary losses to Freedom.  [*Id.* at 422 ("my sample of 200 covered about 23 and a half percent of the total losses.").]  Analyzing the sample, Brazier observed that "every one of these 200 loans defaulted within 17 months," which he found to be "horrendous" and indicative of origination problems up front.  [*Id.* at 425–26.]

Freedom first challenges Brazier's methodology.  It claims that, because Brazier employed a judgmental sampling method—which is not random by definition—his conclusions cannot be representative of the total population of loans.  [Pl.'s Br. 1–2.]  LoanCare disagrees.  It argues that Brazier opted not to sample the total population at random because only a small subset of loans represented a large share of damages and, upon review, nearly every loan sampled had an origination defect.  [Def.'s Opp'n 11–12.]   These facts provided Brazier with confidence that his methodology is representative of the total population.  [*See* Hrg. Tr. 423–25; Brazier Rpt. 17–19.]

Courts have permitted nonrandom sampling so long as the technique is accepted in the field and otherwise reliable.  *See, e.g., Jama v. Esmor Corr. Serv., Inc.*,

44

2007 WL 1847385, at *27 (D.N.J. June 25, 2007) (permitting "convenience sampling" where evident that technique was accepted by other experts); *Chavez v. IBP, Inc.*, 2004 WL 5520002, at *4–*5 (E.D. Wash. Dec. 8, 2004) (permitting nonrandom sample where technique routinely employed in field).   Another court explained that judgmental or "purposeful" sampling may be a superior method to assess a given population where there is reason to examine a particular characteristic chosen by the subject matter expert. *See Braggs v. Dunn*, 317 F.R.D. 634, 646 (M.D. Ala. 2016) (citing *Dockery v. Fisher*, 253 F.Supp.3d 832, 844 (S.D. Miss. 2015)).   Ultimately, "use of standard techniques bolster[s] the inference of reliability; nonstandard techniques need to be well-explained."   *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 797 (3d Cir. 2017) (citing *In re Paoli*, 35 F.3d at 758).

Here, as it previewed during the *Daubert* hearing, the Court rejects Freedom's argument.   [Hrg. Tr. 473.]   Whether or not the Court construes Brazier's judgmental sampling methodology as standard or nonstandard, Brazier has provided a persuasive basis explaining why he focused his review of Freedom's portfolio of loans on the 200 loans accounting for the largest share of damages and why his conclusions reassured him of the sample's representativeness.   While he concedes that the OCC Handbook cautions against drawing conclusions about a population from a judgmental sample, he explains that other guides routinely used by government agencies and businesses in the industry permit his technique.   [Hrg. Tr. 443–45.]   Thus, the Court finds that LoanCare has satisfied its burden of demonstrating that Brazier's methodology is

45

reliable.[8]

Next, Freedom contends that Brazier must be precluded from testifying because his opinions do not address causation: whether the alleged origination deficiencies actually caused any "hindrances" to LoanCare's performance under the Subservicing Agreement. [Pl.'s Br. 2.] Without this topic addressed, Freedom claims that Brazier will not be helpful to a jury. [*Id.* at 2–3.] In response, LoanCare argues that Brazier sufficiently addresses whether the origination errors contributed to LoanCare's servicing issues, like delays, because he opines that the large number of "sub-prime" loans in the portfolio had a "direct impact" on LoanCare's ability to service them in accordance with applicable guidelines. [Def.'s Opp'n 13–14.]

Ultimately, the Court agrees with LoanCare, but only insofar as Brazier is proffered to rebut Freedom's position that LoanCare's acts and omissions are the sole cause of Freedom's losses. Brazier's testimony establishes that flaws at the outset contributed to LoanCare's servicing woes, and he documents several specific deficiencies in the loans he sampled. [*See, e.g.*, Brazier Rpt. 22 (describing loan that was refinanced as an FHA Streamline Refinance less than nine months after it was originated and inconsistent with underwriting guidelines); *see also id.* at 7–8 (identifying

---

[8] The Court notes that, whereas Sicuranza's methodology enabled valid extrapolation *because* he employed random selection and assured representativeness, see *supra* Section III.B.1, the Court did not conclude that random selection must be employed in all cases for a methodology to be reliable. The inquiry, after all, is a "flexible one," *Daubert*, 509 U.S. at 595, that involves weighing numerous factors to ensure that an expert's conclusions could "reliably flow from the facts know to the expert and the methodology used," *Oddi*, 234 F.3d at 146. Freedom's recourse to challenging Brazier's methodology is thus cross-examination.

other defects, like low credit scores and the existence of recent delinquencies or bankruptcies). But he clearly testified that he did not review the servicing files for the loans at issue to determine "timelines, adherence to them, and whatever issues LoanCare no doubt came up against in servicing these loans." [Hrg. Tr. 452.] Standing alone then, Brazier's testimony cannot be offered to prove that Freedom is the cause of its own losses—on the 200 loans Brazier sampled or the population from which they were selected. The Court does not read Brazier's report or testimony to connect the dots in this regard. [*Cf.* Brazier Rpt. 38–40; Hrg. Tr. 424–25.] However, Freedom has not set forth a persuasive basis to exclude Brazier's analysis entirely. Accordingly, the Court will limit Brazier's testimony: he cannot opine that Freedom's origination errors are the cause of its losses.

Furthermore, Freedom argues that Brazier should be precluded from testifying that Freedom's loans are "non-standard" and that the parties should have entered into a special servicing agreement, whereby LoanCare would have received an additional $8 million in fees. [Pl.'s Br. 3–5.] Freedom states that § 2.8 of the Subservicing Agreement specifically contemplates loans that (a) may require "special servicing requirements" and (b) are *not* listed on an accompanying schedule.[9] Because the loans

---

[9] The provision reads as follows:

> For Loans with special servicing characteristics that are not shown and price on Schedule II, but not limited to, Subprime Loans, High-Cost Loans or other Loans as designated or defined by the respective Applicable Requirements, the Parties acknowledge that certain special servicing requirements may be appropriate. The Parties shall work together in good faith to establish terms for such

at issue are listed and priced on that schedule, Freedom argues that Brazier cannot "contradict the terms of [the] contract" and opine that they are "non-standard." [*Id.* at 4.] Relatedly, because Brazier apparently agrees that the loans do not meet the Subservicing Agreement's contractual definitions of "Subprime Loan" or "High-Cost Loan," Freedom claims that Brazier cannot opine that any of its loans should be considered "non-standard." [*Id.* at 4–5.] Finally, Freedom argues that Brazier's opinion that the parties should have entered into a special servicing agreement is speculative because there is no evidence that LoanCare asked for, or Freedom would have entered into, such an agreement. [*Id.* at 5.]

Freedom's arguments are unavailing, as they fail to set forth a basis to exclude Brazier's testimony. First, Freedom's interpretation of § 2.8 does not prohibit Brazier's testimony that Freedom's loans were, *in fact*, non-standard. Brazier bases his opinions on industry experience and review of Freedom's loans. He testified that 197 of the 200 loans he reviewed had "special servicing characteristics," such as limited to nonexistent evidence of underwriting. [Hrg. Tr. 428–29.] In effect, this made Freedom's loans "more difficult to service." [*Id.* at 429.] Ultimately, LoanCare's

---

special servicing requirements and the accompanying payment of fees promptly after the Effective Date of this Agreement. If the Parties can agree upon the terms of special servicing, such terms and fees shall be memorialized as an amendment to this Agreement. If the Parties cannot agree upon the terms of special servicing, Subservicer will refuse the subject Loans.

[Subservicing Agreement § 2.8.]

assertion is that Freedom's loans were non-standard, even though Freedom represented them as standard and free of origination defects. Thus, Freedom's interpretation of § 2.8 has no impact on whether Brazier may testify. Rather, its contention is contrary evidence that the loans are non-standard. The same is true of Freedom's argument that the definitions of "Subprime Loan" and "High-Cost Loan" prohibit Brazier's testimony. Under Rule 702, they do not.

Second, the Court fails to see how Brazier's testimony is speculative. He explained how he calculated the amount that he believes LoanCare was underpaid, considering that it accepted loans from Freedom with special servicing characteristics. [Hrg. Tr. 430; Brazier Rpt. 36–38.] This figure—$8.33 million—represents the value of the portfolio Freedom sent to LoanCare without having negotiated terms to service these "special" loans. There need not be evidence that the parties would have entered into a special servicing agreement to support the point for which Brazier's opinions are proffered. Freedom may oppose LoanCare's claim, but it has not explained why Brazier's testimony must be precluded in this regard.

Finally, Freedom seeks to preclude Brazier from testifying that its origination errors constitute a breach of the Subservicing Agreement, since experts are prohibited from offering an opinion regarding a legal conclusion. [Pl.'s Br. 5.] LoanCare responds that Brazier's opinions address whether Freedom breached its representations and warranties but do not amount to a legal conclusion that a breach occurred. [Def.'s Opp'n 15–16.] The Court agrees with LoanCare. Again, expert testimony is impermissible if it would interfere with the court's "pivotal role in

49

explaining the law to the jury." *Berckeley*, 455 F.3d at 217.  But experts are not prohibited from opining about an "ultimate issue" in a case. FED. R. EVID. 704.  Here, Brazier identifies numerous origination defects, including, for example, "49 breaches of underwriting guidelines" and "evidence of other weaknesses." [Brazier Rpt. 8.]  His testimony helps the jury to assess whether Freedom breached its contractual representations and warranties when it assigned its portfolio of loans to LoanCare for servicing.   He is not merely opining that Freedom *breached* the Subservicing Agreement.   Accordingly, the Court rejects Freedom's argument and finds that Brazier's testimony is permissible.

Therefore, Freedom's Motion will be granted, in part, and denied, in part, as to the proffered testimony of Nigel Brazier; except as explained above, his expert opinions meet the requirements of Federal Rule of Evidence 702 and LoanCare has met its burden. *See Daubert*, 509 U.S. at 592 n.10.

## IV.   CONCLUSION

For the reasons set forth above, LoanCare's Motion will be **GRANTED** and Freedom's Motion will be **GRANTED**, **IN PART**, and **DENIED**, **IN PART**.  An accompanying Order shall issue on today's date.

March 20, 2023
Date

s/Renée Marie Bumb
Renée Marie Bumb
Chief United States District Judge

50