## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

FREEDOM MORTGAGE
CORPORATION,

     Plaintiff/Counterclaim-Defendant,

          v.

LOANCARE, LLC (as successor to
FNF Servicing, Inc. and LoanCare, a
Division of FNF Servicing, Inc.),

     Defendant/Counterclaimant.

Civil No. 16-02569 (RMB/AMD)

**OPINION**

**APPEARANCES:**

LANDMAN CORSI BALLAINE & FORD P.C.
By: Mark S. Landman (*pro hac vice*); Jerry A. Cuomo;
Timothy J. Collazzi; Janelle N. Winters
One Gateway Center, 4th Floor
Newark, New Jersey 07102

    *Counsel for Freedom Mortgage Corporation*

DUANE MORRIS LLP
By: Wayne A. Mack (*pro hac vice*); James H. Steigerald; Brad D. Feldman
30 South 17th Street
Philadelphia, PA 19103-4196
1940 Route 70 East, Suite 100
Cherry Hill, NJ 08003

    *Counsel for Freedom Mortgage Corporation*

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
By: Robert J. Lack; Andrew M. Englander
One Gateway Center, 25th Floor
Newark, New Jersey 07102

    *Counsel for LoanCare, LLC*

BOIES SCHILLER FLEXNER LLP
By: Stuart H. Singer (*pro hac vice*); Sabria A. McElroy (*pro hac vice*);
Pascual A. Oliu (*pro hac vice*); Evan Ezray (*pro hac vice*); Savannah Mora (*pro hac vice*)
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301

    *Counsel for LoanCare, LLC*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter comes before the Court upon the Motion for Judgment as a Matter of Law (*i.e.*, Directed Verdict) ("**Motion**") of Defendant/Counterclaimant LoanCare, LLC ("**LoanCare**") pursuant to Federal Rule of Civil Procedure 50(a). [Docket No. 341.] Plaintiff/Counterclaim-Defendant Freedom Mortgage Corporation ("**Freedom**") filed a Brief in Opposition, [Docket No. 344], and the Court heard oral argument on July 18 and 20, 2023, [Docket No. 345]. For the reasons set forth on the record, and more fully below, and for good cause shown, the Motion has been **GRANTED, IN PART**, and **DENIED, IN PART**. [Docket No. 352.] Judgment as a matter of law has been granted in favor of LoanCare as to the Subservicing Claim (defined herein) as well as to the implied covenant of good faith and fair dealing claim. As for the Overbilling Claim (defined herein), that claim will proceed to the jury.

## I.    INTRODUCTION

This case is a contractual dispute between two business partners in the mortgage industry. Like any business relationship that ends badly, there are facts in dispute: Freedom alleges that LoanCare negligently serviced its loan portfolio; LoanCare contends that it was not negligent and, in fact, performed at or above the industry

standard.  But these factual disputes are *not* the basis for this Court's decision here. Rather, the relevant issue is whether Freedom presented a case by which a reasonable jury could apply these disputed facts and resolve them, *in a legally permissible way*, as to the elements of Freedom's contract claims.  This Court finds that Freedom did not. After affording it the opportunity to present its case-in-chief and to be fully heard on its claims, this Court concludes that Freedom failed to adduce the legally sufficient evidence that the jury would need to resolve Freedom's claims.  Accordingly, pursuant to Rule 50(a), the Court has issued partial judgment as a matter of law in favor of LoanCare.

\*     \*     \*

Mortgage servicing involves complying with a patchwork of government rules and regulations, tracking reams of data, and closely monitoring borrowers.  It also means, at times, foreclosing upon delinquent mortgages as expeditiously as possible to secure possession of property on behalf of investors.   In the wake of the Great Recession of 2008 and 2009, and the housing crisis that followed, mortgage servicing became that much more challenging for all those involved.

The parties here had a contract—the Amended and Restated Subservicing Agreement, effective February 1, 2010 (the "**Subservicing Agreement**" or "**SSA**") [Freedom Trial Ex. 2]—by which Freedom, a full-service residential mortgage lender, outsourced a portfolio of residential loans to LoanCare, a mortgage subservicer.  The loans in the portfolio were insured by, among others, the Federal Housing Administration ("**FHA**") and the Department of Veterans Affairs ("**VA**").  LoanCare

3

accordingly agreed to service the loans in compliance with applicable rules and regulations.

Between 2010 and 2016, LoanCare experienced difficulties servicing Freedom's portfolio of loans. Among other things, it failed to complete foreclosures timely, missed investor conveyance milestones, made mistakes processing insurance claims, and observed deficient property preservation practices. Of course, as the evidence at trial revealed, so did many subservicers in the industry.

But the parties had a contract, and Freedom's founder and Chief Executive Officer, Stanley C. Middleman, expected LoanCare to perform—to "do the work per the contract." [Trial Tr. 1263:18–19.] When claim curtailments began to increase and Fannie Mae (defined below) started assessing greater compensatory fees, Freedom began experiencing losses on its loan portfolio, and Mr. Middleman became "annoyed" with LoanCare. [*Id.* at 1263:16, 1262:25–1263:9.] He viewed the losses as LoanCare's responsibility. [*Id.*] In an e-mail to his staff in 2012, he wrote: "Fight them [LoanCare] on the beaches, on the streets, and house to house, if necessary. Review every loan and determine why it is, in fact, their fault. Update me on the results of your study." [*Id.* at 1264:5–9; see also LoanCare Trial Ex. 25 (March 26, 2012 E-mail from Mr. Middleman).]

Unsurprisingly, the parties' contractual relationship eventually deteriorated beyond repair. By the end of 2015, Freedom sought to service its own loan portfolio in-house, and it began preparing to terminate the Subservicing Agreement. As part of that transition effort, Mr. Middleman wrote his staff again: "I want LoanCare's share

of losses for everything down to paper clips and the cost to calculate the loss manifested; the cost of excessive oversight required due to their inability to invoice accurately; Ginnie Mae violations due to their inability to perform.  Dig deep.  I expect to find in excess of $100 million of losses and overcharges between them and their related parties."  [Trial Tr. 1303:12–18; LoanCare Trial Ex. 85 (Oct. 2, 2015 E-mail from Mr. Middleman).]   He continued: identify "[e]very scrap of dirt"; "[e]very blunder, delay, penalty, payment missed and any place that a loss was incurred that may have been their fault."  [Trial Tr. 1304:7–11; LoanCare Trial Ex. 85.]

During that process of transferring the loan portfolio, Freedom filed this Civil Action.  Freedom alleged that LoanCare breached the Subservicing Agreement by negligently servicing Freedom's loan portfolio and overbilling for services.  Consistent with the CEO's directive, and as discussed below, Freedom's theory of liability was premised on the (faulty) assumption that loan losses—standing alone—could result in contractual liability, notwithstanding the parties' express agreement to a Limitation on Liability provision that provided, in part, for LoanCare responsibility for servicing deficiencies only where it is grossly negligent (*i.e.*, below the standard of care for mortgage subservicers generally).

Freedom brought contract, unjust enrichment, and fraud claims against LoanCare.  [Am. Compl. ¶¶ 198–246, Docket No. 69.]   Freedom's claims are essentially two-fold:  (1) LoanCare breached the Subservicing Agreement based on it errors and omissions in servicing Freedom's loan portfolio ("**Servicing Claim**"); and (2) LoanCare committed fraud and unjustly enriched itself by either overbilling

Freedom for services or billing Freedom for servicing loans that LoanCare had stopped servicing ("**Overbilling Claim**").[1]  [See Joint Final Pretrial Order 3, Docket No. 196 ("**PTO**").]   The principal Servicing Claim focuses on LoanCare's alleged errors and omissions, such as foreclosure delays, missed investor deadlines resulting in fees by the investors (the Federal National Mortgage Association ("**Fannie Mae**") or the Government National Mortgage Association ("**Ginnie Mae**")), curtailments on FHA and VA claims because of missed deadlines causing Freedom to receive less than full reimbursement from those agencies, improper or negligent property preservation practices causing damage to mortgaged properties, and mistakes in handling insurance claims.  [Freedom's Opp'n to LoanCare's Mot. 6–8, Docket No. 344 ("**Freedom's Br.**").]   Freedom's claimed losses as to the Servicing Claim are $38 million, and Freedom's damages as to the Overbilling Claim are $247,000.  [See PTO 3.]

After years of protracted discovery and motion-practice, this case proceeded to a jury trial.  Freedom called many witnesses in its case-in-chief, including current and former Freedom and LoanCare employees (some live and some by deposition testimony).  The jury heard from:  (1) Reginald A. Watkins; (2) Martin J. Levine; (3) Carla Wise; (4) Jared M. Huffman; (5) Michael Klotz: (6) Greg Lee: (7) Linda Sams; (8) Stephanie McClane; (9) Eileen Lare; (10) Vicki Brown; (11) John Walters, II; (12)

---

[1] Freedom also asserts a claim for breach of the implied covenant of good faith and fair dealing based on LoanCare's repeated subservicing deficiencies despite notice from Freedom to improve.  [Am. Compl. ¶¶ 218–225.]  Freedom has claimed that such action constitutes bad faith, purposeful, and dishonest conduct.  [*Id.*]

Stanley Middleman; and (13) Ralph Carrigan.[2]  After Freedom rested, LoanCare moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) as to Freedom's Servicing Claim, Overbilling Claim, and implied covenant of good faith and fair dealing claim.  [LoanCare's Br. in Support of Mot. 1, Docket No. 341 ("**LoanCare's Br.**").]

## II.   MOTION AND ARGUMENTS

### A.   LoanCare's Arguments

In support of the Motion, LoanCare first argues that Freedom's Servicing Claim fails because Freedom (1) did not establish a standard of care through expert testimony or otherwise, (2) did not satisfy the limitation on liability contained in SSA § 8.3 because there was a legally insufficient evidentiary basis to establish each component of the limitation, and (3) did not establish damages.  As a result, LoanCare submits that no reasonable jury would have a legally sufficient basis to find in Freedom's favor.

To begin, LoanCare contends that because it agreed to perform its contractual responsibilities under the Subservicing Agreement "with a degree of care that is no less than that provided by industry subservicers generally," Freedom was required to introduce expert testimony to show a deviation from a professional standard of care in

---

[2] The jury also heard testimony from LoanCare witnesses Roseanne Goldberg, Jackie Barson, Genger Charles, Timothy O'Bryant, Gene D. Ross, and John Patrick Cox either on LoanCare's defense to Freedom's affirmative claims or LoanCare's counterclaims against Freedom for conversion, fraud, and breach of contract.  Based on witness availability and time constraints, the Court allowed the parties to call witnesses out-of-order and the parties designated what portions of the testimony were theirs.

order to prevail as to its Servicing Claim.  [LoanCare's Br. 2–3 (citing SSA § 2.9(a)).]  Alternatively, LoanCare points to record evidence to demonstrate that Freedom failed to prove the standard of care through any of the fact witnesses who testified in its prima facie case.  [*Id.* at 6–7.]  As a result, LoanCare argues that no reasonable jury could find it liable under the Subservicing Agreement.

Next, LoanCare focuses on the text of SSA § 8.3.  LoanCare contends that no reasonable jury could find, on the record before it, the necessary facts for a breach (1) that LoanCare's errors and omissions subservicing Freedom's loans were the result of "gross negligence" or "willful misconduct," (2) that Freedom's damages were caused solely by LoanCare's conduct, **and** (3) that LoanCare did not act in good faith, all three of which are required under the plain terms of the Servicing Agreement for LoanCare to be liable.  [*Id.* at 7–17.]

First, because Freedom did not present expert testimony to assist the jury in determining gross negligence, LoanCare argues that there is not a sufficient record on which a reasonable jury could find gross negligence by LoanCare.  Second, it claims that there is legally insufficient evidence that LoanCare solely caused Freedom's damages.  [*Id.* at 12–13, 18–20.]  In support of its claims, Freedom offered summary charts of its loan losses, but LoanCare contends that this evidence and the testimony elicited from fact witnesses do not enable a jury to disaggregate the losses and assign responsibility to LoanCare for errors and omissions solely within its own control, as the evidence has shown that other facts such as Freedom's own conduct contributed to the losses.  [*Id.*]  In other words, LoanCare argues that, on the record established,

the jury was not provided with the tools necessary to separate unavoidable losses from avoidable losses.   Third, LoanCare submits that there is no record evidence that LoanCare did not act in good faith.   In this vein, LoanCare concentrates on the evidence that it raised Freedom's Fannie Mae STAR Score to the top of its peer group, that its own HUD (defined below) TRS Tier Score was consistently an "A," and that Moody's described LoanCare's collection abilities, loss mitigation efforts, foreclosure and timeline management, and loan administration as "above average."   [*Id.* at 10 (citing Day 2 Tr. 339:3–6; LoanCare Trial Exs. 68, 745).]   It also points to various of Freedom's statements that it was "happy with" LoanCare as its subservicer.   [*Id.* at 10 (citing LoanCare Trial Ex. 13).]     Each one of these arguments, LoanCare presses, independently dooms Freedom's claim.

Furthermore, LoanCare contends that Freedom's Overbilling Claim fails on the evidence adduced.[3]  [*Id.* at 20.]  It submits that the record does not show that Freedom was entitled to a refund of $247,000 as to the loans for which LoanCare charged Freedom but that had gone 60 days post-claim.   Rather, as the claim is premised on the testimony of John Walters, LoanCare argues that the evidence shows that LoanCare had ***potentially*** billed Freedom for servicing loans on which it was doing no

---

[3] Responding to the Court's request for briefing on the "source-of-duty" rule, LoanCare first acknowledges that Freedom's Overbilling Claim is not barred by the rule, as it precludes tort claims based on duties owed solely under a contract. [LoanCare's Br. 20 (citing *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998)).]  Because Freedom's unjust enrichment and constructive fraud claims are not premised on the Subservicing Agreement, LoanCare agrees that the source-of-duty rule does not preclude them.  [*Id.*]

work, but that further confirmation was necessary. Deciding to resolve the dispute instead of expending the time and expense of researching the potential billbacks, the parties apparently agreed in 2014 that Freedom would receive a credit on its invoice and LoanCare would cease billing for loans that had gone more than 60 days post-claim. Accordingly, LoanCare argues that this claim was resolved and that it lacks sufficient evidence in any event.

Finally, LoanCare submits that Freedom cannot maintain an independent implied covenant of good faith and fair dealing claim under Virginia law. [*Id.* at 21–22.] Because the claim is premised on allegations of non-performance under the Subservicing Agreement, LoanCare argues that it must be dismissed.

### B.   Freedom's Arguments

Freedom opposes the Motion, arguing it has presented sufficient evidence to allow the jury to find it should prevail on its Servicing Claim against LoanCare. Freedom first argues that LoanCare has focused on the requirements of SSA § 8.3 at trial, but Freedom has asserted that LoanCare's is liable for breach under SSA § 8.2, which states:

> Except as otherwise stated in this Agreement, [LC] shall indemnify, defend and hold harmless [Freedom] from any Losses resulting from or arising out of: (i) the material failure of [LC] to perform all of its material obligations in compliance with the terms of the Agreement; (ii) a material breach of [LC's] representations and warranties; or (iii) gross negligence arising solely from its own acts or omissions or the willful misconduct of [LC] in performing its obligations thereunder . . . .

10

[Freedom Trial Ex. 2, SSA § 8.2.] While Freedom admits that SSA § 8.2(iii) "mirrors § 8.3 by allowing Freedom to recover for L[oan]C[are]'s gross negligence or willful misconduct," it argues that subsections (i) and (ii) allow Freedom to recover if LoanCare either materially fails to perform its material obligations under the SSA or materially breaches its representations and warranties under the contract. [Freedom's Br. 4.] Freedom maintains that applying the limitation on liability provided in SSA § 8.3 to § 8.2 "would effectively excise § 8.2(i) and § 8.2(ii) from the SSA." [*Id.*] Since Virginia law requires every word and clause in a contract to be ascribed meaning to the extent possible, Freedom argues that a gross negligence standard would render a potential breach by Freedom of § 8.2(i) or § 8.2(ii) "illusory and meaningless." [*Id.* (citing *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012)).]

Freedom acknowledges that indemnity provisions like SSA § 8.2 typically are used to protect against third-party claims, but also that such provisions may be applicable to first-party claims if drafted broadly. [*Id.* at 5 (citing *Chesapeake & Potomac Tel. Co. of Va. v. Sisson & Ryan, Inc.*, 362 S.E.2d 723, 729 (Va. 1987)).] Based on the clear language of SSA § 8.2, Freedom argues that LoanCare's "widespread violations of the Applicable Requirements, as defined by § 1.8 of the SSA" constitute a breach of the agreement since compliance with the Applicable Requirements is a material obligation of LoanCare for purposes of SSA § 8.2(i). [Freedom's Br. 6.] With respect to § 8.2(ii), Freedom maintains that LoanCare "represented and warranted in the SSA . . . § 7.1(h) . . . that it would comply with the contractually defined 'Applicable Requirements.' " [*Id.*]

11

Freedom goes on to cite trial testimony and other evidence of record that certain errors by LoanCare constitute a breach of SSA § 8.2. First, Freedom points to evidence that there were repeated delays and failures by LoanCare to timely complete foreclosures, including by missing investor conveyance milestones on an average of 97% of loans serviced, having approximately 90% curtailment rates, and exceeding the conveyance timeline on more than 300 properties when the relevant loans were transferred from LoanCare back to Freedom. [*Id.* at 7.] Freedom also criticizes LoanCare's property preservation practices as woefully deficient, including by allowing a property to sit for 5½ years while completely missing the back of the house, allowing several feet of water to deteriorate a property for years, failing to repair the roof and placing a tarp on the roof of a property for years, failing to timely winterize properties (if at all), failing to address roof leaks and mold, and failing to meet HUD inspection timelines. [*Id.*] Other evidence of LoanCare's alleged breach include failure to perform bank reconciliations within the timeframe set by investors and the SSA, not seeking available extensions of foreclosure deadlines, not timely referring defaulted loans to counsel, failure to supervise attorneys and property preservation vendors, and mishandling the filing of insurance claims in violation of HUD requirements. [*Id.* at 7–8.]

Alternatively, Freedom argues that even if it must satisfy SSA § 8.3, the evidence is sufficient for a reasonable jury to find LoanCare liable under a theory of either gross negligence or willful misconduct. [*Id.* at 9.] As to gross negligence, Freedom argues that Virginia law permits the aggregation of multiple negligent acts

12

even if different or independent of one another (what counsel have referred to as the "cumulative effect" theory of gross negligence). [*Id.* at 9–12.] Freedom also maintains that LoanCare's errors did not meet the Applicable Requirements set forth in SSA § 2.5(c), including HUD regulations and requirements, the VA, Fannie Mae, and Ginnie Mae. [*Id.* at 14–15.] Since the SSA adopts and incorporates a standard of care embodied in these government regulations, it is Freedom's position that such standards of care become the appropriate measure for LoanCare's conduct. [*Id.* at 15.] Thus, Freedom argues that each violation of the Applicable Requirements by LoanCare constitutes negligence, which not only may be aggregated to establish gross negligence, but also may be considered evidence that LoanCare engaged in willful misconduct by acting in "conscious disregard of Freedom's rights or with a reckless indifference to the consequences to Freedom." [*Id.* at 16.]

Next, LoanCare argues that the jury is entitled to consider LoanCare's poor performance across Freedom's entire portfolio of defaulted loans, which is consistent with the SSA as a contract for LoanCare to subservice an entire portfolio of loans. [*Id.* at 18–19.] Thus, it is Freedom's position that since the terms of the SSA do not require the jury to assess gross negligence on a loan-by-loan basis, the jury may consider LoanCare's performance across all of the defaulted loans. Freedom also argues that even if Virginia law did not permit aggregating multiple cumulative negligent acts to establish gross negligence, Freedom has introduced sufficient evidence that LoanCare deliberately and repeatedly made the same set of errors servicing the same set of loans.

Freedom suggests that the limitation in SSA § 8.3 that LoanCare shall only be liable for losses arising "solely from its own acts or omissions" applies only for LoanCare's gross negligence under the last antecedent doctrine and not for willful misconduct by LoanCare. [*Id.* at 27.] Freedom maintains that the evidence presented at trial provides a reasonable basis by which the jury can conclude LoanCare's gross negligence was caused solely by its own acts and omissions, including by delaying the foreclosure process, not seeking extensions of foreclosure deadlines despite Freedom's instruction to do so, not timely referring defaulted loans to counsel, engaging in "terrible property preservation practices," and making negligent mistakes in filing insurance claims. [*Id.* at 29–30.] It is Freedom's position that whether other factors could have contributed to LoanCare's errors is an issue of fact that must go to the jury—but Freedom should be allowed to recover under the SSA for losses caused by LoanCare's agents. [*Id.* at 32–33.] Relatedly, Freedom argues that it presented sufficient evidence for a reasonable jury to find LoanCare engaged in acts or omissions that were not made in good faith or good faith errors in judgment. [*Id.* at 34.]

Finally, Freedom argues that a reasonable jury could return a verdict in its favor as to its remaining claims for breach of the implied covenant of good faith and fair dealing, fraud, and unjust enrichment. Based on the trial record, Freedom proffers that the jury can conclude that LoanCare exercised its discretion under the contract in bad faith. [*Id.* at 37.] As to Freedom's fraud claim, it argues that the evidence shows LoanCare misrepresented the work it was actually performing, that Freedom has shown LoanCare's misrepresentations were made intentionally and knowingly (or

14

innocently but negligently), that misrepresentations in LoanCare's invoices were made "with the intent that Freedom rely upon it," that Freedom did so rely, and that Freedom has shown it was damaged by such misrepresentations. [*Id.* at 37–39.] As to Freedom's claim for unjust enrichment, it maintains there is sufficient evidence for the jury to reasonably conclude that LoanCare continued to retain fees from Freedom "received for services that LoanCare was not actually performing." [*Id.* at 40.] Freedom concludes that under Virginia law it may pursue these claims alongside its breach of contract claim, noting that the SSA does not require LoanCare to certify the truth of its billing or address the issue of overbilling for services never performed. [*Id.* at 41–44.]

The Court addresses each relevant argument below.

## III. LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure 50(a), a party may move for judgment as a matter of law ("**JMOL**") once the opposing party has been fully heard on an issue during a jury trial. FED. R. CIV. P. 50(a)(1). A party may move for judgment as a matter of law "at any time before the case is submitted to the jury" so long as the party "specifies the judgment sought and the law and facts that entitle the movant to the judgment." FED. R. CIV. P. 50(a)(2). Courts must grant a JMOL motion "if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Galena v. Leone*, 638 F.3d 186,

196 (3d Cir. 2011) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).

In reviewing a JMOL motion, courts must view the evidence in the nonmoving party's

favor and afford the nonmoving party "every fair and reasonable inference" from the

evidence. *Lightening Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). This

inquiry requires courts to "review all of the evidence in the record" and "disregard all

evidence favorable to the moving party that the jury is not required to believe." *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). Courts should "give

credence to the evidence favoring the nonmovant as well as that evidence supporting

the moving party that is uncontradicted and unimpeached, at least to the extent that

that evidence comes from disinterested witnesses." *Id.* at 151 (citation omitted).

Courts cannot weigh the evidence, draw legitimate inferences from the facts, or make

credibility calls because those are quintessential jury functions. *Smith v. Katz*, 696 F.

App'x 582, 589–90 (3d Cir. 2017) (citing *Reeves*, 530 U.S. at 150–51).

While courts should grant JMOL motions "sparingly," *Avaya Inc., RP v. Telecom*

*Labs, Inc.*, 838 F.3d 354, 373 (3d Cir. 2016) (citation and internal quotation marks

omitted), courts have a duty to enter a JMOL "as soon as it is apparent that [the

plaintiff] is unable to carry a burden of proof that is essential to [the plaintiff's] case."

*Amica Mut. Ins. Co. v. BMW of N. Am., LLC*, 2023 WL 3144042, at *4 (2d Cir. Apr. 28,

2023) (quoting FED. R. CIV. P. 50(a) advisory committee's note to 1991 amendment).

Indeed, a JMOL is "mandated where the facts and the law will reasonably support

only one conclusion." *Galena*, 638 F.3d at 196 (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)).

## IV.   DISCUSSION

Before discussing the Motion and the parties' arguments, the Court first returns to its *Daubert* Opinion to supplement its reasons for excluding Freedom's proposed expert witnesses and to address its prior treatment of the so-called "cumulative effects" theory of gross negligence.   During the trial, the Court concluded that the parties maintained dueling interpretations on both scores, and there appeared to be confusion about the Court's rulings.   The below analysis attempts to set the record straight.

### A.   The Court's *Daubert* Opinion and the "Cumulative Effects" Theory

On March 20, 2023, after a two-day hearing on October 24 and 25, 2022, the Court issued a lengthy Opinion addressing the parties' motions to exclude the testimony of each other's expert witnesses.   [Docket No. 259 ("***Daubert* Op.**").[4]] Finding that the expert opinions of Susan Connally and Robert Lyons—Freedom's only proposed expert witnesses in this matter—were the product of an unreliable methodology and irrelevant as a result, the Court precluded their testimony.   [*Id.* at 11–12, 22–24.]   The Court explained that the primary problem was their failure to design a methodology that would help a jury to assess LoanCare's liability in compliance with SSA § 8.3.   [*Id.*]

---

[4] See also *Freedom Mortg. Corp. v. LoanCare, LLC*, 2023 WL 2570201 (D.N.J. Mar. 20, 2023).

As the parties well know, that section limits LoanCare's liability under the Subservicing Agreement for only (1) willful misconduct or gross negligence (2) arising solely from LoanCare's own acts or omissions and (3) it excludes LoanCare's liability for acting (or refraining from acting) in good faith. [Freedom Trial Ex. 2, SSA § 8.3.] Though Connally and Lyons performed a loan-by-loan analysis of Freedom's claimed losses and disaggregated what they considered unavoidable losses from avoidable losses, the Court determined that their proffered testimony did not meet the *Daubert* standard under Federal Rule of Evidence 702 because neither proposed expert provided the "tools" by which a jury could assess, much less determine, whether the identified losses that each opined were the sole responsibility of LoanCare established gross negligence or reflected a failure to act in good faith. [*Daubert* Op. 11, 12, 21, 23, 25.]   As recounted below, even assuming the losses each witness identified were LoanCare's responsibility, neither expert provided objective measures or "yardsticks" by which a jury could compare LoanCare's performance (those losses) against industry peers to determine gross negligence.[5]

For example, Connally's opinion that LoanCare's curtailment rate was "high" across the portfolio of VA loans that she reviewed because 1,100 out of the 1,300 VA loans were impacted by a servicing error "solely attributable" to LoanCare would only have been meaningful if she could have explained how, specifically, that outcome

---

[5] It bears noting that even after the Court ruled that the experts' opinions only dealt with the "sole responsibility" part of the equation and did not connect the dots to gross negligence, as discussed herein, at no time did Freedom seek to introduce expert testimony that would bridge this fatal gap.

deviates from industry norms or other subservicers at the relevant time.   [See Transcript of *Daubert* Hearing 32:5–9, Docket Nos. 247, 248 ("**Daubert Hr'g Tr.**").] This is because servicing errors resulting from violation of the SSA's "Applicable Requirements"—which incorporate relevant governmental rules, regulations, and guidelines, such as the VA Handbook—are only actionable in this case if they amount to gross negligence or willful misconduct and otherwise meet the terms of SSA § 8.3. Freedom attempted, over and over again, to frame this case as one where LoanCare's repeated failures to meet the Applicable Requirements necessarily equated with gross negligence, or at least presented a question for the jury.  Indeed, Freedom's prima facie case at trial reflected the same problem inherent in the analyses of their excluded experts.  For this reason, the Court writes to supplement its *Daubert* rulings for the record.  To do so, the Court begins by revisiting its discussion of Freedom's "cumulative effects" theory of gross negligence under Virginia law, [see *Daubert* Op. 15–17], which, as noted, seems to have generated confusion among the parties. Thereafter, the Court returns to Connally and Lyons.

Throughout this action, Freedom has maintained that it could hold LoanCare accountable for servicing errors and omissions based on the "cumulative effect" of several acts—such as foreclosure delays, property preservation issues, failures to apply for deadline extensions, and others—notwithstanding the limitation on liability contained in SSA § 8.3.  According to Freedom, under this theory, multiple instances of ordinary negligence or errors may be aggregated together to constitute gross negligence, even if a single error or omission concerning a particular loan would not

result in liability.  Freedom articulated the theory consistently throughout this case. [*See, e.g.*, Freedom's Opp'n to LoanCare's Mot. to Exclude Freedom's Experts 2–3, Docket No. 226; Freedom's Trial Br. 2–13, Docket No. 300; Freedom Mem. of Law in Opp'n to LoanCare's Mot. in Lim. No. 1, at 9–19, Docket No. 304.]

In the *Daubert* Opinion, the Court touched on the cumulative effects theory in passing as it considered whether to preclude Connally and Lyons.  Reading the cases referenced during the *Daubert* Hearing in this context, the Court determined that the cumulative effects theory failed to establish the relevance and reliability of the expert testimony of Connally and Lyons because it could not cure their fatal methodological flaws—that is, connecting the dots to gross negligence.  [*Daubert* Op. 16–17.]  And, in part, the Court observed that "Freedom cannot treat losses arising from a LoanCare error—such as a missed deadline—on one loan as gross negligence by focusing on losses arising from other loans."  [*Id* at 17.[6]]

As trial approached, LoanCare then suggested that, by virtue of this statement, the Court had "ruled" that Freedom could not argue its cumulative effects theory of gross negligence at trial.  For instance, during the June 29, 2023 Status Conference and Motion Hearing, LoanCare sought to, in its words, "give effect to the Court's prior rulings" and prohibit Freedom from arguing a theory that "the Court has already said is not a proper basis in the law."  [Transcript of June 29, 2023 Status Conference and Motion Hearing 28:18–24, 41:7–8 ("**June 29 Hr'g Tr.**").]   In contrast, Freedom

---

[6] In other words, here, loan **loss** upon loan **loss**—standing alone—cannot establish gross negligence under Virginia law.

correctly criticized LoanCare's argument, contending that it overstated the Court's discussion of the theory, [*see, e.g.*, *id.* at 33:5–10 ("I think they've overstated what you said in your *Daubert* decision")], and alternatively urged the Court to adopt a broader reading of the Virginia case law, [*see, e.g.*, Freedom's Trial Br. 2, Docket No. 300 (arguing that "the Court suggested a more limited interpretation of Virginia law on gross negligence" and that at trial "the jury should have more flexibility to consider LC's errors and breaches of the contractual standards in the aggregate than this Court's prior discussion may suggest")].

To be clear, in its *Daubert* Opinion, the Court only precluded the expert testimony of Connally and Lyons; it did not reject the cumulative effects theory of gross negligence as a matter of law.[7] Nor did the Court accept LoanCare's Motion in Limine No. 1 [Docket No. 281] to preclude argument and evidence as to the cumulative effects theory. Rather, the Court permitted the introduction of such evidence at trial, though it prohibited Freedom from arguing the theory in its opening

---

[7] In fact, even during the *Daubert* Hearing, the Court acknowledged that the cumulative effects theory had foundation, but that the problem lay in the experts' methodology:

> MR. CUOMO:  There's no doubt under Virginia law that cumulative ***instances of conduct***, whether it's simple negligence, ***some other degree of culpability***, all of that can be cumulated together where a finder of fact can conclude that because of that cumulation there is gross negligence.

> THE COURT:  I know.  But your experts aren't doing that.

[*Daubert* Hr'g Tr. 189:4–10 (emphases added).]

statement because the Court was concerned that, given the history of this matter and aware that the opinions of Connolly and Lyons would not be part of Freedom's case, such argument might confuse the jury and imply—wrongly—that Freedom could prevail simply by showing a morass of losses across the loan portfolio.  [*See* June 29 Hr'g Tr. 30:15–17 (explaining during the Status Conference and Motion Hearing that Freedom planned to "keep throwing it up against the wall and at some point the jury is going to be like enough already, it's gross [negligence], right?"); *see also id.* at 41:1–13.]  Accordingly, the Court decided that it was "better off having a record to rule on as opposed to preventing [Freedom] from introducing" such evidence.  [*Id.* at 30:22–24; *see also id.* 41:3 ("I'd rather rule on what I know versus what I don't know.").] Thereafter, the Court denied LoanCare's Motion in Limine No. 1 without prejudice, subject to its proviso, [Docket No. 320, at 4 (June 30, 2023 Order)], and Freedom proceeded to call fact-witness after fact-witness who testified about the loan losses Freedom sustained as well as all of LoanCare's subservicing deficiencies during the course of the parties' business relationship.

Still, and quite perplexingly, at the close of its case-in-chief, Freedom moved for a mistrial based on, in part, its perception that the Court had prevented it from presenting the "cumulative effects" theory of gross negligence.  [See Trial Tr. 1749:18–20 (arguing for a mistrial because it was "precluded from aggregating the loans to show gross – the acts of negligence to show gross negligence"); see also *id.* at 1749:22–1751:15 (arguing that the Court had prevented Freedom from introducing evidence consistent with the cumulative effects theory).]  After questioning Freedom about the

22

evidence it believed it was precluded from introducing, [*id.* at 1754–58], and determining that the cumulative effects theory had been "the plaintiff's whole case," the Court flatly rejected the motion, [*id.* at 1759], reminding Freedom of its colloquy with counsel during the *Daubert* Hearing as one example to dispel Freedom's misconception, [*id.* at 1762:17–1763:6; see also *supra* note 7].

The Court does not (and did not) disagree with Freedom's theory, properly construed. Under Virginia law,[8] Freedom can demonstrate gross negligence by aggregating individual acts of negligence that, when combined, have the cumulative effect of gross negligence. The case law for this proposition is legion. *See, e.g.*, *Cockey v. Covanta Fairfax, Inc.*, 109 Va. Cir. 14, 2021 WL 9918493, at *7 (Va. Cir. 2021); *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016); *Volpe v. City of Lexington*, 708 S.E.2d 824, 828–29 (Va. 2011); *Chapman v. City of Virginia Beach*, 475 S.E.2d 798, 801 (Va. 1996); *Ferguson v. Ferguson*, 181 S.E.2d 648, 652 (Va. 1971); *Kennedy v. McElroy*, 81 S.E.2d 436, 439 (Va. 1954).

As the parties know, in *Chapman* bereaved parents filed a wrongful death action against the City of Virginia Beach after their eight-year-old died, hanged between the metal bars of a gate that the city maintained. 475 S.E.2d at 799–800. After a jury returned a verdict in favor of one of the parents, the trial court ruled that the evidence did not establish gross negligence. *Id.* at 800. Finding that the city was informed on

---

[8] The Court applies Virginia substantive law pursuant to the Subservicing Agreement's Applicable Law provision. [See Freedom Trial Ex. 2, SSA § 10.6 ("This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without giving effect to its conflict of laws principles.").]

multiple occasions that the gate was broken and that it made a deliberate decision not to order it repaired, the *Chapman* court reinstated the verdict. *Id.* at 801. "On this record, reasonable persons could differ upon whether the cumulative effect of these circumstances constitutes a form of recklessness or a total disregard of all precautions, an absence of diligence, or lack of even slight care," so the question was properly submitted to the jury. *Id.* There, the evidence reflected a degree of deliberate indifference as the city was on notice of the danger and failed to exercise due care. *See id.* at 800–01.

Consider another case cited in the parties' submissions. In *Cockey*, a fire broke out at a trash incineration facility in Virginia and firefighters were dispatched to suppress the flames. 2021 WL 9918493, at *1. At the facility, the firefighters discovered a burning trash heap and waded through a chest-deep "toxic-stew" that had collected on the "tipping floor" in order to make use of water cannons, which were ultimately not operable. *Id.* at *1–2. They became ill thereafter and sued the facility for gross negligence. *Id.* To determine whether the firefighters had stated a claim, the trial court considered the firefighters' allegations that the facility failed to maintain a fire suppression system; that it knew or should have known about its malfunctioning fire pump and blocked hydrants; that it misrepresented the contents of its trash; that it did not appoint fire watch personnel; and that it did not call the fire department immediately after discovering a fire, among other individual allegations of negligence. The court aggregated these independently negligent acts—although different in kind— to conclude that the firefighters had stated a claim. *Id.* at *4, *7–8.

24

Here, the Court notes another critical point: although under Virginia law Freedom can aggregate individual instances of negligence to prove gross negligence, Freedom is not relieved of the burden of demonstrating, through a legally sufficient basis, that LoanCare's conduct shows "indifference to another and an utter disregard of prudence" and a "degree of negligence that would shock fair-minded persons." *Elliott*, 791 S.E.2d at 732 (citing *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004)). To do so, as discussed below, Freedom had to employ expert testimony to establish the standard of care and demonstrate LoanCare's deviation from it. See *infra* Section IV.B.1. Connally and Lyons were Freedom's attempt at meeting its burden under the Subservicing Agreement. But the Court rejected their expert testimony because both experts failed to provide objective measures by which a jury could weigh whether LoanCare's violations of the Applicable Requirements amounted to gross negligence.

In Connally's case, true, she identified servicing errors as to Freedom's portfolio of VA loans for which LoanCare was responsible. For instance, Connally identified reimbursable expenses incurred after VA-mandated deadlines (which resulted in curtailments), delays in processing foreclosure proceedings, and mismanagement of foreclosure attorneys. [Freedom Mortg. VA Claim Review 8–10, Docket No. 215-13 ("**Connally Rpt.**").] She distinguished between servicer-caused losses, uncontrollable losses, and other losses. [*Id.* at 3–7.] However, in preparing her analysis, she equated these violations of the Applicable Requirements with fault (*i.e.*, loss equals fault) and she offered no opinion as to gross negligence or LoanCare's liability under the

25

Subservicing Agreement.  [*See Daubert* Hr'g Tr. 15:21–16:7; *see id.* at 16:8–13 ("Q. What opinion, if any, do you intend to offer on whether LoanCare is liable for the errors and damages identified in your report? A.  I'm not – I don't intend to offer an opinion on that.  The opinion provided is based solely on the delays that we identified and determined responsibility for those delays."); *see generally* Connally Rpt.]  Indeed, Freedom later acknowledged that it never planned for Connally to establish LoanCare's gross negligence concerning its subservicing efforts of Freedom's VA loan portfolio.  In essence, Freedom planned to ***argue*** gross negligence based on the sheer number of losses identified, not ***prove*** it.  [*Daubert* Hr'g Tr. 109 ("So Ms. Connally is more than qualified to testify as to the sheer number or errors that she saw in her review process.  And ***it's Freedom's position that it is then up to counsel to make the argument as to the cumulative effect of those errors as to gross negligence***.") (emphasis added); *see also id.* at 189:4–10 (Freedom arguing that "cumulative ***instances of conduct***, whether it's simple negligence, ***some other degree of culpability***, all of that can be cumulated together where a finder of fact can conclude that because of that cumulation there is gross negligence") (emphases added).]

The Court explained that such an approach doomed Connally as an expert: "errors and omissions aren't the same as gross negligence" and Connally "equated error or mistake with gross negligence."  [*Id.* at 105:19–20, 107:23–24.]  She failed to provide the "tools" necessary for the jury to find gross negligence.  She rendered no opinion, for example, how the avoidable losses she found compared to losses sustained

by peer firms in the mortgage-servicing industry. She rendered no opinion that these losses, and the extent of losses, fell below the acceptable standard of care in the industry. In contrast, the testimony of Genger Charles highlights why such testimony was necessary in order for the jury to be able to render a decision. For example, Charles testified that LoanCare's foreclosure conveyance curtailment rate, which was quite high, was actually better than other subservicers in the industry during the applicable period, and even improved between 2011 and 2016. [*See, e.g.*, Trial Tr. 1088–90 (explaining that LoanCare's curtailment rate was 91 percent, that other servicers' rate was 92 percent, and that LoanCare's average dollars of curtailments was declining year-over-year).] Without this "yardstick" testimony, the jury would have no idea how to assess the high number when analyzing the gross negligence claim. That was the fundamental problem with Connally's opinion.

Lyon's case is the same story as Connally's. In the course of his analysis, Lyons and his team reviewed roughly 6,000 loans representing the entire population of claims between 2010 and 2015 where Freedom sustained a loss it believed was attributable to LoanCare. [*Daubert* Hr'g Tr. 115:4–10.] He determined that LoanCare repeatedly erred servicing Freedom's portfolio of loans, and he attributed sole causation to LoanCare for $17,262,890.08 of Freedom's losses based on LoanCare's property preservation practices, improper conveyances of damaged property, missed deadlines and other untimely conduct. [See Collingwood Grp. Am. FHA Analysis ¶ 3.1(c), Docket No. 215-2 ("**Lyons Rpt.**").] Still, he offered no objective measure to explain how such conduct deviated from an acceptable standard of care in the mortgage-

servicing industry.  Even assuming the accuracy of his determinations, a reasonable jury would not have been furnished with the "yardsticks" necessary to make a finding as to LoanCare's gross negligence.  Lyons, like Connally, equated violations of the Applicable Requirements with loan losses attributable to LoanCare—and offered no opinion as to how LoanCare's conduct could amount to gross negligence.  [*See Daubert* Hr'g Tr. 123:13–20 (explaining that he and his team were "specifically asked not to opine on gross negligence"); Lyons Rpt. ¶ 2.3 (outlining purposes of analysis: to determine LoanCare's compliance with FHA requirements, determine financial loss sustained by Freedom, determine "damage amounts" by category of loss, and identify instances where damage amount was caused solely by an error or omission of LoanCare's or its agents).].  Like Connally, it was a "you erred, you're liable" approach.

The Court need not belabor the point any further: neither Connally nor Lyons provided a basis by which a reasonable jury could assess LoanCare's conduct in context.  Unlike LoanCare's experts, Connally and Lyons offered opinions focused on attributing fault for each loan, nothing more.  Accordingly, the Court precluded their testimony pursuant to Federal Rule of Evidence 702.  [*Daubert* Op. 21, 25.]  In sum, the following colloquy from the *Daubert* Hearing captures the disconnect between Freedom's experts' analyses and Freedom's theory of liability for breach under the Subservicing Agreement:

> THE COURT: [] That's not your problem. Your problem is the limitation on liability.  That's your problem.  So that's why I asked of your adversary, do you concede that you

didn't follow the applicable requirements. They don't. But even if they did concede, I still think Freedom's got an 8.3 problem.

MR. CUOMO: The universe of loans that our experts looked at is 90 percent-plus of the post-default claims that – post-default loans that went into foreclosure and went to claim. On 95 percent or 90-plus percent of those post-default loans, there was a curtailment that our experts identified as being solely due to LoanCare failing to comply with the applicable requirements.

This is not a small cross-section.

. . .

THE COURT:  Assume for argument's sake I agree with you, they solely caused it.

MR. CUOMO: Uh-huh.

THE COURT: Assume for argument's sake, how is a jury going to find whether or not it was in good faith, bad judgment, gross negligence or negligent?  How are they going to do that?

MR. CUOMO:  Because at a certain point – and I know this I part of what you're getting at, Your Honor – at a certain point it morphs from simple negligence or run-of-the-mill breach of contract to gross negligence.

THE COURT: And is that depending upon how many you throw against the wall and then they say, oh, enough of it, LoanCare, they're terrible?

MR. CUOMO:  Not –

THE COURT:  I mean, how does that – I mean, what's the tools for [the jury]?

MR. CUOMO: The tool for the jury and the reason that we structured the case and presented it this way goes back to the 90-plus percent where there are mistakes in the post-

default handling of, you know, the VA and the FHA loans that were in foreclosure. And the errors and the mistakes are contractual breaches, repeatedly, the same type of mistake over and over and over again.

Our position is that when our experts tell the jury that this mistake happened X number of times, that mistake happened this number of times, without our experts saying I think this is gross negligence, we can argue to the jury that the cumulative effect of the same mistakes over and over and over again -- and remember, Judge, this case will go to the jury with other evidence not just from experts. There will be testimony from fact witnesses. And I think you saw a lot of this in the summary judgment record. And I know that was all over the place. But you will see testimony from witnesses saying we had conference calls with LoanCare where we asked them to stop doing X, Y and Z because it resulted in a curtailment.

All of this stuff together accompanied by the expert witness testimony, cumulatively I don't know why a jury wouldn't be allowed to hear that and decide for themselves that it's gross negligence when you tell them what gross negligence is under Virginia law.

THE COURT: Because I think the ingredient that's missing is these experts are not giving them any tools to do that. They are not going to testify that it is not common practice in the industry that a certain percentage of someone's loan portfolio has these kinds of numbers. It is not accepted practice in the industry that a certain percentage such as LoanCare's here have these kinds of delays. They have nothing to go on. That's the problem.

[*Daubert* Hr'g Tr. 190:25–193:19.]

With these preliminary matters addressed, the Court now turns to the claims as to which LoanCare seeks judgment as a matter of law.

### B.   Freedom's Servicing Claim

As noted above, Freedom claims LoanCare breached the Subservicing Agreement based on its errors and omissions in servicing Freedom's loan portfolio for defaulted loans.   In § 10.6 of the Subservicing Agreement, the parties agreed that Virginia law governs their contractual relationship.   [Freedom Trial Ex. 2, SSA § 10.6 (choice-of-law provision).]   To sustain a breach-of-contract claim under Virginia law, a plaintiff must prove: (1) defendant owed plaintiff "a legally enforceable obligation," (2) defendant breached "that obligation," and (3) plaintiff suffered damages because of "the breach of obligation."   *Frankl Miller Webb & Moyers, LLP v. Crest Ultrasonics Corp.*, 860 F. App'x 45, 46 (4th Cir. 2021) (quoting *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016)).   "Courts must interpret the contract according to the plain meaning of the terms, giving effect to all words, and must not search for meaning outside the contract, where the agreement is complete on its terms."   *Design & Prod., Inc. v. Am. Exhibitions, Inc.*, 820 F. Supp. 2d 727, 736 (E.D. Va. 2011).

By executing the Subservicing Agreement, the parties agreed to limit LoanCare's contractual liability to Freedom.   Section 8.3 of the Subservicing Agreement ("Limitation Provision") unambiguously provides that:

> [LoanCare] shall be liable to [Freedom] only for [LoanCare's] willful misconduct or gross negligence arising solely from its own acts or omissions and shall not be under any liability to [Freedom] for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for good faith errors in judgment, . . . . In no event shall [LoanCare] be held liable for any special, indirect, punitive or consequential damages, resulting from any action taken or omitted to be taken by it

hereunder or in connection herewith.

[Freedom Trial Ex. 2, SSA § 8.3].   To overcome the Limitation Provision, Freedom must show at a minimum:  (1) LoanCare engaged in either willful misconduct or gross negligence; and (2) Freedom's injuries arose "solely" from LoanCare's "own acts or omissions."   [*Id.*]   On top of that minimum showing, Freedom must prove that LoanCare's complained-of conduct was not in good faith or the result of good faith errors in judgment.  [*Id.*]

Besides the Limitation Provision, the parties also agreed on a standard of care to govern LoanCare's performance of the Subservicing Agreement.  They agreed that LoanCare "shall perform and discharge its duties, covenants and obligations as subservicer in accordance with this Agreement with a degree of care that is no less than that provided by industry subservicers generally."  [*Id.* § 2.9.]  Further, the parties agreed that LoanCare would comply with the Agreement's "Applicable Requirements," which includes, among other things, FHA and VA guidelines, the Housing and Urban Development ("**HUD**") handbook, Fannie Mae's and Ginnie Mae's instructions and guidelines, requirements of the underlying loan documents, government agency regulations, including FHA regulations, and other federal, state, and local laws.  [*Id.* § 2.2 (LoanCare's compliance provision); see also § 1.8 (defining "Applicable Requirements").]  This includes servicing defaulted loans.  [*Id.* § 2.5(c).]

With these contract terms in mind, this Court turns to whether Freedom's

32

Servicing Claim can go to the jury.[9]

> ### 1. *Freedom's Servicing Claim fails as a matter of law because Virginia law requires expert testimony to establish the appropriate standard of care, deviation of that standard, and causation.*

Under Virginia's "expert testimony rule," courts generally require expert testimony on "issues beyond the realm of common knowledge and experience of a lay jury." *Benedict v. Hankook Tire Co.*, 286 F. Supp. 3d 785, 791 (E.D. Va. 2018) (quoting *Beverly Enters.-Va., Inc. v. Nichols*, 441 S.E.2d 1, 3 (Va. 1994)). Virginia law requires expert testimony in cases involving highly technical professions "to establish the standard of care and whether there has been any departure from that standard." *William H. Gordon Assocs., Inc. v. Heritage Fellowship*, 784 S.E.2d 265, 274 (Va. 2016) (explaining that engineering, architecture, medicine, and automotive transmission are "sufficiently technical to require expert testimony"); *Seaward Intern., Inc. v. Price Waterhouse*, 391 S.E.2d 283, 287 (Va. 1990) (holding expert testimony required in

---

[9] As noted above, see *supra* Section II.B., Freedom now argues that it can prevail as to its Servicing Claim under § 8.2 of the Subservicing Agreement, which provides that LoanCare agrees to indemnify Freedom for certain "Losses" resulting from (i) LoanCare's failure to perform its material obligations in compliance with the terms of the Subservicing Agreement, and (ii) a material breach by LoanCare of its representations and warranties. [Freedom's Br. 3–8 (citing SSA § 8.2).] As the Court explained on the record, such argument fails because it was not raised in the PTO, [see Trial Tr. 1653:5–20; see also June 29 Hr'g Tr. 29:18–30:1], which controls at this juncture. *See Basista v. Weir*, 340 F.2d 74, 85 (3d Cir. 1965) (explaining that the pretrial order limits the issues for trial and "in substance takes the place of pleadings"); *see also, e.g.*, *Bornstein v. County of Monmouth*, 2015 WL 2125701, at *8 (D.N.J. May 6, 2015) ("the vast majority of cases applying this rule have used it to find waiver, rather than to permit a newly asserted claim at trial" even where included in a prior pleading) (collecting cases). Accordingly, the Court will not permit Freedom to raise its indemnification theory now.

malpractice action against accounting firm because "generally accepted auditing standards' and the application of that definition to the facts of a particular case[] are matters beyond the common knowledge of laymen"); *Feld v. Priebe*, 2004 WL 2999114, at *4 (Va. Cir. Ct. Dec. 22, 2004) (expert testimony required to determine appropriateness of financial investments); *Benedict*, 286 F. Supp. 3d at 791–92 (holding expert testimony required for commercial truck driving and noting cases applying Virginia law that required expert testimony on firearms training and museum exhibition designers).   The rule "applies to all technical elements of the claim, including duty, breach, and causation." *Benedict*, 286 F. Supp. 3d at 793; *see also id.* at 791–92 ("In technical negligence cases, '[e]xpert testimony is ordinarily necessary to establish the appropriate standard of care, a deviation from that standard, and that such deviation was the proximate cause of damages.'" (quoting *Beverly*, 441 S.E.2d at 3)).   And the "expert testimony rule" applies in cases involving "specialized knowledge." *Trident Prod. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 777 (E.D. Va. 2012) (collecting cases requiring expert testimony), *aff'd*, 505 F. App'x 242 (4th Cir. 2013).

If a party needs an expert to establish a standard of care and fails to provide one, then courts must enter judgment as a matter of law. *Benedict*, 286 F. Supp. 3d at 796–97 (applying Virginia law and granting summary judgment motion on contributory negligence defense because defendants "have failed to produce any expert evidence of the standard of care applicable to [plaintiff's] conduct"); *Design*, 820 F. Supp.2d at 737–38 (granting summary judgment as to plaintiff's breach of contract claim since

defendant needed expert testimony to show that defendant was excused for non-performance because "[w]hether the alleged deficiencies that [defendant] cites constitute a breach of the standard of care is outside the knowledge of a layperson"); *Cf. Feld*, 2004 WL 2999114, at *4 (rejecting plaintiff's argument that defendant should be responsible for financial losses to parents' estate based on investments without expert testimony that the investments were inappropriate). This is so because jurors are "not permitted to speculate as to the professional standard against which to measure the reasonableness" of a party's conduct in cases involving technical professions requiring specialized knowledge. *Nelson v. Commonwealth*, 368 S.E.2d 239, 245 (Va. 1988); *see also Seaward,* 391 S.E.2d at 287 (explaining the standard of care and whether the defendant deviated from it "may not be left to speculation"); *Benedict*, 286 F. Supp. 3d at 793 ("The standard [of care] cannot be left to speculation or inferred merely from a party's conduct or its consequences.").

Against that backdrop, this Court finds Freedom needs expert testimony to establish a standard of care for mortgage servicers and whether LoanCare deviated from it. Mortgage servicing is highly technical because servicers must navigate through a thicket of complex federal regulations on government insured home loans, various investor rules and guidelines (like those set by Fannie Mae and Ginnie Mae), and federal, state, and local law on foreclosures (which vary across state lines like foreclosure requirements in judicial or nonjudicial states). Indeed, when the Court revisited its decision on Wise's testimony on the cause of Freedom's losses, the Court observed that mortgage servicing requires "specialized knowledge" because mortgage

servicers must know about "complex rules and regulations, the intricate compliance issues[,] the complex analysis regarding various issues relating to defaults, foreclosures, attorney performances, discovery[,]" as well as "[c]ourt delays, borrower's actions, cloud on title actions and things all beyond the borrower's control." [Trial Tr. 560:13–18]. This is all highly technical and touches on many subjects well beyond "the realm of common knowledge and experience of a lay jury." *Benedict*, 286 F. Supp. 3d at 791 (quoting *Beverly*, 441 S.E.2d at 3); *see also In re ResCap Liquidating Trust Lit.*, 432 F. Supp. 3d 902, 931 (D. Minn. 2020) (observing that "the complex residential mortgage-backed securities industry [is] a subject *not* within the knowledge or experience of lay people"); *cf. Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, 2008 WL 11336701, at *2 (M.D. Fla. 2008) ("The complexity in this case. . . is evident in the volume of evidence and the specialized knowledge involved in the mortgage servicing industry, which would not be familiar to the average lay person."). Because Freedom's Servicing Claim involves issues that are not within the jury's common knowledge and experience, expert testimony is needed to establish the relevant standard of care, whether LoanCare deviated from it, and causation. *Design*, 820 F. Supp. 2d at 738 ("To prove the standard required in highly technical professions, expert testimony is required unless the matters pertaining to duty and breach are obvious from ordinary human knowledge and experience." (citing *Nelson*, 368 S.E.2d at 243–44)).

But Freedom argues no expert testimony is needed because the Subservicing Agreement incorporates a standard of care defined by the contract's Applicable

Requirements. [Freedom's Br. 15; see also Freedom Mem. of Law in Opp'n to LoanCare's Mot. in Lim. No. 1, at 26–27, Docket No. 304.] According to Freedom, since the Subservicing Agreement incorporates HUD's, VA's, Fannie Mae's, and Ginnie Mae's regulations, requirements, and guidelines, those regulations, requirements, and guidelines establish the required standard of care. [*Id.*] Pointing to the Fourth Circuit's decision in *TransDulles Ctr., Inc. v. USX Corp.*, 976 F.2d 219 (4th Cir. 1992), Freedom argues no expert testimony is required. [*Id.*]

Freedom's argument is problematic for a few reasons. *First*, Freedom's argument ignores § 2.9 of the Subservicing Agreement where Freedom agreed that LoanCare would "perform and discharge its duties, covenants and obligations as subservicer in accordance with this Agreement with a degree of care that is no less than that provided by industry subservicers generally." [Freedom Trial Ex. 2, SSA § 2.9]. True, LoanCare agreed to comply with the Subservicing Agreement's Applicable Requirements. [*Id.* §§ 2.2, 2.5(c)-(d).] But the Court cannot divorce those Applicable Requirements provisions from § 2.9's standard of care provision. *Chantilly Constr. Corp. v. Commonwealth, Dep't of Highways & Transp.*, 369 S.E.2d 438, 444 (Va. Ct. App. 1988) ("[A]ll of the provisions of a contract should be construed together and those which appear to conflict should be harmonized whenever it is reasonably possible." (alteration in original) (quoting *Seaward v. Am. Hardware Co.*, 171 S.E. 650, 659 (Va. 1933))). Read together, the contractual provisions required LoanCare to comply with the Applicable Requirements with the same care as "industry subservicers

generally."[10]

*Second*, *TransDulles* does not relieve Freedom of its obligation to present expert testimony.  Freedom clings to the Fourth Circuit's ruling that expert testimony was inadmissible because the court found the parties' contract defined the standard of care by reference to various local zoning ordinances, subdivision plans, and a facilities manual.  976 F.2d at 227.  But Freedom ignores critical features of *TransDulles*.

That case involved the development of a subdivision.  The master subdivision agreement required the developer to "construct all physical improvements . . .  in accordance with applicable provisions of the Subdivision and Zoning Ordinances, including . . . adequate storm drainage system both on the subdivided property and on adjacent properties as needed improvements."  *Id.* at 222.  The developer contracted with an engineer "to design the property's infrastructure, including the stormwater drainage system that [the developer] had agreed to build in accordance with the County's regulations in the Subdivision Agreement," including a certain facilities manual.  *Id.* at 222, 227.  The facilities manual required the drainage system's pipes be a certain size to handle the expected flow of storm water.  *Id.* at 222 & n.3.  The

---

[10] At oral argument on LoanCare's motion for judgment as a matter of law, Freedom argued § 2.9's standard of care does not apply based on the provision's language stating "Except as otherwise expressly set forth in this Agreement."  [Trial Tr. 1982:17–1984:16.]  This Court has reviewed the relevant contract provisions and finds nothing in the agreement that expressly excludes § 2.9 from the contract's Applicable Requirement provisions.  There is nothing in Subservicing Agreement's Compliance provision (SSA § 2.2) and Delinquency Control provision (SSA §§ 2.5(c)-(d))—the very provisions Freedom argues establishes the contractual standard of care—that "expressly" states SSA § 2.9 does not apply to those provisions.

developer constructed the subdivision based on the engineer's plans that provided for smaller pipes for the drainage system than allowed under the facilities manual. *See id.* The municipality determined that drainage pipes were too small in violation of the subdivision agreement. *See id.*

In the ensuing litigation between the developer and engineer, the engineer sought to introduce expert testimony on the professional standard of care for engineers. *Id.* at 223. The trial court precluded that testimony, and the Fourth Circuit affirmed that decision. *Id.* at 223, 226–27. In doing so, the Fourth Circuit concluded under Virginia law, "expert testimony is not permitted when the facts to be proven are within the common understanding of the jury." *Id.* at 227. The court ruled that "a layperson could comprehend whether or not [the engineer's] plans met the County's regulations," and so, expert testimony was inappropriate. *Id.* But all the jury had to do in *TransDulles* was to compare the engineer's plans to the county regulations and facilities manual to determine the if the engineer's plan called for required pipe size for the drainage system—basic calculations and measurements. And under Virginia law, basic math calculations and measurements are within a lay person's knowledge. *Bd. of Supervisors of Fairfax Cnty. v. Lake Servs. Inc.*, 440 S.E.2d 600, 602 (Va. 1994) (holding expert testimony unnecessary if the issue "involves matters of common knowledge and basic calculation"). Because the jurors in *TransDulles* could have used their common knowledge, expert testimony was unnecessary. 976 F.2d at 227.

Unlike *TransDulles*, the issues involved here are well beyond basic calculations

39

and common experience.  As noted, mortgage servicing involves complex regulatory schemes at the federal, state, and local levels, and servicers must deal with multiple regulators (HUD, VA, Fannie Mae, and Ginnie Mae) each with different rules and requirements.  On top of this multifaceted regulatory scheme, throw a national mortgage crisis in the mix when loan defaults and home foreclosures became almost ubiquitous.  Navigating through this regulatory field during a national mortgage crisis is not within the common knowledge or experience of a lay person.

*Third*, even if a contract incorporates a standard of care, Virginia law still requires expert testimony to establish that standard.  *Seaward*, 391 S.E.2d at 287–88. Take *Seaward* as an example.  There the parties agreed the defendant-accounting firm would perform an audit of a plaintiff-corporation's books and records "in accordance with generally accepted auditing standards." 391 S.E.2d at 285.  Virginia's Supreme Court held expert testimony was required because "the definition of 'generally accepted auditing standards,' and the application of that definition to the facts of a particular case[] are matters beyond the common knowledge of laymen." *Id.* at 287. The court concluded the plaintiff needed expert testimony to "not only define the applicable standard, but also would adduce facts from which the jury could find that the defendant had deviated from it." *Id.*

Like the *Seaward* contract, the parties here agreed to a standard of care in the Subservicing Agreement:  LoanCare would perform its contractual obligations "with a degree of care that is no less than that provided by industry subservicers generally." [Freedom Trial Ex. 2, SSA § 2.9].   And just like the *Seaward* plaintiff needed expert

witness to establish that contractual standard of care, so too does Freedom.  391 S.E.2d at 287; *see also Design*, 820 F. Supp.2d at 737–38 (holding expert testimony required even though contract established the "standard" for the product to "be of museum quality" because whether the product "conformed to that of 'museum quality' is technical and outside the knowledge of a layperson").

Since Freedom's Servicing Claim involves highly technical issues on mortgage servicing well beyond the common knowledge and experience of lay juror, Virginia law required Freedom to present expert testimony establishing the appropriate standard of care, whether LoanCare deviated from it, and whether that deviation caused Freedom's losses.  *Design*, 820 F. Supp. 2d at 738.   Because Freedom did not have an expert to do so, judgment as a matter of law is necessary.  *Benedict*, 286 F. Supp. 3d at 796–97.

Next, even assuming that Freedom were not required to introduce expert testimony establishing the standard of care for mortgage-servicing (which it is), Freedom's lay witnesses failed to do so.  In fact, they did not know the standard of care, [*see, e.g.*, Trial Tr. 574:14 (Ms. Wise) ("I do not know of any industry – single industry sources I could compare to"); *id.* at 892:4–8 (Ms. Lare) ("Q. Is that a typical complaint in the industry, that a subservicer has curtailments on 93 percent of his claims?  A. I don't have any supporting information about those numbers.  So I really can't answer that question")], did not compare LoanCare's performance under the Subservicing Contract vis-à-vis other peer subservicers, [*see, e.g.*, *id.* at 446:2–4 (Mr. Huffman) ("Q. And you didn't study LoanCare's performance compared to other

subservicers, did you?  A. Subservicers, no.")], and even concluded that subservicers faced widespread problems outside of their control, [*see, e.g.*, *id.* at 334:16–19 ("Q. Okay.  This was a widespread problem in the industry right, the backlog?  A. It was tough.  The states weren't allowing you to foreclose, so things backed up.")].  The Court cannot identify from the record evidence by what standard a reasonable jury would compare LoanCare's performance under the Subservicing Agreement to determine whether LoanCare was grossly negligent; Freedom failed to adduce any testimony in this regard.

Still, Freedom submits that, because the parties agreed that LoanCare must perform its obligations in accordance with the Applicable Requirements, [Freedom Trial Ex. 2, SSA § 2.5(c)], the jury could conclude on the record before it that LoanCare was repeatedly and systematically negligent concerning its post-default servicing of Freedom's loans.  [Freedom's Br. 14.]  The jury would do this by considering, for example, the testimony showing that LoanCare allowed a property to sit for nearly five and half years while completely missing the back portion of the house, [Trial Tr. 451:19–452:23], or its failure to perform bank reconciliations within the timelines required by investors and the Subservicing Agreement, [Freedom Trial Ex. 761; Trial Tr. 198–200:9; *id.* at 202:19–203:7; *id.* at 204:3–205:10], or its repeated mistakes in the handling of insurance claims pursuant to HUD requirements, [*id.* at 445:8–445:17; *id.* at 555:12–556:23].  [*See also* Freedom's Br. 6–8.]  In other words, Freedom argues that the jury could find gross negligence from the foregoing testimony because contractual performance is the standard of care.

It is not.  As discussed above, see *supra* Section IV.B.1. & note 10, § 2.9(a) provides that LoanCare shall "perform and discharge its duties, covenants and obligations as subservicer in accordance with [the Subservicing] Agreement with a degree of care that is no less than that provided by industry subservicers generally." [Freedom Trial Ex. 2, SSA § 2.9(a).]  Nothing about LoanCare's duty to service delinquent loans in accordance with the Applicable Requirements modifies Section 2.9(a).

Ultimately, the problem lurking in Freedom's argument (and, indeed, its entire case) is that, under Virginia law, a jury cannot speculate or infer a standard of care, a deviation from that standard, or causation from a party's acts or the consequences of those acts.  *See Benedict*, 286 F. Supp. 3d at 793 ("The standard [of care] cannot be left to speculation or inferred merely from a party's conduct or its consequences.").  The jury needs to hear evidence on the standard of care.  *Raines v. Lutz*, 341 S.E.2d 194, 197 (Va. 1986) ("In cases of this kind, the jury must make an objective determination, based upon evidence and not upon speculation, whether the appropriate standard of care has been followed. The jury cannot make such a determination without evidence of what the standard was.").  The standard of care is critical because it provides objective measures by which the jury can compare LoanCare's conduct. *Nelson*, 368 S.E.2d at 245 ("This standard of care properly should have been the subject of expert testimony because the trier of fact is not permitted to speculate as to the professional standard against which to measure the reasonableness of an architect's actions or inaction.").  Accordingly, without expert testimony or other evidence establishing the

standard of care, Freedom has not set forth a legally sufficient basis for the jury to find

in its favor.  Therefore, judgment as a matter of law is required.

> **2.    Freedom's claim also fails as a matter of law because it has not presented legally permissible evidence by which a reasonable jury could conclude that LoanCare caused its claimed damages.**

Similarly, Freedom needed expert testimony to establish proximate causation—

that LoanCare was *solely* responsible for Freedom's losses.  [Freedom Trial Ex. 2, SSA

§ 8.3.]  Under Virginia law, courts distinguish between simple and complex causation.

*Roop v. Desousa*, ___ F. Supp. 3d ___, 2023 WL 2434281, *17 (E.D. Va. Mar. 9, 2023).

Lay testimony often suffices to establish causation in simple cases.  *See, e.g.*, *Peterson v.*

*Neme*, 281 S.E.2d 869, 872 (Va. 1981) (explaining that in an automobile accident case,

lay testimony of the causal connection between the accident and the claimed injury is

sufficient without medical testimony, as the jury may give such testimony whatever

weight it chooses).  However, in more complicated cases involving multiple causes of

injury or loss, courts require expert testimony to "elucidate issues for the jury and to

ensure that jurors do not succumb to logical fallacies in determining liability."  *Roop*,

2023 WL 2434281, at *17 (citing *Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 709–

10 (W.D. Va. 1999)); *see also Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 972 (4th Cir.

1990) (explaining that proof of legal causation in a medical device case must be by

expert testimony); *Zellars v. NexTech Ne., LLC*, 895 F. Supp. 2d 734, 739–40 (E.D. Va.

2012) (same requirement in complex toxic tort cases).  This is so because "[n]egligence,

and an accident . . . do not make a case.  As between them there must be [a] causal

connection." *Wilkins v. Sibley*, 135 S.E.2d 765, 767 (Va. 1964). "The evidence tending to show causal connection must be sufficient to take the question out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference, before a question of fact for submission to the jury has been made out." *Id.* (citations omitted).

Here, because of the faulty methodologies employed by Connally and Lyons, the Court precluded their testimony; and Freedom had no expert witness at trial to opine on whether LoanCare was the sole cause of its loan losses. In a case where there are multiple, independent causes of loss—here, from origination issues to third-party conduct, such as agency discretion to grant or deny extension applications, to market conditions to LoanCare's own servicing actions—disaggregating unavoidable from avoidable losses is paramount. Expert testimony to establish proximate causation was thus required. *See Benedict*, 286 F. Supp. 3d at 791 ("In technical negligence cases, therefore, '[e]xpert testimony is ordinary necessary to establish the appropriate standard of care, a deviation from that standard, and that such deviation was the proximate cause of damages.' ") (quoting *Beverly*, 441 S.E.2d at 3).

The Court essentially adopted this position during trial by considering whether to permit Carla Wise, Freedom's 30(b)(6) witness, to testify that, in her opinion, LoanCare was solely responsible for certain loan-level losses sustained by Freedom. Among the deposition testimony designated by Freedom for introduction at trial was the following: "Losses that were not attributable to LoanCare, you will not see in our claims, but where we found LoanCare to be solely responsible by their acts and omissions of filing the HUD claims or pursuing foreclosure timely or managing their

45

attorney network timely are including in our claims." [30(b)(6) Dep. Tr. of Carla Wise 98:14–22; *see also id.* at 134, 135, 136, 137, 138, 142–54 and 264–65.]  Freedom then tied up the losses identified in summary charts representing Freedom's damages.[11]

Pursuant to Federal Rule of Evidence 701, lay opinion testimony is limited insofar as it must be (a) rationally based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or determining a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge with the scope of Rule 702.  FED. R. EVID. 701.  Subsection (c) supplies the critical component of the rule.[12] *See Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81–82, 83 (3d Cir. 2009) (explaining that subsection (c) was added to ensure that opinion testimony which "crosse[s] the line into subject areas that demand expert testimony" because they are "sufficiently complex" will be precluded).  "[A] person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person."  *United States v. Kale*, 445 F. App'x 482, 485 (3d Cir. 2011).  In that case, in order provide opinion testimony, the witness must proceed through the gauntlet of Rule 702 to test the basis for her opinions and the reliability of

---

[11] In this Court's mind, it saw no relevant difference between the testimony of Carla Wise that the Court excluded and the testimony of Connally and Lyons that the Court precluded.  All three equated servicing deficiencies as the fault of LoanCare and as to those loans opined that LoanCare was solely responsibility.  It was, as LoanCare argued, a "you erred, your liable" approach.

[12] In fact, subsection (c) was added to the Rule in 2000 for the express purpose of "eliminat[ing] the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." FED. R. EVID. 701 advisory committee's note to 2000 amendment.

her methods.

Here, Ms. Wise was not qualified as an expert or identified as such in the Joint Final Pretrial Order.   Considering whether to permit her to testify to the cause of Freedom's losses as a lay witness, the Court held that Rule 701 expressly precluded such testimony.   [Trial Tr. 560:3–5 ("[A]ny testimony where she opines as to the causation issue would be impermissible testimony under [Rules] 701 and 702."); *see also id.* at 560:10–19 ("And in this case, I do find that causation is within the purview of Rule 702. It does require to opine as to loss causation, it does require specialized knowledge of the rules, complex rules and regulations, the intricate compliance issues; the complex analysis regarding various issues relating to defaults, foreclosures, attorney performances, discovery. Now I've heard more today about discovering vacancy issues, what does that mean? Court delays, borrower's actions, cloud on title actions and things all beyond the borrower's control. And so I think that all requires specialized knowledge.").]   Freedom's designated causation testimony from Ms. Wise's deposition fit squarely within the ambit of subsection 701(c), and was thus precluded.  *See Donlin*, 581 F.3d at 82–83; *Kale*, 445 F. App'x at 485.

Freedom nevertheless sought to meet its burden through various fact witnesses. For instance, Freedom suggests that a reasonable jury could conclude that LoanCare caused its losses based on the record evidence of repeated delays completing foreclosures.  [*See, e.g.*, Freedom's Br. 29 (citing Freedom Trial Exs. 276, 577; Trial Tr. 305:18–306:9, 312:15–313:8; Freedom Trial Ex. 707; Trial Tr. 185:24–186:15, 187:10–188:9).]  Take the testimony of Martin Levine as one cited example.  He indicated that

LoanCare wasn't "doing the collections timely. They weren't chasing up fast enough. They weren't being active. You know, they'd make a collection call, and then they won't talk to the borrower again for 90 days, never following up." [Trial Tr. 313:1–4.] He also addressed a "punch list" of action items produced by Ms. Wise and emailed to LoanCare regarding servicing improvement. [Trial Tr. 305:18–306:9.] In the correspondence, LoanCare's president, Gene Ross, acknowledged receipt of the "helpful" list and noted his intention to "reach out . . . with a comprehensive work plan." [*Id.* at 306:5.] But that work plan never materialized. Freedom suggests that a jury could take these assertedly "negligent acts," in combination with others, to find that Freedom's damages are solely attributable to LoanCare. This evidence—even crediting, as the Court must, the legitimate inferences raised by the other evidence of record in Freedom's favor—simply does not establish causation. *See Wilkins*, 135 S.E.2d at 767.

Indeed, the record evidence demonstrates that a claim curtailment is not necessarily proof of LoanCare's liability under the Subservicing Agreement. The jury heard testimony from witnesses, such as Mr. Watkins, who testified that 90 percent of Freedom's loans suffered a curtailment, but that "a portion of these curtailments are unavoidable or perhaps [Freedom's] own fault." [Freedom Trial Ex. 707; *see also* Trial Tr. 272:25–274:4 (Mr. Watkins acknowledging that Freedom's delays in sending buyout funds to LoanCare resulted in some claim curtailments).] Freedom's case-in-chief failed to provide a reasonable basis for the jury to conclude that LoanCare proximately caused all of Freedom's claimed damages.

48

Judgment as a matter of law is thus required for the foregoing reason as well. *See Roop*, 2023 WL 2434281, at *22 (granting JMOL motion as to causation issue where injuries too "complex, degenerative, unfamiliar to the average juror," and stemming from many, interrelated causes to permit lay testimony alone) (citing *Taylor v. Shreeji Swami, Inc.*, 820 F. App'x 174, 178 (4th Cir. 2020)).

> **3.    Freedom also, as a matter of law, cannot overcome the Subservicing Agreement's Limitation Provision under a gross negligence theory because the indisputable evidence shows LoanCare exercised some care.**

Even if Freedom could establish a standard of care and causation for its Servicing Claim, its gross negligence theory fails as a matter of law.  As noted above, gross negligence under Virginia law "requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness." *Cowan*, 603 S.E.2d at 918.  It is "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." *Patterson v. City of Danville*, 875 S.E.2d 65, 75 (Va. 2022) (emphasis in original) (quoting *Commonwealth v. Giddens*, 816 S.E.2d 290, 294 (Va. 2018)).   This gross negligence standard "is one of indifference, not inadequacy." *Id.* (quoting *Elliot*, 791 S.E.2d at 732)).  Simply stated, gross negligence under Virginia law is an "I don't care" standard.

While the question whether a party has shown gross negligence should often be left for a jury to decide, Virginia law requires dismissal of such claims "when persons of reasonable minds could not differ upon the conclusion that such negligence has not

been established." *Elliot*, 791 S.E.2d at 732 (quoting *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (Va. 1987)).  Indeed, in such cases, courts "have a duty to so rule." *Id.* Thus, if there is any showing that a party exercised some care—even if ineffectual— the gross negligence claim fails. *Id.* at 733 (affirming grant of summary judgment on gross negligence claim against Boy Scout troop leader who took a boy scout to a river knowing the scout could not swim because the leader attempted to save the boy when he fell into the water); *see also Patterson*, 875 S.E.2d at 75 (holding trial court properly dismissed gross negligence claim against doctor because "Dr. Wang's multiple efforts to treat Patterson—whether or not negligently performed—demonstrate that Dr. Wang was exercising 'some degree of care' in his capacity as a physician, and thus, the 'claim for gross negligence must fail as a matter of law'" (quoting *Elliot*, 791 S.E.2d at 732)).

Here, even when viewing the evidence in light most favorable to Freedom, *see Galena*, 638 F.3d at 196, no reasonable jury could not find that LoanCare did not exercise at least some care in servicing Freedom's loan portfolio.  [LoanCare Trial Ex. 45 (2013 email from Ms. Wise explaining "delinquencies are down" and LoanCare's "activity on our loans much improved, our Fannie Mae and Ginnie Mae results are trending correctly and production is up"); LoanCare Trial Ex. 729 (another email from Wise stating that LoanCare's "performance overall around transparency and responsive has improved in a huge way"); LoanCare Trial Ex. 60 (another 2013 email from Wise stating "[a]ll going well with LoanCare" and acknowledging Freedom's oversight of LoanCare "continues to improve, default is down, STAR rating continue to improve, loss mitigation is up, our investor reporting errors are improving . . .");

LoanCare Trial Ex. 333 (2013 from Jackie Barson crediting Freedom and LoanCare for their "hard work" because Freedom's Fannie Mae STAR report card increased by "8 points!"); LoanCare Trial Ex. 435 (2014 email from Freedom employee Autumn Hollars to LoanCare employee Elieen Lare thanking Lare and her colleagues "for such a great performance" when Freedom's Fannie Mae STAR rating increased).]

Indeed, several of Freedom's own witnesses prove that LoanCare exercised some care.  [Trial Tr. 338:22–339:20 (Levine testifying that Freedom attributed its improvement on Fannie Mae STAR rating in March 2014 to LoanCare); (Lee testifying that he thought LoanCare did a "good job" servicing Freedom's loans).] Indeed, Freedom's own CEO, Middleman, testified that by 2014, LoanCare's performance "[w]as improving" and that he "did not" have concerns about LoanCare's future performance.  [Trial Tr. 1338:17–25.].   All this evidence on LoanCare's improvement and efforts to work with Freedom dooms a gross negligence theory because it shows LoanCare was not indifferent.  *Patterson*, 875 S.E.2d at 75 (stating the standard for gross negligence is indifference).

Despite the above evidence, Freedom argues that LoanCare did not exercise "some degree of care . . . with regard to the loans that are subject of this lawsuit." [Trial Tr. 1988:3–8.].  Freedom contends LoanCare made no "good faith effort" on the loans within its damages claim. [*Id*. at 1989:13–15.].  According to Freedom, LoanCare just never got better and made the same mistakes over-and-over again. [*Id*. at 2004:4–6.]

51

The Court finds Freedom's arguments legally troubling for two reasons.  *First*, Freedom wants to aggregate LoanCare's errors and omissions on individual loans to show LoanCare's servicing of Freedom's entire portfolio was grossly negligent.  At the same time, Freedom asks this Court to ignore mounds of evidence showing LoanCare improved in certain servicing areas because Freedom does not have a claim against LoanCare in the improved servicing areas, like loss mitigation.  [*Id*. at 1988:15–1989:2.]  This Court cannot turn a blind eye to this evidence (much of which came from Freedom's own witnesses and employees) because Freedom does not have a specific claim against LoanCare in that servicing area.  Freedom seeks to hold LoanCare liable for losses across the entire portfolio on a gross negligence theory, and so, this Court must consider LoanCare's servicing across the portfolio.  Put simply, Freedom cannot have its cake and eat it too.

*Second*, just because LoanCare's conduct that caused a loss was inadequate or ineffectual does not equate to gross negligence.  Again, the standard for gross negligence is "indifference, not inadequacy." *Elliot*, 791 S.E.2d at 732 (citation omitted).  On this record, this Court cannot find LoanCare was indifferent when servicing Freedom's loans.  Said another way, the evidence does not support a finding that LoanCare simply did not care.  To the contrary, the evidence shows that even if LoanCare was negligent in some servicing areas, LoanCare cooperated with Freedom and improved in other areas illustrating LoanCare exercised some care—evidence fatal to a gross negligence claim.  *See Patterson*, 875 S.E.2d at 75.

In sum, this Court concludes that no reasonable jury could find that LoanCare did not exercise some care in servicing Freedom's loans, and so, Freedom cannot show gross negligence. *Elliot*, 791 S.E.2d at 732.

### 4. Freedom also has not presented legally sufficient evidence for a jury to find that LoanCare engaged in willful misconduct to overcome the Subservicing Agreement Limitation on Liability.

Next, the Court considers whether a reasonable jury could find, on the record before it, that LoanCare engaged in willful misconduct in connection with its performance under the Subservicing Agreement.[13]   Under Virginia law, willful misconduct refers to acting in conscious disregard of the rights of another or with reckless indifference to the consequences of one's actions.  *See Green v. Ingram*, 608 S.E.2d 917, 923 (Va. 2005) ("Negligence conveys the idea of heedlessness, inattention, inadvertence; willfulness and wantonness convey the idea of purpose or design, actual or constructive.") (quoting *Boward v. Leftwich*, 89 S.E.2d 32, 35 (Va. 1955)).  Willful misconduct does not mean intentional misconduct: "An actor guilty of willful and wanton conduct intends his act, but not the resulting harm."  *Id.* (quoting *Infant C. v. Boy Scouts of America, Inc.*, 391 S.E.2d 322, 328 (Va. 1990)).  Still, proof of "actual or

---

[13] As noted above, see *supra* Section II.B., Freedom advances the argument that the last antecedent doctrine requires an interpretation of SSA § 8.3 such that the phrase "solely from its own acts or omissions" applies only to gross negligence, and not willful misconduct.  [Freedom's Br. 27–28 (citing *Lewis v. Lewis*, 2016 WL 2864378 (Va. App. May 17, 2016)).]  In this way, Freedom argues that it need not have presented evidence that LoanCare's willful misconduct is directly attributable to its own acts and omissions. [*Id.* at 29.]  Because the Court concludes that no reasonable jury could find LoanCare engaged in willful misconduct based on the evidence adduced, the Court need not directly address this argument.

constructive consciousness that injury will result from the act done or omitted" is necessary. *Alfonso v. Robinson*, 514 S.E.2d 615, 618 (Va. 1999).

In this case, Freedom submits that a reasonable jury could conclude that LoanCare engaged in willful misconduct based on the evidence of record. [Freedom's Br. 16–18.] It points to testimony from Ms. Wise concerning Freedom's efforts to achieve greater transparency concerning LoanCare's subservicing operation. In particular, Ms. Wise testified that Freedom requested access to certain curtailment information for loans in its portfolio (*i.e.*, LoanCare images), but Mr. Carrigan at LoanCare did not address her verbal and written demands despite promising to guarantee access. [Trial Tr. 522:19–524:19.] Part A claim data, of course, was already available to Freedom directly from the FHA. [*Id.* at 522:8–14.] On this point, Freedom also argues that a jury could conclude that LoanCare engaged in willful misconduct from the fact that LoanCare removed curtailment information from the Advice of Payment form for Part A claims that it was providing to Freedom. [*Id.* at 501:10–502:1.] Again, the curtailment data were available to Freedom at FHA Connection; Freedom did not immediately recognize that it could obtain access to the information it sought. [*Id.* at 502:7–16.] Furthermore, Freedom points to testimony that LoanCare sometimes did not respond to Freedom's requests. [*Id.* at 449:5–451:13; *see also* Freedom Trial Ex. 365 (e-mail from LoanCare property preservation supervisor to colleague) ("FYI, I'm not responding to her [a Freedom representative]").] Finally, Freedom has previously referenced LoanCare's failure to provide a performance improvement work plan upon request, despite LoanCare's representations that it

54

would, as evidence of willful misconduct. [*See, e.g.*, Trial Tr. 1555:4–19 (testimony of Mr. Ross); *id.* at 306:1–9; Freedom Trial Ex. 577 (E-mail from Gene Ross to Carla Wise).]

The Court does not find Freedom's assessment persuasive. No reasonable jury could conclude, based on the foregoing—or any other evidence of record—that LoanCare engaged in willful misconduct warranting liability under the Subservicing Agreement. The evidence fails to show that LoanCare acted with a "wrongful intention." Ignoring a client from time to time may be poor business practice, but the isolated instances Freedom documented at trial hardly rise to the level demonstrating willful misconduct under Virginia law. *See Buzzo v. Woolridge Trucking, Inc.*, 437 S.E.2d 205, 208 (Va. App. 1993) ("[W]illful misconduct imports something more than a mere exercise of the will in doing the act. It imports a wrongful intention.") (internal quotation marks omitted) (quoting *Uninsured Employer's Fund v. Keppel*, 335 S.E.2d 851, 852 (Va. 1985)). Additionally, failing to supply curtailment information upon request—where that information is already available to Freedom from the FHA—does not demonstrate willful misconduct, especially where the complete record reveals that LoanCare's representatives "showed" Freedom's representatives how to access the Advices of Payment themselves. [Trial Tr. 929:7–9.] Finally, the undisputed evidence at trial revealed that the parties continued to do business together—that Freedom continued sending loans to LoanCare for servicing—notwithstanding LoanCare's failure to supply a work plan in response to Ms. Wise's "punch list." [*See, e.g.*, *id.* at 1295:5–13 (Mr. Middleman testifying that Freedom continued sending LoanCare

loans because "it's not easy to change platforms" and he "could tolerate a certain level of bad performance").]  The foregoing does not demonstrate willful misconduct.  *See Green*, 608 S.E.2d at 924.

Freedom has simply failed to adduce the evidence by which a reasonable jury could find willful misconduct.  Therefore, judgment as a matter of law is warranted.

> **5.      Freedom also has not presented legally sufficient evidence by which a reasonable jury could conclude that LoanCare's acts and omissions under the Subservicing Agreement were not made in good faith or did not result from good faith errors in judgment.**

Finally, as discussed above, for LoanCare to be liable under the Subservicing Agreement, Freedom needed to show that LoanCare failed to act in good faith.  [SSA § 8.3.]  LoanCare construes the required showing as one of "bad faith," submitting that there is no evidence revealing LoanCare's "sinister motive" or a conscious intention to do a wrong "because of dishonest purpose or moral obliquity." [LoanCare's Br. 17 (quoting *Conrad Co. v. Jesco, Inc.*, 908 F.2d 966 (4th Cir. 1990)) (internal quotation marks omitted).]  Freedom argues that it has adduced sufficient evidence to show that LoanCare failed to act with "honesty of purpose" and fidelity to its contractual duties.  [Freedom's Br. 33 (citing *Arnold M. Diamond, Inc. v. Dalton*, 25 F.3d 1006, 1010 (Fed. Cir. 1994)); *see Dalton*, 25 F.3d at 1010 ("The phrase 'good faith' in common usage has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation.").]

Whether Freedom's required showing is one of "honesty of purpose" or "sinister motive," the Court determines that no reasonable jury could find in Freedom's favor as to its Subservicing Claim based on the evidence it adduced to show LoanCare's lack of good faith. For instance, Freedom first contends that each of the acts demonstrating willful misconduct, which were discussed above, see *supra* Section IV.B.4, also establish LoanCare's lack of good faith. [Freedom's Br. 34–35.] They do not. Even crediting this evidence in Freedom's favor, the Court determines that they appear to be isolated instances of organizational friction, not lack of good-faith conduct. Next, Freedom points to LoanCare's billing practices as evidence of lack of good faith. Freedom maintains that they were unclear and inconsistent and resulted in double or even triple billing for duplicative or non-existent services. [*Id.* at 35 (citing Freedom Trial Exs. 273, 578, 603, 681; Trial Tr. 181:25–190:6, 191:5–192:5, 191:22–192:5, 192:21–194:9, 194:21–195:18, 196:5–197:20, 315:21–316:10, 316:24–317:14).] Even crediting this evidence, the Court notes that there is also uncontroverted evidence that Freedom and LoanCare worked together to resolve these billing irregularities and duplicative fees. The evidence introduced hardly shows a lack of good faith on LoanCare's part. Accordingly, no reasonable jury could find that LoanCare failed to act in good faith in connection with the performance of its duties under the Subservicing Agreement.

*   *   *

Ultimately, each of the foregoing reasons independently dooms Freedom's Subservicing Claim. Freedom has not adduced the evidence required for the jury to

find that LoanCare's conduct amounted to gross negligence or willful misconduct, that such conduct solely caused Freedom's damages, and that such conduct reflects a lack of good faith on LoanCare's part. Therefore, judgment as a matter of law is warranted in LoanCare's favor.

### C.      Freedom's Implied Covenant of Good Faith and Fair Dealing Claim

Next, the Court addresses Freedom's claim for breach of the implied covenant of good faith and fair dealing, which is premised on the same evidence of willful misconduct and lack of good faith discussed above, see *supra* Sections IV.B.4 & 5. LoanCare argues that Freedom cannot maintain its implied covenant claim because it is premised on contractual non-performance and, thus, is not independent of Freedom's breach of contract claim. [LoanCare's Br. 21–22.] Freedom argues that its claim is premised on LoanCare's bad faith exercise of discretion under the Subservicing Agreement. [Freedom's Br. 36, 37.]

Under Virginia law, every contract includes an implied covenant that the parties will act in good faith and deal fairly with one another. *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 381 (E.D. Va. 2020) (citing *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541–42 (4th Cir. 1998). To prevail on a claim for breach of the implied covenant, a plaintiff must sufficiently show "(1) a contractual relationship between the parties, and (2) a breach of the implied covenant." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (citing *Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 386 (Va. 1996)). A party can breach its duty of good faith and fair dealing by (1) acting dishonestly

during the performance of a contract, or (2) exercising its discretion arbitrarily or unfairly. *See Stoney Glen, LLC v. S. Bank & Tr. Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013), *clarified on denial of reconsideration,* 2013 WL 4539736 (E.D. Va. Aug. 27, 2013). When a contract provides for a party's discretion in performing its contractual obligations, such party breaches the implied covenant of good faith and fair dealing when it " 'exercise[s] contractual *discretion* in bad faith, even when such discretion is vested solely in that party.' " *Stoney Glen*, 944 F. Supp. 2d at 466 (quoting *Virginia Vermiculite*, 156 F.3d at 542).

Here, there is no dispute that the Subservicing Agreement is the contract at issue between the parties, so the relevant inquiry concerns whether Freedom has presented sufficient evidence that would allow the jury to conclude that LoanCare either acted dishonestly or exercised its discretion under the Subservicing Agreement in bad faith, unfairly or arbitrarily. As discussed above, Freedom failed to present sufficient evidence or a viable theory of culpability that LoanCare breached that standard of care set forth in the Subservicing Agreement. Relatedly, the Court finds that Freedom did not present any evidence to the jury that LoanCare's performance under the Subservicing Agreement was dishonest or that it exercised its contractual discretion unfairly or arbitrarily. *See Stoney Glen*, 944 F. Supp. 2d at 466. In fact, Freedom's own witnesses confirmed that LoanCare's employees were cooperative in addressing subservicing deficiencies. [*See, e.g.*, Trial Tr. 653:23–25, 654:3–5 (Ms. Wise reporting to Mr. Middleman that "We have LoanCare's attention and they are being very cooperative" and that "All our LoanCare measures continue to improve"); *id.* at

59

1323:23–24, 1324:3–9 (same).] Without sufficient evidence that the Subservicing Agreement was ever breached by LoanCare, it follows that Freedom's evidence is also insufficient to prove LoanCare breached the implied covenant of good faith and fair dealing.  Accordingly, the Court will also grant LoanCare's Motion with respect to such claim.

### D.    Freedom's Overbilling Claim

Finally, the Court addresses Freedom's fraud and unjust enrichment claims in connection with its assertion that LoanCare billed Freedom servicing fees for loans on which, in truth, it was not actually performing any services.

To prove fraud under Virginia law, a plaintiff must show: "(1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting in damage to the party misled." *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 346–47 (Va. 1998).  To prove unjust enrichment, a plaintiff must show that (1) it conferred a benefit on the defendant, (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff, and (3) the defendant accepted or retained the benefit without paying for its value.  *See Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008).

Freedom argues that it has elicited sufficient evidence by which a jury could find in its favor as to either theory, relying principally on the testimony of Mr. Walters. [*See, e.g.*, Trial Tr. 1196:2–5 ("Q. Okay.  These are the potential months Freedom has been charged by LoanCare for maintaining these loans on their system with no work;

60

is that right? A. Yes."); *id.* at 1200:9–12 ("So they agreed with our findings in May and credited us back on some of the loans.  But then in June, the same thing continued, and so our oversight team had to manage that accordingly[.]"); *see also* Freedom's Br. 37–41.]  LoanCare disputes Freedom's claims and argues that no jury could find in Freedom's favor because the overbilling issues were resolved and Mr. Walters only identified "potential" problems.  [LoanCare's Br. 20–21.]

As the Court has set forth on the record, [see Trial Tr. 2038:1–2039:12], the Court reserves on this issue pursuant to Rule 50(b).  Accordingly, this claim will go to the jury.

## V.     CONCLUSION

For the foregoing reasons, LoanCare's Motion has been **GRANTED**, **IN PART**, and **DENIED**, in part.  An Order was filed on the docket on July 21, 2023 to that effect.  [Docket No. 352.]


**July 23, 2023**                                    **s/Renée Marie Bumb**
DATE                                                 RENÉE MARIE BUMB
                                                     Chief United States District Judge