## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| FREEDOM MORTGAGE CORPORATION, | |
| Plaintiff/Counterclaim-Defendant, | Civil No. 16-02569 (RMB/AMD) |
| v. | |
| LOANCARE, LLC (as successor to FNF Servicing, Inc. and LoanCare, a Division of FNF Servicing, Inc.), | **MEMORANDUM OPINION**<br>**&**<br>**ORDER** |
| Defendant/Counterclaimant. | |

**APPEARANCES:**

Mark S. Landman (*pro hac vice*)
Jerry A. Cuomo
Timothy J. Collazzi
LANDMAN CORSI BALLAINE & FORD P.C.
One Gateway Center, 22nd Floor
Newark, New Jersey 07102

    and

Wayne A. Mack (*pro hac vice*)
James H. Steigerwald
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, Pennsylvania 19103

    and

Brad D. Feldman
DUANE MORRIS LLP
1940 Route 70 East, Suite 100
Cherry Hill, New Jersey 08003

*On behalf of Plaintiff/Counterclaim-Defendant Freedom Mortgage Corporation*

Robert J. Lack
Andrew M. Englander
FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
One Gateway Center, 25th Floor
Newark, New Jersey 07102

 and

Stuart H. Singer (*pro hac vice*)
Sabria A. McElroy (*pro hac vice*)
Pascual A. Oliu (*pro hac vice*)
Evan Ezray (*pro hac vice*)
Savannah Mora (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301

 *On behalf of Defendant/Counterclaimant LoanCare, LLC*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter, having been restored to the Court's active docket recently, is now before it upon the post-trial Motions to Amend the Judgment filed by Plaintiff/Counterclaim-Defendant Freedom Mortgage Corporation ("**Freedom**") and Defendant/Counterclaimant LoanCare, LLC ("**LoanCare**") pursuant to Federal Rules of Civil Procedure 58(b), 59(e), and 60(a), [Docket Nos. 382, 383], and LoanCare's Renewed Motion for Judgment as a Matter of Law filed pursuant to Rule 50(b), [Docket No. 384]. Having considered the parties' submissions without oral argument pursuant to Local Civil Rule 78.1(b), and for good cause shown, the Court will **DENY** Freedom's Motion to Amend the Judgment, **GRANT** LoanCare's Motion to Amend the Judgment, and **GRANT** LoanCare's Renewed Motion for Judgment as a Matter of Law. The Court will enter an amended final judgment separately.

## I.

In July 2023, this matter proceeded to a two-week jury trial. Before the trial began, the Court dismissed Count II of LoanCare's Second Amended Counterclaim [Docket No. 90] (i.e., LoanCare's claim for conversion before termination), [Order, Docket No. 117 (dated Sept. 23, 2019)], and granted summary judgment to LoanCare as to Count V of Freedom's Amended Complaint [Docket No. 69] (i.e., Freedom's claim for tortious interference with contract). [Mem. Op. & Order, Docket No. 177 (dated July 23, 2020).] During the trial, the Court entered judgment as a matter of law in favor of LoanCare as to Counts I and II of Freedom's Amended Complaint (i.e.,

Freedom's claims for breach of contract and breach of the implied covenant of good faith and fair dealing). [Order, Docket No. 352.] On July 24, 2023, the jury rendered a verdict as to the parties' remaining claims and awarded LoanCare and Freedom $22,693,762 and $247,071, in compensatory damages, respectively. [Docket No. 365.] The jury declined to award LoanCare punitive damages. [Docket No. 368.] The next day, the Court entered judgment (the "**Original Judgment**"). [Docket No. 370.]

Following the trial, Freedom and LoanCare timely filed their Motions to Amend the Original Judgment to correct certain clerical errors and provide for prejudgment and postjudgment interest, [Docket Nos. 382, 383], and LoanCare renewed its Motion for Judgment as a Matter of Law as to its $22.7 million contract claim (i.e., Count IV of LoanCare's Second Amended Counterclaim), [Docket No. 384]. LoanCare also moved for attorneys' fees and expenses. [Docket No. 386.] The parties' post-trial motions were fully briefed as of November 7, 2023. [*See generally* Docket.] Having conferred with the parties on November 9, 2023, the Court administratively terminated the parties' post-trial motions, [Docket Nos. 382, 383, 384, & 386], and referred this matter for mediation before the Hon. Joel Schneider (Ret.). [Docket Nos. 407, 413.] Unfortunately, that effort proved unsuccessful. [Docket No. 414.] Accordingly, on April 5, 2024, the Court restored this matter to its active docket and reactivated the parties' post-trial motions. [Docket No. 415.] Thus, they are now ripe for adjudication.

## II.

The Court first considers the Motions to Amend the Original Judgment, beginning with where the parties agree. Freedom and LoanCare both argue that the Original Judgment should be amended to correct certain clerical mistakes. [*Compare* Freedom's Mem. Supp. Mot. Amend J. at 1–2, Docket No. 382-1, *with* LoanCare's Mem. Supp. Mot. Amend. J. at 7, Docket No. 383-2.]

Under Federal Rule of Civil Procedure 60(a), the Court "may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment." FED. R. CIV. P. 60(a). The rule "encompasses only errors 'mechanical in nature, apparent on the record, and not involving an error of substantive judgment.'" *Pfizer Inc. v. Uprichard*, 422 F.3d 124, 129–30 (3d Cir. 2005) (quoting *Mack Trucks, Inc. v. Int'l Union, UAW*, 586 F.2d 579, 594 n.16 (3d Cir. 1988)); *see also United States v. Stuart*, 392 F.2d 60, 62 (3d Cir. 1968) ("Rule 60(a) is concerned primarily with mistakes which do not really attack the party's fundamental right to the judgment at the time it was entered. It permits the correction of irregularities which becloud but do not impugn it."). "As long as the intentions of the parties are clearly defined and all the court need do is employ the judicial eraser to obliterate a mechanical or mathematical mistake, the modification will be allowed." *Pfizer*, 422 F.3d at 130 (quoting *In re W. Tex. Mktg.*, 12 F.3d 497, 504–05 (5th Cir. 1994)).

The Court employs the 'judicial eraser' here. The jury voted in favor of LoanCare as to its conversion, fraudulent inducement, and unjust enrichment claims (i.e., Counts III, I, and V of LoanCare's Second Amended Counterclaim), [Docket

No. 365, at 1–3], but the Original Judgment omits any reference to the unjust enrichment claim, [*see* Docket No. 370]. Similarly, the jury voted in favor of Freedom as to its actual or constructive fraud and unjust enrichment claims (i.e., Counts III and IV of Freedom's Amended Complaint), [Docket No. 365, at 3–4], but the Original Judgment erroneously reflects that Freedom succeeded as to a contract claim, [Docket No. 370]. Finally, the Original Judgment does not address LoanCare's two contract claims as to which the jury found in Freedom's favor (i.e., Counts IV and VI of LoanCare's Second Amended Counterclaim), [*compare* Docket No. 365, at 2–3, *with* Docket No. 370], or LoanCare's other claims that it withdrew in open court (i.e., Counts VII, VIII, IX, X, XI, XII, and XIII of LoanCare's Second Amended Counterclaim), [*compare* Trial Tr. at 2261:16–22, Docket No. 378, *with* Docket No. 370]. The Court finds these errors and omissions in the Original Judgment to be mechanical in nature and clear from the record. *See Pfizer*, 422 F.3d at 130. Accordingly, the Court will enter the parties' proposed amended judgment to correct these clerical mistakes and omissions. *See* FED. R. CIV. P. 60(a).

## III.

Next, the Court addresses the parties' joint request for prejudgment interest. Freedom and LoanCare both argue that they are entitled to prejudgment interest on their respective damages awards in accordance with New Jersey Court Rule 4:42-11, but they disagree as to whether prejudgment interest should accrue between (i) April 1 and November 1, 2021, and (ii) January 1 and July 10, 2023. [*Compare* Freedom's Mem. Supp. Mot. Amend J. at 3–9, Docket No. 382-1, *with* LoanCare's Mem. Supp.

Mot. Amend. J. at 1–6, Docket No. 383-2; *see also* Freedom's Opp'n LoanCare's Mot. Amend. J. at 1, Docket No. 391; LoanCare's Mem. Opp'n Freedom's Mot. Amend. J. at 1, Docket No. 393.]

Freedom submits that thirteen months of delays occasioned by the COVID-19 pandemic constitute "exceptional circumstances" that warrant the suspension of prejudgment interest on the parties' respective damages awards. [Freedom's Mem. Supp. Mot. Amend J. at 6.] LoanCare counters that, under ordinary equitable principles, Freedom should not be permitted to reduce the true value of LoanCare's damages award. [LoanCare's Mem. Opp'n Freedom's Mot. Amend. J. at 2.] Under Freedom's position, LoanCare and Freedom would be entitled to $3,887,720.96 and $45,105.85 in prejudgment interest, respectively. [Freedom's Mem. Supp. Mot. Amend J., Ex. A; Freedom's Opp'n LoanCare's Mot. Amend. J. at 7.] Under LoanCare's position, LoanCare and Freedom would be entitled to $4,622,999.11 and $53,118.57 in prejudgment interest, respectively. [LoanCare's Mem. Supp. Mot. Amend. J. at 2 & 6 n.4.] The Court first turns to whether any prejudgment interest is warranted.

A party may move for prejudgment interest pursuant to Federal Rule of Civil Procedure 59(e). *See Keith v. Truck Stops Corp. of Am.*, 909 F.2d 743, 746 (3d Cir. 1990) (explaining that a request for prejudgment interest is properly brought under Rule 59(e) as a motion to alter or amend the judgment) (citing *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 177 (1989)); *see also Rosen v. Rucker*, 905 F.2d 702, 705 (3d Cir. 1990). Rule 59(e) provides that a "motion to alter or amend a judgment must be filed no later than

28 days after the entry of the judgment." FED. R. CIV. P. 59(e). Here, both parties timely moved for prejudgment interest under the rule, [*compare* Freedom's Mot. Amend. J., Docket No. 382 (dated Aug. 22, 2023), *and* LoanCare's Mot. Amend. J., Docket No. 383 (same), *with* Original Judgment, Docket No. 370 (dated July 25, 2023)], so the next question is what law applies to the parties' request for prejudgment interest. They both submit that New Jersey Court Rule 4:42-11 applies. [Freedom's Mem. Supp. Mot. Amend J. at 4; LoanCare's Mem. Supp. Mot. Amend. J. at 2.]

"Federal courts sitting in diversity must apply state law with respect to prejudgment interest." *Gleason v. Norwest Mortg., Inc.*, 253 F. App'x 198, 203 (3d Cir. 2007) (citing *Jarvis v. Johnson*, 668 F.2d 740, 746 (3d Cir. 1982)). As to which state's law, the question is resolved here by applying the choice-of-law principles of the forum state—in this case, New Jersey—where a different state's substantive law governs the underlying dispute—in this case, Virginia law. *See Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3d Cir. 1978) ("In diversity cases, the choice of law rules of the district court's forum state are controlling.") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)); *De Puy Inc. v. Biomedical Eng'g Tr.*, 216 F. Supp. 2d 358, 381 (D.N.J. 2001) (explaining that, to determine whether New Jersey or Indiana law applies, district court would apply New Jersey choice-of-law rules under *Klaxon*, asking whether New Jersey views prejudgment interest as "substantive" or "procedural"), *aff'd sub nom. Pappas v. DePuy Orthopaedics, Inc.*, 33 F. App'x 35 (3d Cir. 2002). *But see Salas by Salas v. Wang*, 846 F.2d 897, 909 n.13 (3d Cir. 1988) (explaining that New Jersey federal

courts should apply New Jersey prejudgment interest rule in diversity actions applying New Jersey law under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

In any case, in 1999, the New Jersey Supreme Court determined that prejudgment interest is a procedural issue that is governed by New Jersey law, "even when a different state's substantive law" governs the underlying dispute. *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 730 A.2d 843, 848 (N.J. 1999). Therefore, courts in this district routinely apply New Jersey law when determining whether to award prejudgment interest. *See, e.g.*, *USI Int'l Inc. v. Festo Didactic Inc.*, 2023 WL 3996360, at *2 (D.N.J. June 14, 2023) (Shipp, J.); *Little Wash. Fabricators, Inc. v. J. Blanco Assocs., Inc.*, 2020 WL 6156757, at *3 (D.N.J. Oct. 21, 2020) (Arleo, J.); *Kerns v. Logicworks Sys. Corp.*, 2015 WL 4548733, at *1–2 (D.N.J. July 28, 2015); *Munich Reinsurance Am., Inc. v. Am. Nat'l Ins. Co.*, 999 F. Supp. 2d 690, 758 (D.N.J. 2014); *cf. De Puy Inc.*, 216 F. Supp. 2d at 382. Likewise, this Court considers whether the parties are entitled to prejudgment interest under New Jersey Court Rule 4:42-11.

New Jersey law distinguishes between postjudgment interest, which is governed by New Jersey Court Rule 4:42-11(a); prejudgment interest in tort cases, which is governed by New Jersey Court Rule 4:42-11(b); and prejudgment interest in contract cases, which is governed by equitable principles. *Gleason*, 253 F. App'x at 204 (citing *Cnty. of Essex v. First Union Nat'l Bank*, 891 A.2d 600, 609 (N.J. 2006)); *Munich Reinsurance Am.*, 999 F. Supp. 2d at 758. Still, courts generally refer to New Jersey Court Rule 4:42-11 to determine the rate of prejudgment interest to award. *See, e.g.*,

*USI*, 2023 WL 3996360, at *3 ("Absent unusual circumstances . . . courts should refer to N.J. Cᴛ. R. 4:42-11(b) when determining the rate of pre-judgment interest to be awarded.") (quoting *Napp Techs., L.L.C. v. Kiel Labs., Inc.*, 2008 WL 5233708, at *9 (D.N.J. Dec. 12, 2008)); *see also De Puy Inc.*, 216 F. Supp. 2d at 381 n.22 ("The rate applied in new Jersey to postjudgment interest pursuant to New Jersey Court Rule[] 4:42-11(a)(ii) generally provides an appropriate benchmark."). Accordingly, just as the parties seek here, the Court looks to New Jersey Court Rule 4:42-11(b) to determine the annual rates of interest applicable in this case, recognizing that the parties' prevailed on tort and quasi-contractual claims.

New Jersey Court Rule 4:42-11(b) provides, in pertinent part, as follows:

> **Tort Actions.** Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, . . . include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. . . . Prejudgment interest shall be calculated in the same amount and manner provided for by paragraph (a) of this rule[.]

N.J. Cᴛ. R. 4:42-11(b). Under paragraph (a) of the rule, the annual rate of interest for judgments exceeding the applicable monetary limit at the time of entry (i.e., $20,000) equals "the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year terminating on June 30, of the State of New Jersey Cash Management Fund (State accounts) as reported by the Division of Investment in the Department of the Treasury, but . . . not less than 0.25%[,]" plus an additional 2%

per annum.[1]  N.J. CT. R. 4:42-11(a)(ii), (iii); *see also Adkins v. Sogliuzzo*, 820 F. App'x 146, 151–52 (3d Cir. 2020) (explaining that increased 2% interest rate was warranted for $391,040 damages award because it exceeded the then-applicable statutory threshold of $15,000) (citing *Waldron v. Johnson*, 845 A.2d 1287, 1291 (N.J. Super. Ct. App. Div. 2004)).  Accordingly, the Court calculates the amount of prejudgment interest due on the parties' damages awards using the following rates:

| Year | Rate |
|------|------|
| 2016 | 2.25% |
| 2017 | 2.5% |
| 2018 | 2.5% |
| 2019 | 3.5% |
| 2020 | 4.5% |
| 2021 | 3.5% |
| 2022 | 2.25% |
| 2023 | 2.25% |

The Court next addresses where the parties part company.  While they agree to the above rates, Freedom contends that the Court should suspend prejudgment interest between (i) April 1 and November 1, 2021, and (ii) January 1 and July 10, 2023. [Freedom's Mem. Supp. Mot. Amend J. at 6–9.]  Freedom argues that "exceptional circumstances" caused by the COVID-19 pandemic justify the suspension under New Jersey Court Rule 4:42-11(b).  [*Id.*]  Freedom points to two Orders of the Court in

---

[1] These rates, organized by year, are published online by the New Jersey Courts: Post-Judgment and Pre-Judgment Interest Rates (Rev. Nov. 8, 2023), https://www.njcourts.gov/sites/default/files/courts/civil/postprejudgmentrates.pdf [https://perma.cc/RH5Y-GQWY].

furtherance of its position, arguing that the Court expressly recognized that the COVID-19 pandemic caused litigation delays:

> The Court is in receipt of the parties' Joint Final Pre-Trial Order. [Docket No. 196.] The Court takes this opportunity to notify the parties that, due to the continued COVID-19 pandemic, the resulting backlog of cases awaiting trial, and the safety precautions that will be in place even once the Court starts to have trials again, it appears likely that this case will not be tried until late 2022 or even 2023. This case already being five years old, the Court encourages the parties to entertain alternative methods of resolving their disputes.

[Text Order, Docket No. 197 (entered Apr. 1, 2021).]

> In light of the Court's schedule having recently freed up, the Court intends to try this matter by the end of this year. The parties shall confer and submit a joint letter on the docket with a list of possible dates by no later than Thursday, November 4, 2021.

[Text Order, Docket No. 202 (entered Nov. 1, 2021).]

After the parties wrote to the Court to request a trial date between mid-July and September of 2022, [Docket No. 203], (ultimately indicating a readiness for trial at the end of 2022, [*see* Docket No. 232]), Freedom submits that COVID-19-pandemic-related delays continued to disrupt this litigation. [Freedom's Mem. Supp. Mot. Amend J. at 8.] For instance, Freedom points out that there was a near twelve-month delay between the submission of the parties' *Daubert* motions and the Court's corresponding decision. [*Id.*] Freedom suggests that other courts have suspended the accrual of prejudgment interest due to COVID-19-pandemic-related delays, so the Court should follow suit. [*Id.* at 7 (collecting cases).] And finally, Freedom all but states that the Court's own delay in scheduling the July 2023 trial (six months after the

date the parties indicated they were ready for trial) is an additional reason to suspend the accrual of prejudgment interest. [*See id.* at 7–9.]

As noted, New Jersey Court Rule 4:42-11(b) provides that courts "shall" award prejudgment interest except that "in exceptional cases the court may suspend the running of such prejudgment interest." N.J. CT. R. 4:42-11(b). This rule embodies a strong presumption in favor of awarding prejudgment interest in tort actions, absent exceptional circumstances. *See Abrams v. Lightolier, Inc.*, 841 F. Supp. 584, 599 (D.N.J. 1994) ("The plain language of Rule 4:42–11(b) . . . provides that prejudgment interest is mandatory in tort actions, absent exceptional circumstances."); *DialAmerica Mktg., Inc. v. KeySpan Energy Corp.*, 865 A.2d 728, 732 (N.J. Super. Ct. App. Div. 2005) (noting that in tort actions, prejudgment interest can be considered "automatic"); *Montone v. City of Jersey City*, 2018 WL 3536093, at *2 (D.N.J. July 23, 2018) ("This rule contains a presumption in favor of granting prejudgment interest.") (citing *Potente v. Cnty. of Hudson*, 900 A.2d 787, 794 (N.J. 2006)); *Crowley v. Chait*, 2005 WL 8165119, at *3 (D.N.J. Sept. 30, 2005) ("New Jersey has adopted a general policy favoring awards of prejudgment interest in tort cases."). This presumption reflects the underlying purposes of awarding prejudgment interest.

An award of prejudgment interest advances two objectives: (1) "to compensate the plaintiff for the loss of income that would have been earned on the judgment had it been paid earlier"; and (2) "to encourage settlement." *Ruff v. Weintraub*, 519 A.2d 1384, 1390 (N.J. 1987). These objectives have been frequently rescribed, by many courts, in different ways. *See, e.g.*, *N. Bergen Rex Transp.*, 730 A.2d at 851 ("The

'equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled, but which has been retained by another.'") (quoting *Sulcov v. 2100 Linwood Owners, Inc.*, 696 A.2d 31, 43 (N.J. Sup. Ct. App. Div. 1997)); *Hurley v. Atlantic City Police Dep't*, 933 F. Supp. 396, 431 (D.N.J. 1996) (observing that the principal purpose of prejudgment interest is "to compensate the plaintiff for the defendants' use of plaintiff's money after the cause of action accrued but before judgment was entered"); *Salas*, 846 F.2d at 910 ("The rule is designed to discourage defendants' delay by 'inducing prompt defense consideration of settlement possibilities.'") (cleaned up) (citing *Ruff*, 519 A.2d at 1390); *Crowley*, 2005 WL 8165119, at *3 ("[T]he prejudgment interest rule serves to promote settlement and remove any incentive for a defendant to delay payment."). But an award of prejudgment interest is not punitive in character. *N.J. Mfrs. Ins. Co. v. Nat'l Cas. Co.*, 923 A.2d 315, 324 (N.J. Super. Ct. App. Div. 2007). Rather, it is an acknowledgment that the plaintiff was denied the use of its money. *Id.* "These policies are to guide judges in exercising their discretion in deciding whether to grant prejudgment interest." *Salas*, 846 F.2d at 910 (citing *Kotzian v. Barr*, 408 A.2d 131, 133 (N.J. 1979)).

Now consider the "exceptional cases" exemption. "Under New Jersey Court Rule 4:42–11(b), a court may suspend prejudgment interest in a tort action for a period of time in 'exceptional cases.'" *Elec. Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F. Supp. 2d 394, 402 (D.N.J. 2000). To decide whether a set of circumstances presents an "exceptional case," courts still must consider the "policy, spirit and intent of the rule." *Wiese v. Dedhia*, 806 A.2d 826, 833 (N.J. Super. Ct. App. Div. 2002) (quoting

*Ruff*, 519 A.2d at 1391); *see also Adkins v. Sogliuzzo*, 820 F. App'x 146, 151 (3d Cir. 2020)

("Although a court may suspend the running of prejudgment interest in 'exceptional

cases,' it may do so only 'where it is demonstrated that the policy, spirit and intent of

the rule are patently inapposite to the circumstances at hand.' ") (quoting *Ruff*, 519

A.2d at 1391). "Under the New Jersey prejudgment interest rule, the 'judicial

suspension of interest extends only to those cases where an award of interest would

neither advance the aim of early settlement nor constitute fair compensation to plaintiff

for money withheld and used or presumptively used by defendant.' " *Mandile v. Clark*

*Material Handling Co.*, 303 F. Supp. 2d 531, 537 (D.N.J. 2004) (quoting *Dall'Ava v.*

*H.W. Porter Co.*, 488 A.2d 1036, 1037 (N.J. Super. Ct. App. Div. 1985)).

Given these underlying policies, the exception to the presumption in favor of

awarding prejudgment interest is to be invoked "sparingly." *N. Bergen Rex Transp.*, 730

A.2d at 851 (citing *Osborne v. O'Reilly*, 631 A.2d 577, 580 (N.J. Super. Ct. Law Div.

1993)). As the *Osborne* court observed, the "suspension authority should . . . be most

cautiously exercised, and always with consideration of the underlying purpose and

philosophy of the rule—namely that prejudgment interest is not a penalty but is rather

a payment for the use of money." 631 A.2d at 580 (citation omitted).

Here, the Court disagrees with Freedom's submission that the exception should

be invoked to suspend prejudgment interest between (i) April 1 and November 1, 2021,

and (ii) January 1 and July 10, 2023. While the COVID-19 pandemic was certainly

an unprecedented and disruptive event that delayed litigation in this district and

throughout the country, in the circumstances of this case—where LoanCare has

13

steadfastly maintained that Freedom absconded with $22,693,762 of LoanCare's funds and a jury agreed, finding in LoanCare's favor on claims of conversion, fraud, and unjust enrichment—any suspension of prejudgment interest would be inequitable. During the pendency of this action, Freedom was able to invest and earn a return on LoanCare's money. LoanCare was obviously deprived of the "use of [its] money, while [Freedom] was not." *N.J. Mfrs. Ins. Co.*, 923 A.2d at 324. Any suspension of prejudgment interest would unfairly reduce the true value of LoanCare's recovery of the money that, a jury concluded, Freedom stole. *See W.R. Huff Asset Mgmt. Co. v. William Soroka 1989 Tr.*, 2009 WL 2436692, at *9 (D.N.J. Aug. 6, 2009) (Hayden, J.) ("The exceptional cases doctrine is used to avoid punitive prejudgment interest awards. Suspending prejudgment interest here would penalize [LoanCare] as opposed to sparing [Freedom] from an unduly oppressive judgment."). Accordingly, finding that the equities do not support Freedom's position, the Court will decline to suspend prejudgment interest for any period of time. *See Osborne*, 631 A.2d at 580.

Freedom's case citations are not to the contrary of this Court's holding. Most notably, consider *North Bergen Rex Transport, Inc. v. Trailer Leasing Co.*, 730 A.2d 843 (N.J. 1999). There, the court invoked Rule 4:42-11(b) and suspended a heightened, 18% annual interest rate fixed by contract where the dispute was delayed for thirteen months because the trial court failed to follow the usual practice of issuing a reserved decision within sixty days. *N. Bergen Rex Transp.*, 730 A.2d at 851. Suspending the contractual rate of interest "[u]nder the special circumstances presented," the court nevertheless concluded that the defendant was entitled to interest "in accordance with

14

equitable principles." *Id.* The court remanded for the trial court to "fix an equitable amount of prejudgment interest" in the defendant's favor "for the thirteen months of judicial delay." *Id.* at 852. *See also W.R. Huff Asset Mgmt. Co.*, 2009 WL 2436692, at *9 ("Rather than preclude prejudgment interest outright due to the delay, the [c]ourt defaulted to equity, holding the lessor was still 'entitled to interest in accordance with equitable principles.' ") (citing *N. Bergen Rex Transp.*, 730 A.2d at 851).

Just as in *North Bergen*, LoanCare here is entitled to prejudgment interest throughout the entire period based on equitable principles. The case does not stand for the proposition that a court delay necessitates the suspension of prejudgment interest entirely, as Freedom would suggest. The award of prejudgment interest here is intended to compensate LoanCare for the time value of money.[2] *See N. Bergen Rex Transp.*, 730 A.2d at 851 ("The 'equitable purpose of prejudgment interest is to compensate a party for lost earnings on a sum of money to which it was entitled, but which has been retained by another.' ") (quoting *Sulcov*, 696 A.2d at 43); *see also Ruff*, 519 A.2d at 1390 (same); *Hurley*, 933 F. Supp. at 431 (same).

One more, as the Court need not belabor the point. *Dall'Ava v. H.W. Porter Co.*, 488 A.2d 1036 (N.J. Super. Ct. App. Div. 1985), does not support Freedom's position for the same reason. In *Dall'Ava*, the court affirmed the suspension of prejudgment interest due to a four-month litigation delay caused by a court-ordered stay following

---

[2] Of course, though undisputed by LoanCare, the same objective underlies an award of prejudgment interest on Freedom's damages award of $247,071—compensation for LoanCare's actual or constructive fraud and unjust enrichment.

a bankruptcy petition filed by a co-defendant. 488 A.2d at 1036. Considering whether the exceptional case doctrine was permissibly invoked, the court observed that "judicial suspension of interest extends only to those cases where an award of interest would neither advance the aim of early settlement nor constitute fair compensation to plaintiff for money withheld and used or presumptively used by defendant." *Id.* at 1037 (quoting *Kotzian v. Barr*, 378 A.2d 256, 258 (N.J. Super. Ct. App. Div. 1977), *rev'd on other grounds*, 408 A.2d 131 (N.J. 1979)). Applying these principles, the court explained that the stay was no different than "if the filing of the complaint had been delayed four months[,]" so the "award of interest for the period of the stay would thus not constitute fair reimbursement to plaintiff for monies withheld and used by defendant" and "presented a sufficiently exceptional case to warrant" suspension of prejudgment interest. *Id.* at 1038.

Not so here. Applying the same principle, the Court is not persuaded that an award of prejudgment interest would "neither advance the aim of early settlement nor constitute fair compensation" to LoanCare/Freedom for money withheld. *Id.* at 1037. As explained above, the purpose of prejudgment interest in this case is to make the parties whole. Therefore, the undisputed delays in this civil action are not a sufficient reason to suspend prejudgment interest and reduce the value of the parties' damages awards. *See, e.g.*, *Crowley*, 2005 WL 8165119, at *4 (declining to suspend prejudgment interest per *Dall'Ava* during time when case was transferred to other court for multidistrict litigation because "the equities do not favor" suspension) (citing *Elec. Mobility Corp.*, 87 F. Supp. 2d at 404). Doing so would unfairly penalize LoanCare.

Finally, the Court rejects Freedom's submission that suspension of prejudgment interest on account of the COVID-19 pandemic is warranted because "[o]ther courts considering this issue have reached this conclusion." [Freedom's Mem. Supp. Mot. Amend. J. at 7 (collecting cases).] Freedom's nonbinding cases—see *Doe 1 v. East Side Club, LLC*, 2023 WL 4174141 (S.D.N.Y. June 23, 2023); *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 2023 WL 4675986 (E.D. Tenn. June 9, 2023), *report & recommendation adopted*, 2023 WL 4674265 (E.D. Tenn. July 20, 2023); *AGA & Titan Inc. v. United Specialty Ins. Co.*, 2022 WL 16859652 (C.D. Cal. Aug. 1, 2022); and *Pierce Mfg., Inc. v. E-One, Inc.*, 2022 WL 479804 (M.D. Fla. Feb. 16, 2022)—are not persuasive. Freedom took and held LoanCare's money. Now Freedom must return that money, with interest. In the circumstances of this case, under New Jersey law, the equities do not favor suspension of prejudgment interest. Litigation delays attributable to the COVID-19 pandemic and the Court's own management and disposition of this matter are beside the point.

Having concluded that this is not an "exceptional case," *see* N.J. CT. R. 4:42-11(b), and that suspension of prejudgment interest between (i) April 1 and November 1, 2021, and (ii) January 1 and July 10, 2023, is thus not warranted, the Court shall award prejudgment interest on the parties' respective damages awards (i.e., LoanCare: $22,693,762.00; Freedom: $247,071.00) as set forth in the table that follows:

| Prejudgment Interest Due | | | | | |
|---|---|---|---|---|---|
| From | To | Days | Rate | LoanCare's Interest Award | Freedom's Interest Award |
| 11/5/2016† | 12/31/2016 | 57 / 240 | 2.25% | $79,739.04 | $3,655.30 |
| 1/1/2017 | 12/31/2017 | 365 | 2.5% | $567,344.05 | $6,176.78 |
| 1/1/2018 | 12/31/2018 | 365 | 2.5% | $567,344.05 | $6,176.78 |
| 1/1/2019 | 12/31/2019 | 365 | 3.5% | $794,281.67 | $8,647.49 |
| 1/1/2020 | 12/31/2020 | 366‡ | 4.5% | $1,021,219.29 | $11,118.20 |
| 1/1/2021 | 12/31/2021 | 365 | 3.5% | $794,281.67 | $8,647.49 |
| 1/1/2022 | 12/31/2022 | 365 | 2.25% | $510,609.65 | $5,559.10 |
| 1/1/2023 | 7/25/2023 | 206 | 2.25% | $288,179.69 | $3,137.46 |
| **Total** | | | | **$4,622,999.11** | **$53,118.57** |

**Notes**:

† For 2016, prejudgment interest runs from November 5, 2016 (six months after the date Freedom seized LoanCare's funds) for LoanCare's claims (amounting to 57 days); prejudgment interest runs from May 6, 2016 (the date this action was instituted) for Freedom's claims (amounting to 240 days).

‡ 2020 was a leap year.

Accordingly, the Original Judgment shall be amended pursuant to Federal Rule of Civil Procedure 59(e) to include prejudgment interest in the amounts set forth above.

## IV.

Next, the Court briefly addresses the parties' joint request for postjudgment interest. [*See* Freedom's Mem. Supp. Mot. Amend. J. at 9 & n.3, Docket No. 382-1; LoanCare's Mem. Supp. Mot. Amend. J. at 6, Docket No. 383-2.] Postjudgment interest in federal court is governed by 28 U.S.C. § 1961. *Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 548 (3d Cir. 1988). Under the statute, "[i]nterest shall be

allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Postjudgment interest is thus mandatory. *See Dunn v. HOVIC*, 13 F.3d 58, 60 (3d Cir. 1993).

Postjudgment interest is calculated beginning on the day a money judgment is entered. 28 U.S.C. § 1961(a); *see Dunn*, 13 F.3d at 60. To count as a "money judgment," a judgment must include: "(1) an identification of the parties for and against whom judgment is being entered; and (2) a definite and certain designation of the amount which plaintiff is owed by defendant." *Eaves v. Cnty. of Cape May*, 239 F.3d 527, 533 (3d Cir. 2001) (emphasis removed) (quoting *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 275 (3d Cir. 1984)). Under the statute, the applicable interest rate is equal to "the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of the judgment." 28 U.S.C. § 1961(a). The statute further directs the Court to compute interest "daily to the date of payment" and that interest "be compounded annually." 28 U.S.C. § 1961(b).

Here, the Court will award postjudgment interest pursuant to 28 U.S.C. § 1961. *See Dunn*, 13 F.3d at 60 (explaining that postjudgment interest is mandatory). As the Original Judgment was entered on July 25, 2023, [Docket No. 370], the applicable rate of interest for the calendar week preceding the date of the Original Judgment was 5.33%. *See Selected Interest Rates (Daily) - H.15*, BD. OF GOVERNORS OF THE FED. RSRV. SYS., https://www.federalreserve.gov/releases/h15/. The Court shall therefore amend the Original Judgment pursuant to Federal Rule of Civil Procedure 59(e) to

award postjudgment interest on the parties' respective damages awards (i.e., LoanCare: $22,693,762.00; Freedom: $247,071.00) accruing, as of the date of the Original Judgment, at the rate of 5.33% and in accordance with § 1961(b). *See Dunn*, 13 F.3d at 60.

Moreover, the Court will also award postjudgment interest on the parties' respective prejudgment interest awards, as provided pursuant to this Memorandum Opinion and Order, accruing as of the date of the entry of the amended final judgment. *See Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 174–75 (3d Cir. 2010) (interpreting *Eaves* and explaining that postjudgment interest on a prejudgment interest award only begins to accrue "when a judgment quantifying that award has been entered," not the date when a party first became entitled to an award of prejudgment interest) (citing *Skretvedt v. E.I. Dupont De Nemours*, 372 F.3d 193, 217 (3d Cir. 2004)); *see also, e.g.*, *USI Int'l Inc. v. Festo Didactic Inc.*, 2023 WL 3996360, at *5 (D.N.J. June 14, 2023) (Shipp, J.) (awarding postjudgment interest on prejudgment interest as of the date of entry of the final judgment) (citing *Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 366 (D. Del. 2018), *aff'd*, 944 F.3d 1327 (Fed. Cir. 2019)). Here, the weekly average 1-year constant maturity Treasury yield for the calendar week immediately preceding the date of this Memorandum Opinion and Order and the corresponding amended judgment—June 16, 2024 through June 22, 2024—is 5.10%. *See Selected Interest Rates (Daily) - H.15*, BD. OF GOVERNORS OF THE FED. RSRV. SYS., https://www.federalreserve.gov/releases/h15/. Accordingly, the Court shall amend the Original Judgment pursuant to Federal Rule of Civil Procedure 59(e) to award

postjudgment interest on the parties' prejudgment interest awards at such rate, accruing from the date hereof.  *See Travelers Cas. & Sur. Co.*, 609 F.3d at 174–75.

## V.

Finally, the Court addresses LoanCare's Renewed Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b). [Docket No. 384.] LoanCare seeks judgment as to its claim for breach of contract (i.e., Count IV of LoanCare's Second Amended Counterclaim). [*Id.*]  During the trial, the jury rejected that claim, determining that LoanCare had not proven that Freedom breached the parties' Amended and Restated Subservicing Agreement (the "**Subservicing Agreement**" or "**SSA**") by failing to return LoanCare's $22.7 million. [Docket No. 365, at 2.]  In support of its Rule 50(b) motion, LoanCare submits that the Court should enter judgment in its favor because the Subservicing Agreement "unequivocally imposed an obligation on Freedom to return [LoanCare's] money" and the jury "necessarily found" that Freedom failed to do so when it returned a verdict for LoanCare on its fraud, conversion, and unjust enrichment claims. [LoanCare's Mem. Supp. Renewed JMOL Mot. at 1, Docket No. 384-2.]

Opposing LoanCare's motion, Freedom offers two overarching arguments. First, Freedom submits that the jury had reasonable grounds to conclude that Freedom did not breach the Subservicing Agreement—i.e., Sections 2.9(c), 4.1(d), 5.5, and 8.4—mainly because LoanCare inadequately addressed its contract counterclaim at trial, never even arguing to the jury that Freedom breached the latter three provisions. [Freedom's Opp'n LoanCare's JMOL Mot. at 1, Docket No. 392.]  Second, Freedom

contends that LoanCare waived its ability to bring a Rule 50(b) motion because it failed to identify any contractual duty obligating Freedom to return the $22.7 million or demonstrate evidence of breach. [*Id.* at 1–2.] Failing to "specify the law and facts" entitling it to relief in its Rule 50(a) motion, LoanCare cannot raise new issues post-trial, Freedom argues. [*Id.*]

Having reviewed the parties' papers, the Court first considers Freedom's principal waiver argument before turning to the merits of whether judgment as a matter of law should issue.

## A.

A party may seek judgment as a matter of law during a jury trial once the opposing party "has been fully heard on an issue." FED. R. CIV. P. 50(a)(1). The motion must be made "before the case is submitted to the jury," and it must "specify the judgment sought and the law and facts that entitle the movant to the judgment." FED. R. CIV. P. 50(a)(2). If the court does not grant the party's Rule 50(a) motion, the matter is considered "submitted" to the jury, "subject to the court's later deciding the legal questions raised by the motion." FED. R. CIV. P. 50(b). After the jury renders a verdict, a party may "renew[]" its motion for judgment as a matter of law.[3] FED. R. CIV. P. 50(b); *see In re Prosser*, 534 F. App'x 126, 131 (3d Cir. 2013) (noting that the

---

[3] The renewed motion for judgment as a matter of law must be filed no later than 28 days after the entry of judgment. FED. R. CIV. P. 50(b). Here, LoanCare timely filed its renewed motion in compliance with Rule 50(b). [*Compare* LoanCare's Renewed JMOL Mot., Docket No. 384 (dated Aug. 22, 2023), *with* Original Judgment, Docket No. 370 (dated July 25, 2023).]

post-trial motion "is nothing more than a renewal of the earlier motion") (citing 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2537 (3d ed. 2013)).

It is well-settled law that a party's post-trial motion under Rule 50(b) "can only be made on grounds specifically advanced in a motion for a directed verdict at the end of plaintiff's case." *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 220 (3d Cir. 2021) (quoting *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617 (3d Cir. 1989)); *see also Williams v. Runyon*, 130 F.3d 568, 571–72 (3d Cir. 1997); *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 89 F.3d 976, 993 (3d Cir. 1996); *Orlando v. Billcon Int'l, Inc.*, 822 F.2d 1294, 1298 (3d Cir. 1987); *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 814 (3d Cir. 1984), *cert. denied*, 477 U.S. 908 (1986). A party waives its right to seek judgment as a matter of law post-trial on an issue that it failed to adequately raise before the matter was submitted to the jury. *Williams*, 130 F.3d at 571–72; *see also, e.g., State Farm Mut. Auto Ins. Co. v. Lincow*, 715 F. Supp. 2d 617, 629–30 (E.D. Pa. 2010) (finding that party waived post-trial arguments for judgment as a matter of law because of "vague" comments in support of Rule 50(a) motion that failed to alert counterparty of claimed deficiencies), *aff'd*, 444 F. App'x 617, 620 (3d Cir. 2011). To enter judgment otherwise, "is simply to ask the court to reexamine the facts already tried by the jury, and this the court may not do without violating the Seventh Amendment." *Lowenstein v. Pepsi-Cola Bottling Co.*, 536 F.2d 9, 11 (3d Cir.) (quoting *Mut. Ben. Health & Accident Ass'n v. Thomas*, 123 F.2d 353, 355 (8th Cir. 1941)), *cert. denied*, 429 U.S. 966 (1976).

*Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209 (3d Cir. 2021), a recent case, is instructive of this very proposition. There, two charities that used similar trademarks sued each other for trademark infringement, unfair competition, and trademark dilution, among other things. *Kars 4 Kids*, 8 F.4th at 216. The matter proceeded to a jury trial. *Id.* at 217. Following the close of evidence, both charities moved for judgment as a matter of law under Rule 50(a). *Id.* Kars 4 Kids, one of the charities, argued that America Can, the other charity, failed to demonstrate that it had ownership and priority of the applicable trademark. *Id.* The trial court reserved, and the jury returned a verdict in favor of America Can. *Id.* Kars 4 Kids then filed a post-trial motion for judgment as a matter of law under Rule 50(b), arguing, *inter alia*, that America Can's trademark was invalid. *Id.* at 218. The trial court denied the motion but found that Kars 4 Kids had not waived its argument because there was "some interconnectedness" between its validity and ownership arguments. *Id.* Determining that the trial court had abused its discretion in this regard, the Third Circuit explained that Kars 4 Kids had waived its Rule 50(b) validity argument because validity and ownership are separate elements of a trademark infringement claim and require different showings. *Id.* at 220. "Because Kars 4 Kids presented no arguments on the validity of the mark in its Rule 50(a) motion, the [trial c]ourt abused its discretion when it concluded that Kars 4 Kids had not waived its validity arguments." *Id.*

Therefore, to preserve an issue for judgment under Rule 50(b), a party must have adequately specified the issue in its Rule 50(a) motion. *Lightning Lube, Inc. v.*

*Witco. Corp.*, 4 F.3d 1153, 1172 (3d Cir. 1993); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 183 (3d Cir. 1992), *cert. denied*, 507 U.S. 921 (1993). To do so, a party need not engage in an elaborate or overly technical pursuit. *See* 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2533 (3d ed. 2023) ("The rule does not require technical precision in stating the grounds of the motion.") (collecting cases); *see also Ryan Distrib. Corp. v. Caley*, 147 F.2d 138, 140 (3d Cir. 1945) ("Nevertheless, technical precision need (not) be observed in stating the grounds of the motion, but merely that they should be sufficiently stated to apprise the court fairly as to movant's position with respect thereto.") (internal quotation marks and citation omitted). Rather, the specific issue must have been sufficiently stated to afford the non-moving party with notice and "an opportunity to reopen its case and present additional evidence." *Bonjorno*, 752 F.2d at 814 (citing *Lowenstein*, 536 F.2d at 11); *see also Levinson v. Prentice-Hall, Inc.*, 868 F.2d 558, 562 (3d Cir. 1989) ("[T]he purpose of the requirement that a party move for a directed verdict before moving for a judgment notwithstanding the verdict is to provide the opposing party an opportunity to cure defects in his proofs which could not be remedied except by a new trial if first raised on a motion for a judgment notwithstanding the verdict.") (citing *Orlando*, 822 F.2d at 1298); *Acosta v. Honda Motor Co.*, 717 F.2d 828, 831–32 (3d Cir. 1983) ("A motion for a judgment n.o.v. must be preceded by a motion for a directed verdict sufficiently specific to afford the party against whom the motion is directed an opportunity 'to cure possibly technical defects in proof which might otherwise make

his case legally insufficient.' ") (quoting *Wall v. United States*, 592 F.2d 154 (3d Cir. 1979)).  Rule 50(b) "is essentially a notice provision."  *Acosta*, 717 F.2d at 831.

Applying these principles, courts have not unduly scrutinized parties' Rule 50(a) submissions, even when counsel could have been more explicit in identifying the grounds on which such submissions were based.  *See, e.g.*, *Fineman*, 980 F.2d at 184; *Acosta*, 717 F.2d at 832.  In *Fineman*, for instance, the defendant argued at the close of the plaintiff's case that the record was "critically deficient of evidence of coercion and that the tort claims could not be maintained."  980 F.2d at 184.  Defendant's counsel stated, "I will come back to the factual aspects of our position [on] the inducement claim.  We don't believe there is sufficient evidence of coercion here to sustain that claim."  *Id.* (alteration in original).  Defendant's counsel returned "to the theme that the plaintiffs had not adduced evidence that [defendant's] conduct did not constitute legitimate business activity" during oral argument on its renewed motion for judgment as a matter of law.  *Id.*  Although noting that counsel "could more clearly have identified the grounds for directed verdict," the court nevertheless concluded that defendant's counsel provided sufficient information to apprise the trial court and plaintiffs' counsel of the reasons for its motion.  *Id.*

Similarly, in *Acosta*, the "sole" statement identifying the basis of the party's Rule 50(a) motion was characterized as "less than illuminating":  "I move for a directed verdict on Counts I and the remaining counts, . . . under 402(a) [sic] theory which is . . . strict liability . . . and the negligence count which I believe are the only remaining counts in all of the complaints."  717 F.2d at 832 (ellipses in original).  Determining

that this statement was sufficiently specific to satisfy Rule 50, the *Acosta* court endorsed a flexible inquiry, explaining that courts should examine a party's assertions in context. *See id.* ("Ordinarily, and standing alone, [the above statement] might not have served as a valid prerequisite to a motion for judgment n.o.v. as to punitive damages. But the communicative content, 'specificity' and notice-giving function of an assertion should be judged in context.") (citing *Hubbell v. Levin*, 395 F. Supp. 64, 80 (D.N.J. 1975), *vacated on other grounds*, 537 F.2d 726 (3d Cir. 1976)).

Here, at the close of Freedom's rebuttal evidence, LoanCare moved for judgment under Rule 50(a) as to its counterclaim for breach of contract. It made the following statements in support of its motion:

> But first of all, I would move for a directed verdict on our contract counterclaim for the $22.7 million. Their question is simply: Do we owe them the money? You've heard no testimony that they owe them the money. No one has said that.
>
> You have a case here where we have an expert, you had Kim Bigham, documents all indicating this is LoanCare's money. There's nothing that would give the jury the basis to be able to say: We don't get that money back at least under the contract. So I'd move for directed verdict on that ground.

[Trial Tr. at 2243:2–10, Docket No. 378.] Later, at the close of all the evidence, LoanCare formally moved for a directed verdict and stated as follows:

> Second, I renew the motion for a directed verdict on the contract claim in our counterclaim for the reasons stated, that there is no dispute in the evidence, we believe, where a jury could find anything other than we are the owner of the $22.7 million that that counterclaim relates to.

[Trial Tr. at 2257:24–2258:3, Docket No. 378.] Freedom contends that that these two statements were insufficient to preserve the contractual arguments that LoanCare now

27

presents in its Rule 50(b) motion because LoanCare did not identify any duty under the Subservicing Agreement that obligated Freedom to return the $22.7 million or demonstrate breach of such duty. [Freedom's Opp'n LoanCare's Renewed JMOL Mot. at 16, Docket No. 392.] In Freedom's view, the Court cannot consider the merits of LoanCare's Rule 50(b) submission because of waiver. [*See id.*]

The Court does not agree with Freedom's principal waiver argument, with one exception discussed below. At the close of the evidence, LoanCare clearly stated its position that no reasonable jury could conclude that Freedom did not breach the Subservicing Agreement because Freedom failed to introduce any credible evidence establishing its entitlement to the disputed $22.7 million. [*See* Trial Tr. at 2243:2–10, 2257:24–2258:3.] Throughout this litigation, LoanCare has maintained that Freedom's failure to account for and return these funds constitutes a breach of the Subservicing Agreement, specifically outlining its theory of duty and breach under SSA Sections 2.9(c), 4.1(d), and 5.5. [*See, e.g.*, LoanCare's Mem. Supp. Mot. Summ. J. at 17–19, Docket No. 129 (explaining breach-of-contract theories and identifying SSA Sections 2.9(c), 4.1(d), 5.5); LoanCare's Trial Br. at 6–7, Docket No. 302 (same); *see also* Joint Final Pretrial Order at 5, Docket No. 196 (indicating that "Freedom's failure to account for [the $22.7 million] constitutes a breach of the Subservicing Agreement").] Taking LoanCare's Rule 50(a) assertions in context, *see Acosta*, 717 F.2d at 832 (explaining that sufficiency of statements in support of Rule 50(a) motion "should be judged in context" of other record statements), the Court finds that LoanCare adequately "specif[ied] the judgment sought and the law and facts"

supporting its contract counterclaim, FED. R. CIV. P. 50(a)(2), providing Freedom with sufficient notice of the pertinent legal issues in controversy: duty and breach.[4] *See Bonjorno*, 752 F.2d at 814 (explaining that the moving party must identify specific enough grounds so as to provide the non-moving party with notice and "an opportunity to reopen its case and present additional evidence") (citing *Lowenstein*, 536 F.2d at 11); *see also Levinson*, 868 F.2d at 562. Just as in *Fineman* where the defendant sufficiently identified its position—that "the record was critically deficient of evidence of coercion"—even though it developed only the "factual components" of this "theme," 980 F.2d at 184, LoanCare here provided enough factual information such that "[Freedom's] counsel was clearly on notice of the legal rubric under which [LoanCare] planned to proceed." *Id.*

Still, Freedom harps on LoanCare's lack of specificity regarding the contractual provisions that it contends Freedom breached. [*See* Freedom's Opp'n LoanCare's Renewed JMOL Mot. at 16–17, Docket No. 392.] True enough, LoanCare's statements in this regard were "less than illuminating." *Acosta*, 717 F.2d at 832. But Rule 50 does not require an elaborate or overly technical effort. *See* 9B CHARLES

---

[4] Opposing LoanCare's Rule 50(a) motion, Freedom appears to have understood the specific grounds on which LoanCare based its submission, arguing to the Court at the time that the contract counterclaim should be submitted to the jury. [*See* Trial Tr. at 2261:6–9 ("And I agree with you [the Court] on the breach of contract claim. Absolutely. I think the breach of contract claim for the [$]22.7 [million] is a jury issue. No question about it. I don't think there's any basis for the other claims."); *see also* Trial Tr. at 2259:10–13 ("With regard to the conversion claim and the tort claims with regard to the $22.7 million, we don't think there's any issue to go to the jury. We think these are strictly breach of contract.").]

ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2533 (3d ed. 2023) ("The rule does not require technical precision in stating the grounds of the motion.") (collecting cases); *see also Caley*, 147 F.2d at 140. The touchstone of the waiver inquiry under Rule 50(b) is whether a statement's "communicative content," judged in context, provides the non-moving party with notice of the issues. *Acosta*, 717 F.2d at 831–32; *see also Kars 4 Kids*, 8 F.4th at 220; *Lightning Lube*, 4 F.3d at 1173; *Williams*, 130 F.3d at 571–72.

Unlike in *Kars 4 Kids*, for example, in which the Third Circuit found waiver where a party sought judgment as a matter of law by focusing on its counterparty's failure to demonstrate ownership and priority of a trademark during trial, but validity of the mark post-trial, *see* 8 F.4th at 220 (ownership and validity are "distinct" legal issues requiring separate showings), LoanCare here has been consistent, for the most part, about its breach-of-contract claim: Freedom breached Sections 2.9(c), 4.1(d), and 5.5 of the Subservicing Agreement because it could not account for the $22.7 million it failed to return. [*Compare* LoanCare's Mem. Supp. Mot. Summ. J. at 17–19, *with* Trial Tr. at 2243:2–10, 2257:24–2258:3.] As to these theories of breach of contract, the Court cannot conclude that LoanCare inappropriately pivoted between legal issues, *see, e.g.*, *Kars 4 Kids*, 8 F.4th at 220 ("Because Kars 4 Kids presented no argument on the validity of the mark in its Rule 50(a) motion, the [trial c]ourt abused its discretion when it concluded that Kars 4 Kids had not waived its validity arguments."), or offered statements in support of its Rule 50(a) motion that were impermissibly vague, *see, e.g.*, *Lincow*, 715 F. Supp. 2d at 629–30 (finding that party

waived post-trial arguments for judgment as a matter of law because of "vague" comments in support of Rule 50(a) motion that failed to alert counterparty of claimed deficiencies), *aff'd*, 444 F. App'x at 620. While LoanCare could have elaborated its theories of duty and breach with more specificity during the trial, the Court concludes that Freedom was on notice of what LoanCare intended to prove under SSA Sections 2.9(c), 4.1(d), and 5.5.[5]

The critical exception, however, is LoanCare's assertion that Freedom breached SSA Section 8.4 (i.e., the indemnification provision).[6] At no point during this litigation—until its Rule 50(b) motion—did LoanCare specifically identify this theory of breach of contract. It was not included in LoanCare's summary judgment brief, [*see generally* Docket No. 129], its trial brief, [*see generally* Docket No. 302; *but see id.* at 28–29 (identifying entitlement to attorneys' fees under SSA § 8.4)], or the Joint Final Pretrial Order, [*see generally* Docket No. 196], and it was not presented to the Court or the jury during the trial. Resisting the argument that such theory is therefore inappropriately raised, LoanCare submits that it has not waived its position that

---

[5] Indeed, the Court would be straining to conclude otherwise. At the time that LoanCare made its Rule 50(a) motion, Freedom agreed that LoanCare's breach-of-contract counterclaim should be submitted to the jury. *See supra* note 4. If Freedom did not understand LoanCare's claim at the close of the evidence, it should not have conceded to submit the claim to the jury. If it understood LoanCare's claim, as the Court so concludes, it cannot now contend that it lacked a sufficient understanding—at least not persuasively.

[6] SSA Section 8.4 provides, in pertinent part, that Freedom "shall indemnify, defend and hold Subservicer [LoanCare] harmless from any and all Losses arising out of the conduct of Lender/Servicer [Freedom], including, but not limited to" various enumerated categories of conduct. [SSA § 8.4, Freedom's Ex. 2, Docket No. 69-1.]

Freedom breached SSA Section 8.4 because its theory of the case has remained consistent throughout this action.  [*See* LoanCare's Reply Supp. Renewed JMOL Mot. at 8–9, Docket No. 398.]  According to LoanCare, all that remains is for the Court to construe the plain text of SSA Section 8.4 and determine, as a matter of law, whether Freedom's retention of $22.7 million of LoanCare's funds constitutes a breach of the provision.  [*See id.* at 6.]  It further argues that the logic of the Court's conclusion to bar Freedom from pivoting to a similar theory during the trial does not apply, as Freedom's theory of breach of contract was much different from its belated indemnification theory under SSA Section 8.2.  [*See id.* at 8–9 (discussing *Freedom Mortg. Corp. v. LoanCare, LLC*, 2023 WL 4759162, at *13 n.9 (D.N.J. July 23, 2023)).]

The Court must reject LoanCare's strategic maneuver as a matter of fundamental fairness.  LoanCare's post-hoc assertion—that Freedom's retention of the $22.7 million violates SSA Section 8.4—comes too late.  Because LoanCare never identified until after the jury returned its verdict that the $22.7 million was a "Loss[] arising out of the conduct of [Freedom]" for which LoanCare expected Freedom to "indemnify, defend and hold [it] harmless" pursuant to SSA Section 8.4, the Court cannot find that Freedom had sufficient notice of this legal theory.  *See Acosta*, 717 F.2d at 831 (explaining that Rule 50(b) is "essentially a notice provision"); *see also, e.g.*, *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 622 (E.D. Pa. 1998) (finding that party's belated argument that contractual condition was material and could not be waived was itself waived under Rule 50(a) and Rules 50(b) because it was raised "for the first time" post-trial by party's new counsel); *Cipollone v. Liggett Grp., Inc.*, 693 F.

Supp. 208, 217–18 (D.N.J. 1988) (refusing to disturb jury's verdict to address position under N.J. STAT. ANN. § 12A:2-715(2)(b), raised for the first time post-trial, because "[i]t would be unfair to set aside the jury's verdict for a reason that could have been presented, discussed, and resolved before the verdict and not after"), *aff'd in part, rev'd in part on other grounds*, 893 F.2d 541 (3d Cir. 1990), *aff'd in part, rev'd in part on other grounds*, 505 U.S. 504 (1992); *cf. Chainey v. Street*, 523 F.3d 200, 209 (3d Cir. 2008) (finding that a statute of limitations defense was waived where asserted for the first time in a post-trial motion). As a result, LoanCare has waived its ability to raise this theory of breach of contract under Rule 50(b). *See Williams*, 130 F.3d at 571–72.

In so finding, the Court observes that the same logic applicable to its trial ruling regarding Freedom's belated indemnification theory is relevant here. *See Freedom Mortg. Corp. v. LoanCare, LLC*, 2023 WL 4759162, at *13 n.9 (D.N.J. July 23, 2023) (barring Freedom from asserting during the trial that LoanCare's servicing deficiencies constituted "Losses" for which it must indemnify Freedom under SSA Section 8.2 because the theory was not identified in the Joint Final Pretrial Order). It has long been settled that the final pretrial order "limits the issues for trial and in substance takes the place of pleadings." *Basista v. Weir*, 340 F.2d 74, 85 (3d Cir. 1965); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007); FED. R. CIV. P. 16. The " 'claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint.' " *Bornstein v. Cnty. of Monmouth*, 2015 WL 2125701, at *8 (D.N.J. May 6, 2015) (Thompson, J.) (quoting *Wilson v. Muckala*, 303

F.3d 1207, 1216 (10th Cir. 2002)). The purpose of limiting a party to the issues and theories identified in the final pretrial order is to ensure the "orderly and efficient trial of a case," *Petree v. Victor Fluid Power, Inc.*, 831 F.2d 1191, 1194 (3d Cir. 1987), and to prevent tactical maneuvers or unfair surprise during a trial, *see Krys v. Aaron*, 312 F.R.D. 373, 379 (D.N.J. 2015) (explaining that Rule 16 operates " 'to ensure the efficient resolution of cases and, most importantly, to minimize prejudicial surprise' ") (cleaned up) (quoting *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 684 (3d Cir. 2003)); *In re AT&T Sec. Litig.*, 2004 WL 6392120, at *5 (D.N.J. Apr. 7, 2004) (same); *see also Wilson*, 303 F.3d at 1216. Application of the rule often results in a finding of waiver. *See, e.g.*, *DiNenno v. Lucky Fin Water Sports, LLC*, 837 F. Supp. 2d 419, 424 (D.N.J. 2011) (adopting no findings of fact or conclusions of law as to negligent entrustment claim, despite introduction of relevant expert testimony during bench trial, because claim was not identified in final pretrial order or plaintiff's trial brief and plaintiff never moved to amend final pretrial order). Just as the Court precluded Freedom from pivoting to an entirely new theory of its case during the trial, the Court must prohibit LoanCare from seeking judgment post-trial as to a contractual provision that no one realized LoanCare was pursuing under Rule 50(a). *See Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*, 9 F.3d 422, 426 (6th Cir. 1993) ("A litigant must still present to the court a motion which clearly sets forth the *theory* on which the moving party bases his claim and which asks the court to resolve the issue.") (emphasis added) (first citing *Kladis v. Brezek*, 823 F.2d 1014, 1017 (7th Cir. 1987); then *Lowenstein*

*v. Pepsi-Cola Bottling Co.*, 536 F.2d 9, 11 (3d Cir.), *cert. denied*, 429 U.S. 966 (1976); and then citing FED. R. CIV. P. 50(a)).

Therefore, the Court concludes that, except as to SSA Section 8.4, LoanCare's post-trial motion under Rule 50(b) is submitted on the same grounds as its motion for a directed verdict under Rule 50(a), so the issues have been preserved. *See Lightning Lube, Inc. v. Witco. Corp.*, 4 F.3d 1153, 1172 (3d Cir. 1993) (explaining that "to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion"). The Court thus turns to the merits.

## B.

LoanCare seeks judgment as a matter of law on its contract claim (i.e., Count IV of LoanCare's Second Amended Counterclaim) because, in its view, the jury "necessarily found" that the $22.7 million of disputed funds belonged to LoanCare and the Subservicing Agreement clearly imposed an obligation on Freedom to return the money. [LoanCare's Mem. Supp. Renewed JMOL Mot. at 1, Docket No. 384-2.] LoanCare refers the Court to SSA Sections 2.9(c), 4.1(d), 5.5, and 8.4. [*Id.* at 5–6.] Countering this argument, Freedom first argues that the jury reasonably concluded that the $22.7 million was not a "Loss[] directly associated with the servicing of the Loans," per Section 2.9(c). [Freedom's Opp'n LoanCare's Renewed JMOL Mot. at 4–7, Docket No. 392.] Second, Freedom claims that the jury permissibly found that it did not breach Sections 4.1(d), 5.5, and 8.4 because LoanCare failed to adequately explain its theories of duty and breach to the jury. [*Id.* at 7–9.] Third, Freedom

contends alternatively that the jury could have reasonably concluded that its retention of the $22.7 million did not breach these provisions. [*Id.* at 10–14.] The Court considers these arguments after addressing the applicable standard.

Under Rule 50(b), a party may renew its previously filed motion for judgment as a matter of law. FED. R. CIV. P. 50(b); *In re Prosser*, 534 F. App'x 126, 131 (3d Cir. 2013) (noting that a party's post-trial motion under Rule 50(b) "is nothing more than a renewal of the earlier motion") (citation omitted). "A judgment notwithstanding the verdict may be granted under Rule 50(b) only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (cleaned up) (citing *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001)). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978) (citation and quotation marks omitted). "To prevail on a renewed motion for JMOL following a jury trial, [the moving] party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied by the jury's verdict cannot in law be supported by those findings." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1326 (Fed. Cir. 2016) (internal quotations marks and citation omitted).

When considering a Rule 50(b) motion, courts must view the evidence "in the light most favorable to the nonmovant" and give it "the advantage of every fair and

reasonable inference." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citing *Wittekamp v. Gulf & W. Inc.*, 991 F.2d 1137, 1141 (3d Cir. 1993)); *see also Dudley v. S. Jersey Metal, Inc.*, 555 F.2d 96, 101 (3d Cir. 1977). The Court is mindful that overturning a jury's verdict via a Rule 50(b) motion is extraordinary relief that should be granted "sparingly." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 373 (3d Cir. 2016); *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 921 (3d Cir. 1986); *see also Freedom Mortg. Corp. v. LoanCare, LLC*, 2023 WL 4759162, at *6 (D.N.J. July 23, 2023) (outlining similarly applicable standards under Rule 50(a)).

Here, as the jury found that Freedom was *not* liable as to LoanCare's affirmative contract claim, the question is essentially whether a jury, weighing the record evidence as a whole, could have reasonably concluded that LoanCare failed to meet its burden of proof as to each of the provisions of the SSA that the Court found were not waived. *See Express Mobile, Inc. v. GoDaddy.com, LLC*, 680 F. Supp. 3d 517, 524 (D. Del. 2023) ("To grant JMOL on infringement in favor of Express Mobile, the party with the burden of proof, the Court 'must be able to say not only that there is sufficient evidence to support the finding sought by Express Mobile . . . but additionally that there is *insufficient evidence for permitting any different finding.*' ") (quoting *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976)); *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002) ("Key to surviving a Rule 50 motion is a legally sufficient evidentiary basis for the verdict."); *see also, e.g.*, *Roche Diagnostics Operations,*

*Inc. v. Abbott Diabetes Care*, 756 F. Supp. 2d 598, 603 (D. Del. 2010) (concluding that counterclaimant was not entitled to judgment as a matter of law on its unfair competition claim because record evidence, taken as a whole and in the light most favorable to counterclaim defendant, supported jury's verdict in favor of counterclaim defendant), *aff'd sub nom. Roche Diagnostics Operations, Inc. v. Lifescan Inc.*, 452 F. App'x 989 (Fed Cir. 2012).

In this case, LoanCare had the burden of proving three elements to prevail on its counterclaim for breach of contract: (1) "That Freedom had a legally enforceable obligation to LoanCare"; (2) "That Freedom breached its obligation to LoanCare"; and (3) "That LoanCare's injuries or damages were caused by Freedom's breach." [Final Jury Charges at 25, Docket No. 364.] *See Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004) (explaining that the elements of breach of contract are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation") (citations omitted).  During the trial, LoanCare explained its theory of breach of contract to the jury as follows:

> Finally, what they did also breached the contract between the parties. This is – you've been instructed if there's a legally enforced [sic] obligation which has been broken, we're entitled to the damages that that breach has caused.
>
> Now, clearly, you had a contract here. In one section of it, 2.9, says that the lender/servicer, which is Freedom, shall remain responsible for all losses directly associated with servicing of the loans, including . . . and then it lists everything.

So, clearly, if they took money and didn't give it back, it didn't belong to them, that is also a breach of contract, and that amount is also the $22.7 million. And here, too, if you agree, the answer should be "Yes," and the total amount of damages that you should award is the $22.693 million.

[Trial Tr. at 2346:23–2347:11, Docket No. 379 (ellipsis in original).] The jury, however, returned a verdict in Freedom's favor. [Docket No. 365, at 2.]

In support of its Rule 50(b) motion, LoanCare submits that this result cannot follow because the record evidence is undisputed that Freedom was supposed to receive $78 million in connection with the May 2016 transfer as the parties severed their contractual relationship, that it received more than $78 million, that it wrongfully blocked LoanCare's ability to withdraw funds from the parties' custodial accounts, that it later moved $22.7 million out of the custodial accounts, and that it could never reconcile the $22.7 million of LoanCare's funds that it retained. [LoanCare's Mem. Supp. Renewed JMOL Mot. at 2–4 (citing trial evidence).] Clearly, the jury found that Freedom's conduct constituted conversion, fraudulent inducement, and unjust enrichment; the jury determined that LoanCare had met its burden of proving that the $22.7 million belonged to LoanCare and that Freedom had wrongfully taken the money. The Court does not understand Freedom to disagree meaningfully with the jury's verdict on this score, even though it continues to insist on referring to the $22.7 million as "disputed funds." Accordingly, the Court accepts as true that Freedom is in possession of $22.7 million to which it is not entitled. The relevant question is thus whether Freedom's retention of LoanCare's money translates into a breach of the parties' contract.

Begin with Section 2.9(c) of the Subservicing Agreement—the only contractual provision identified to the jury. [*See* Trial Tr. at 2346:23–2347:11.] Under that provision, Freedom "shall remain responsible, as between [Freedom] and [LoanCare], for all Losses directly associated with the servicing of the Loans." [SSA § 2.9(c), Freedom's Ex. 2, Docket No. 69-1.[7]] "Losses" are broadly defined to include "losses, damages, liabilities, actions, suits, proceedings, claims, demands, Taxes, sanctions, deficiencies, assessments, judgments, costs, interest, penalties and expenses," but not "punitive, consequential, exemplary or special damages suffered or incurred by a Party arising out of [the SSA]." [SSA § 1.33.] And Section 2.9(c) includes a non-exclusive list of examples of "Losses directly associated with the servicing of the Loans." [*See* SSA § 2.9(c); *see also infra* note 7.] Citing SSA Sections 2.4(g) and 4.4,[8] LoanCare

---

[7] The full provision reads as follows:

Except as expressly set forth in this Agreement, Lender/Servicer shall remain responsible, as between Lender/Servicer and Subservicer, for all Losses directly associated with the servicing of the Loans, including, without limitation, recourse losses, pool insurance premiums, hazard insurance premiums, trustee fees, earthquake losses, foreclosure losses, REO losses, interest shortfalls due to timing of prepayments and liquidations required under the terms of the applicable servicing agreements, custodial fees, Advances, interest on escrows, and other similar loan-related items incident to the ownership of the servicing rights to the Loans, except for those Losses directly resulting from the failure of Subservicer to comply with or otherwise perform its obligations under this Agreement[.]

[SSA § 2.9(c).]

[8] SSA Section 4.4, for instance, permits LoanCare to charge, and requires Freedom to pay, a "deconversion fee" (as listed on <u>Schedule II</u>) for loans associated with a transfer of servicing upon a termination of the Subservicing Agreement. [*See* SSA § 4.4.]

submits that its transfer of the loan portfolio back to Freedom constituted "servicing of the Loans," per Section 2.9(c). [LoanCare's Mem. Supp. Renewed JMOL Mot. at 5, Docket No. 384-2.] Putting the pieces together, LoanCare contends that the $22.7 million clearly represents a Loss "directly associated with the servicing of the Loans" and that the jury wrongly concluded that Freedom's retention of these funds did not breach this provision. [*See id.*]

The Court must agree. A reasonable jury should have concluded, based on the trial evidence, that Freedom breached Section 2.9(c) by failing to return $22.7 million of LoanCare's funds because Freedom was responsible for "all Losses directly associated with the servicing of the Loans." [SSA § 2.9(c).] This was the only reasonable conclusion because, when Freedom failed to return LoanCare's funds following the May 2016 transfer, LoanCare suffered a (i) "Loss[]" that was (ii) "directly associated with the servicing of the Loans." As explained below, LoanCare demonstrated by sufficient evidence all of the elements required to establish a breach of Section 2.9(c), *see Filak*, 594 S.E.2d at 614, and Freedom has failed to identify any contrary evidentiary basis to support the jury's finding of no liability, making judgment as a matter of law proper, *see Goodman*, 293 F.3d at 665 ("Key to surviving a Rule 50 motion is a legally sufficient evidentiary basis for the verdict.").

First, the trial evidence established that LoanCare suffered a "Loss[]." The evidence was undisputed that Freedom was only entitled to $78 million in connection with the May 2016 transfer, [*see* Tr. at 1809:7–11, 1817:5–7, 1914:18–20 (Kimberly Hare); Tr. at 1931:18–19 (Marcel Bryar); Tr. at 2190:12–2191:7 (Leigh Yasenchak);

41

LoanCare's Exs. 98, 113, 129], that LoanCare deposited significantly more than $78 million in the parties' custodial accounts, [*see* Tr. at 1914:21–22 (Hare); Tr. at 1942:12–19 (Bryar)], that Freedom moved about $22.7 million from the custodial accounts into its own corporate account while blocking LoanCare's ability to debit escrow funds, [*see* Tr. at 1771:8–23, 1774:2–8, 1787:3–13 (David Firestone); Tr. at 1958:22–1959:1–7 (Bryar); LoanCare's Ex. 144], that Freedom was never able to reconcile this figure, [*see* Tr. at 1915:6–8 (Hare)], and that Freedom has never returned the $22.7 million, [*see* Tr. at 1839:2–4, 1914:23–24 (Hare)]. The evidence even showed that the $22.7 million was referred to as "LC money" on Freedom's books and records. [*See* LoanCare's Ex. 142; Tr. at 1772:12–14, 1787:3–13 (Firestone).] And, again, the Court does not understand Freedom to seriously dispute for the purposes of the pending Rule 50 motion that LoanCare suffered a loss. Because the undisputed evidence clearly demonstrated that LoanCare was deprived of its money, the jury should have concluded that LoanCare sustained a "Loss[]."

LoanCare's loss was also "directly associated with the servicing of the Loans." [*See* SSA § 2.9(c).] When LoanCare transferred the loans back to Freedom and deposited funds in the parties' custodial accounts, LoanCare's conduct was pursuant to the terms, conditions, and obligations of the parties' contract. The Subservicing Agreement provided for periodic service releases of the loans, [*see* SSA § 2.4(g)], and the payment of "deconversion fees" in consideration of LoanCare's work transferring subservicing of the loans, [*see* SSA § 4.4]. Freedom recognized that it had to pay deconversion fees to LoanCare to bring its loan portfolio "in-house," [*see* Tr. at

1789:10–12 (Firestone)], and the evidence demonstrated that LoanCare transferred the loan portfolio back to Freedom at Freedom's own instruction, [*see* Tr. at 1812:5–7 (Hare); Tr. at 1931:6–13 (Marcel Bryar)]. As Marcel Bryar testified, servicing transfers of this nature are common in the industry, [*see* Tr. at 1923:22–24], supporting the proposition that LoanCare's conduct was directly associated with the servicing of the loans. Notably, Freedom cites no record evidence to support the contrary assertion. As a result, the Court concludes that there was no legitimate basis for the jury not to find that LoanCare's loss was "directly associated with the servicing of the loans." *See In re Lemington*, 777 F.3d at 626 (explaining that a court may grant a Rule 50(b) motion if the record is "critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief") (citation omitted).

In so concluding, the Court finds Freedom's contrary arguments unavailing. For instance, Freedom contends that the jury could have concluded that LoanCare's loss did not qualify under Section 2.9(c) because it related to a servicing transfer. Freedom attempts to draw a distinction between "transferring the servicing of the loans" and "servicing of the loans." [Freedom's Opp'n LoanCare's Renewed JMOL Mot. at 5–7.] Focusing on the list of examples of "Losses" identified in the contractual provision, Freedom cites the *noscitur a sociis* and *ejusdem generis* maxims in support of its position and argues that the jury could have determined that LoanCare's loss was unlike "recourse losses," "earthquake losses," or "other similar loan related items incident to the ownership of the servicing rights to the Loans," to name a few. [*See id.*;

SSA § 2.9(c).]  These interpretative doctrines are not relevant to the question that was submitted to the jury.

Courts often employ the *noscitur a sociis* canon and the related *ejusdem generis* rule when construing ambiguous text.  *See, e.g.*, *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 258 (3d Cir. 2000).  The former "instructs that a provision should not be viewed 'in isolation but in light of the words that accompany it and give it meaning.' " *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 688 (3d Cir. 1991) (quoting *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989)); *see also United States v. Williams*, 553 U.S. 285, 294 (2008) (explaining that *noscitur a sociis* "counsels that a word is given more precise content by the neighboring words with which it is associated").  The latter canon provides that, "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *United States v. Weadon*, 145 F.3d 158, 160 (3d Cir. 1998) (internal quotation marks and citation omitted); *see also Yates v. United States*, 574 U.S. 528, 544–45 (2015) (distinguishing between the two related doctrines).  These canons only apply, however, when there is uncertainty as to the meaning of a text.  *See Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980); *In re Cont'l Airlines, Inc.*, 932 F.2d 282, 288 (3d Cir. 1991).

Here, there is no ambiguity about the losses for which Freedom remained responsible.  Section 2.9(c) provides that Freedom remained responsible for "*all* Losses directly associated with the servicing of the loans."  [SSA § 2.9(c) (emphasis added).]

The prefatory word "all" is unrestrictive, embracing an expansive construction that *any* loss directly associated with servicing of the loans is covered under the provision. *See Ram Const. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir. 1984) (explaining that contract construction is an issue of law for the court). Freedom's attempt to limit the scope of this provision by focusing on the examples contained in the associated list of "Losses" is unpersuasive, as the key phrase—"including, without limitation"— precedes the list. [*See* SSA § 2.9(c).] In so providing, "the parties unambiguously stated that the list was not exhaustive." *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 280 (3d Cir. 1995). And because the parties invoked this phrase, they clearly expressed an intent not to limit "Losses" under Section 2.9(c) in accordance with the canons *noscitur a sociis* and *ejusdem generis*. *See id.* (rejecting argument that contractual language should be governed in accordance with *ejusdem generis* rule where "including, but not limited to" was used). Said differently, Freedom was responsible for *any* losses that were directly associated with servicing the loans, not just the examples identified in Section 2.9(c).

With this framing, the jury could not have concluded that LoanCare's $22.7 million loss "transferring the servicing of the loans" was the result of anything other than "servicing of the loans." The evidence demonstrated that LoanCare was acting in accordance with the terms, conditions, and obligations of the Subservicing Agreement when the May 2016 transfer occurred. In fact, it was acting pursuant to its counterparty's express instructions. Its loan-transfer activities were thus part and parcel of its servicing responsibilities under the contract. So, when Freedom seized

LoanCare's funds after the transfer, LoanCare incurred a $22.7 million loss that was "directly associated with servicing of the loans." [SSA § 2.9(c).] Because Freedom has not cited any record evidence to the contrary, the Court concludes that the jury's verdict cannot be sustained as to LoanCare's counterclaim and that judgment as a matter of law is therefore warranted in LoanCare's favor as to breach of SSA Section 2.9(c). *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 365 n.11 (3d Cir. 1999) ("A litigant with the burden of persuasion is entitled to judgment as a matter of law at the close of the evidence only in the very rare case where a decision in its favor is mandated by evidence the trier of fact is not at liberty to disbelieve and no inference contrary to its position can be drawn from the undisputable facts.") (citation omitted).

Next, consider Sections 4.1(d) and 5.5 of the Subservicing Agreement. Under Section 4.1(d), LoanCare was entitled to deduct certain fees, including "Advances," from its monthly remittances to Freedom. [*See* SSA § 4.1(d).[9]] In other words, the

_____

[9] Specifically, the provision provides as follows:

Unless otherwise expressly stated to the contrary, Subservicer shall deduct all fees, including without limitation, Special Services and Other Charges, all payments, expenses, Advances, any and all other sums payable to Subservicer by Lender/Servicer hereunder for any reason, from amounts due and payable to Lender/Servicer monthly, and in the event there are insufficient funds due and payable to Lender/Servicer to cover any sum due and payable to Subservicer, together with all amounts due to Subservicer under Subsection 2.3 of this [SSA]. All sums advanced by Subservicer shall be subject to a finance charge equal to per annum interest of four percent (4%) above the Prime Rate from the date of the Advance until the invoice is paid. Should, at any point, the subject finance charge exceed any Applicable Requirement, Subservicer shall

provision entitled LoanCare to subtract all sums due to LoanCare from any amounts due to Freedom. [*Id.*] It also entitled LoanCare to charge Freedom interest on advanced sums (i.e., where a LoanCare deduction exceeded the value of an amount owed to Freedom). [*Id.*] Under Section 5.5, upon a termination of the SSA, LoanCare was obligated to account for all funds collected under every applicable note and mortgage and to turn over such funds to Freedom. [SSA § 5.5.[10]] Freedom was in turn obligated to reimburse LoanCare "for all expenses incurred in connection with the deliveries and notices required" under Section 5.5. [*Id.*] In support of its Rule 50(b) motion, LoanCare submits that Freedom's failure to return the $22.7 million breached these provisions because Section 4.1(d) obligated Freedom to reimburse LoanCare if there were insufficient funds to cover "any and all" amounts payable to

---

charge, and Lender/Servicer shall pay, the maximum amount allowed by such Applicable Requirement[.]

[SSA § 4.1(d).]

[10] Specifically, the provision provides as follows:

Upon any termination of this [SSA], Subservicer will account for and turn over to Lender/Servicer, Lender/Servicer's designee, or the appropriate Investor or such Investor's designee, all funds collected under each Note and Mortgage, less the compensation and any fees then due Subservicer, and deliver to Lender/Subservicer, Lender/Servicer's designee, such Investor or such Investor's designee all records and documents relating to each Loan then subserviced and will advise Borrowers that their Loans will henceforth be serviced by Lender/Servicer, Lender/Servicer's designee, such Investor or such Investor's designee. Lender/Servicer shall reimburse Subservicer for all expenses incurred in connection with the deliveries and notices required by this Subsection 5.5.

[SSA § 5.5.]

LoanCare and Section 5.5 required "an accounting at termination," which Freedom failed to do. [LoanCare's Mem. Supp. Renewed JMOL Mot. at 6.] In LoanCare's view, "[o]nly one fact matters" to determine whether these provisions were breached: that Freedom owed LoanCare the $22.7 million that Freedom stole. [LoanCare's Reply Supp. Renewed JMOL Mot. at 6.]

As to these provisions, the Court disagrees with LoanCare's submission. To prevail, LoanCare was required to demonstrate by sufficient evidence: (1) "That Freedom had a legally enforceable obligation to LoanCare"; (2) "That Freedom breached its obligation to LoanCare"; and (3) "That LoanCare's injuries or damages were caused by Freedom's breach." [Final Jury Charges at 25, Docket No. 364.] *See Filak*, 594 S.E.2d at 614 (stating elements of breach of contract under Virginia law). Even assuming that the jury was aware of LoanCare's position that Freedom's retention of the $22.7 million breached SSA Sections 4.1(d) and 5.5 (in addition to Section 2.9(c)),[11] it could have reasonably determined that LoanCare failed to meet its

---

[11] The Court recognizes that there is reason to question this assumption. LoanCare never argued to the jury that Freedom breached Sections 4.1(d) and 5.5 of the Subservicing Agreement. [*See* Trial Tr. at 2346:23–2347:11, Docket No. 379.] It now falls back on a familiar refrain—"[t]he jury had the contract," "[t]he instructions were broad enough to embrace every section of the agreement." [LoanCare's Reply Supp. Renewed JMOL Mot. at 8.] But this is hardly a sufficient response. The jury's role here was to determine whether LoanCare had proven by a preponderance of the evidence that "Freedom breached the Subservicing Agreement by failing to return money to LoanCare." [Jury Verdict Sheet at 2, Docket No. 365.] Without LoanCare's direction, the Court finds it unlikely that the jurors reviewed a sophisticated contract on their own initiative as if they were lawyers, searching for a duty that was breached based on the evidence presented. Still, the Court will not find a waiver or forfeiture, as Freedom seeks, [*see* Freedom's Opp'n LoanCare's Renewed JMOL Mot. at 7–9],

burden of proof. Both involved complicated and detailed accounting mechanics that were not spelled out at trial. As to Section 4.1(d), the jury could have reasonably concluded that Freedom's wrongful retention of LoanCare's $22.7 million in connection with the servicing transfer did not breach any duty imposed on Freedom to return the funds. LoanCare has simply assumed that Section 4.1(d) imposed such an obligation. True enough, the provision permitted LoanCare to deduct fees (including money it advanced) from its monthly remittances to Freedom and to charge interest when there were not enough funds due to Freedom to cover amounts owed to LoanCare. [*See* SSA § 4.1(d).] But LoanCare has not adequately explained how the provision imposed an obligation on Freedom to return the $22.7 million when LoanCare deposited surplus funds in the parties' custodial accounts. [*See id.*] Despite all the trial evidence that LoanCare cites establishing that Freedom was only entitled to $78 million and that the $22.7 million did not belong to Freedom, LoanCare does not sufficiently explain why a jury must have agreed with its position that Freedom breached Section 4.1(d) by failing to return the money. As a result, the Court cannot conclude that the jury should have found in LoanCare's favor as to Section 4.1(d). *See Express Mobile*, 680 F. Supp. 3d at 527 ("It is not enough for Express Mobile to argue the jury *should* have found in its favor[;] it must establish 'there is insufficient evidence

_____

because SSA Sections 2.9(c), 4.1(d), and 5.5 were adequately identified as LoanCare's theories of breach prior to trial and the pertinent question at this stage is whether a reasonable jury could have concluded that LoanCare failed to meet its burden of proof as to SSA Sections 4.1(d) and 5.5.

for permitting *any different finding*' other than that of [liability].") (quoting *Fireman's Fund Ins. Co.*, 540 F.2d at 1171).

As to Section 5.5, the jury also could have reasonably determined that Freedom did not breach any duty owed to LoanCare. Upon termination of the Subservicing Agreement, Section 5.5 required LoanCare to account for and turn over to Freedom "all funds collected under each Note and Mortgage, less the compensation and any fees then due [LoanCare]." [SSA § 5.5.] Also, LoanCare was required to "deliver to [Freedom] . . . all records and documents related to each Loan then subserviced" and to "advise Borrowers that their Loans [would] henceforth be serviced by [Freedom]." [*Id.*] Finally, it imposed a duty on Freedom to reimburse LoanCare for "all expenses incurred in connection with the deliveries and notices required by [Section 5.5]." [*Id.*] The jury could have reasonably concluded that LoanCare's evidence that Freedom stole the $22.7 million did not sufficiently demonstrate that Freedom failed to reimburse LoanCare for expenses incurred pursuant to Section 5.5. LoanCare fails to show how the wrongful retention represents an "expense incurred in connection with the deliveries and notices required by [Section 5.5]." Because LoanCare failed to show how it met its burden of proof at trial as to Sections 4.1(d) and 5.5, the Court must conclude that the record is not "critically deficient of that minimum quantity of evidence from which a jury might reasonably" have found in favor of Freedom. *In re Lemington*, 777 F.3d at 626; *see also Express Mobile*, 680 F. Supp. 3d at 527. Therefore, LoanCare is not entitled to judgment as a matter of law as to its claim for breach of Sections 4.1(d) and 5.5 either.

Finally, the Court does not consider the merits of LoanCare's theory of breach as to Section 8.4, as the Court concluded that LoanCare failed to properly identify this contractual theory until its post-trial Rule 50(b) motion. *See supra* Section V.A. That it cannot do. *See, e.g.*, *McDermott*, 11 F. Supp. 2d at 622 ("Because Nasuti failed to raise the issue of the materiality of the condition in his Rule 50(a) and 50(b) motions, the issue was waived.").

Therefore, the Court concludes that, pursuant to Rule 50(b), LoanCare is entitled to judgment as a matter of law on its contract claim as to SSA Section 2.9(c) (i.e., Count IV of its Second Amended Counterclaim), but that it is not entitled to judgment as a matter of law as to its other contractual theories.

## VI.

Accordingly, the Court having carefully considered the parties' post-trial submissions,[12] and for the reasons set forth above, and for good cause shown,

**IT IS**, on this <u>27th</u> day of <u>June</u> <u>2024</u>, hereby:

1.      **ORDERED** that Freedom's Motion to Amend the Judgment [Docket No. 382] is **DENIED**; and it is further

2.      **ORDERED** that LoanCare's Motion to Amend the Judgment [Docket No. 383] is **GRANTED**; and it is finally

---

[12] The Court leaves for another day LoanCare's Motion for Attorneys' Fees and Expenses.  [Docket No. 384.]

3.    **ORDERED** that LoanCare's Renewed Motion for Judgment as a Matter of Law [Docket No. 383] is **GRANTED**, and that an amended final judgment shall issue separately.

<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge